**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHEN BURR and DAVID TANGEMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>EQUITY BANCSHARES, INC., BRAD S. ELLIOTT, and GREGORY H. KOSSOVER,<br><br>Defendants. | Case No. 19-cv-04346<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

1.      Lead Plaintiffs Stephen Burr and David Tangeman ("Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, bring this securities class action on behalf of persons and entities that purchased or otherwise acquired Equity Bancshares securities between April 20, 2018 and April 23, 2019, inclusive (the "Class Period").  Lead Plaintiffs assert claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), against Equity Bancshares and its top executive officers, Brad S. Elliot, Equity Bank's Chairman and Chief Executive Officer ("CEO") and Greg Kossover, Equity Bank's Executive Vice President and Chief Financial Officer ("CFO").

2.      Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.  Lead Plaintiffs' information and belief is based upon, among other things, Lead Counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Equity Bancshares, Inc. ("Equity Bank" or "Equity Bancshares" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Equity Bancshares; (c) review of other publicly available information concerning Equity Bancshares, including information obtained from the United States Bankruptcy Court and; (d) interviews of former employees of Equity Bank.

## I.    <u>INTRODUCTION</u>

3.      This case concerns Equity Bancshares, a bank holding company and its wholly-owned banking subsidiary, Equity Bank's, concealment and "extend and pretend" practices related to two problematic loans that represented Equity Bank's largest credit relationship – ultimately resulting in Equity Bank taking a $14.5 million loss against its loss reserves in Q1

2019 – perpetrated by Equity Bank's most senior officers, including CEO Elliott and CFO Kossover. While concealing these problem loans in 2018, Defendants portrayed Equity Bank as a growing and prosperous bank in dozens of earnings releases, SEC filings and other public statements issued during the Class Period.

4.     Defendants assured investors that "[o]ur credit quality remains strong" and that throughout 2018 the bank's credit "[q]uality has improved year-to-date as we have worked down nonaccruals," and "[o]ur percentage of nonperforming assets to total assets has improved."

5.     Unbeknownst to investors, as a part of Defendants were perpetrating an "extend and pretend" scheme, and a mere six months prior to these entities' precipitous bankruptcies, Equity Bank repapered the loan agreements with the borrowers. One entity is a well-known cupcake franchise called "Gigi's Cupcakes" and the other is "Mr. Gatti's Pizza," which is a pizza and entertainment franchise. Both entities had been in dire financial straits leading up to 2018.

6.      Between December 2015 and January 2018, Equity Bank had loaned Gigi's and Gatti's approximately $29,500,000. Based on those loans, Gigi's and Gatti's owed Equity Bank payments in the amount of approximately $6.1 million due in 2018. Gigi's and Gatti's did not have the cash to repay these loans and, according to one former employee, the loans were already four to five months delinquent by mid-2018. Thus, on June 28, 2018, Defendants repapered the loans to Gatti's and Gigi's, in the amounts of *$20,250,000* and *$9,250,000*, respectively.

7.     Through Defendants' concealment of the problematic loans and "extend and pretend" practices, Equity Bank did not have to take a loss against its loan reserves in 2018, resulting in continued favorable analyst reports. Indeed, on January 3, 2019, one analyst reported that "over the past year EQBK's shares have significantly outperformed its peers on a

relative basis." In response to Defendants' statements and omissions, Equity Bank's stock reached a Class Period high of $43.87 before the corrective disclosures were revealed to investors.

8.   Unfortunately for investors, Defendants' Class Period statements were false and misleading. Investors began to partially learn this truth on January 24, 2019, when Equity Bank disclosed that, during fourth quarter 2018, a credit relationship was downgraded to Watch and Substandard for $19 million and $9 million, respectively. On this news, the Company's share price fell $2.14, or more than 6%, to close at $32.15 per share on January 24, 2019, on unusually heavy trading volume.

9.   On April 22, 2019, Defendants shocked the market and disclosed a $14.5 million provision for loss against a credit relationship, resulting in a $4.1 million net loss for first quarter 2019. In a conference call held on April 23, 2019, Defendants reported: (i) the $14.5 million loss taken against the loans; (ii) that those loans represented the bank's largest credit relationship of over $40 million and; (iii) those borrowers had filed for Chapter 11 bankruptcy on January 4, 2019.

10.   The April 2019 disclosures stunned analysts who raised questions regarding the concealment of the issues with the Company's largest credit relationship, with one analyst questioning, "I guess I'm just curious why, if that was the case, we didn't hear about this relationship until today."

11.   In response to Defendants' unexpected disclosures, the Company's share price plummeted to $4.76, or more than 16%, to close at $24.71 per share on April 23, 2019, on unusually heavy trading volume.

12.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have

suffered significant losses and damages.  Equity Bank's stock has never recovered from the misconduct alleged herein, and currently trades at $25.63, a fraction of its Class Period high price of $43.87.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

16.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

17.    Plaintiff Stephen Burr, purchased Equity Bancshares securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  On August 16, 2019, the Court appointed Burr Lead Plaintiff in this litigation.

18.     Plaintiff David Tangeman, purchased Equity Bancshares securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  On August 16, 2019, the Court appointed Tangeman Lead Plaintiff in this litigation.

**B.     Defendants**

19.      Defendant Equity Bancshares is incorporated under the laws of Kansas with its principal executive offices located in Wichita, Kansas.  Equity Bancshares's common stock trades on the NASDAQ exchange under the symbol "EQBK."

20.     Defendant Brad S. Elliott ("Elliott") is Equity Bank's founder, Chairman and the Chief Executive Officer of Equity Bancshares and Equity Bank.  Defendant Elliot serves on the Corporate Governance Committee, Credit Committee and Risk Committee.  During the Class Period, Defendant Elliott reviewed, approved and signed Equity Bancshare's false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certification").  Defendant Elliott also participated in conference calls with securities analysts, during which Equity Bank's false and misleading SEC filings and press releases were presented and discussed.

21.     Defendant Gregory H. Kossover ("Kossover") is the Executive Vice President and CFO of Equity Bancshares and Equity Bank.  Defendant Kossover serves on the Credit Committee and Risk Committee.  During the Class Period, Defendant Kossover reviewed, approved and signed Equity Bancshare's false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certification").  Defendant Kossover also participated in conference calls with securities analysts, during which Equity Bank's false and misleading SEC filings and press releases were presented and discussed.

22.     Defendants Elliott and Kossover (collectively the "Individual Defendants"),

because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein.

### C.   Relevant Non-Parties

#### 1.   Gatti's/Sovrano

23.   Gatti's is a Texas-based pizza restaurant and franchise business.   In June 2015, Sovrano acquired the Gatti's franchise.   Sovrano is the direct or indirect parent of Mr. Gatti's L.P. and Gatti's Great Pizza, Inc.

#### 2.   Gigi's

24.   Gigi's stores are bakery shops offering upscale cupcakes.   In June 2016, Gigi's Cupcakes purchased the assets of the Gigi's franchise system from Gigi's Franchising, LLC. KeyCorp is the parent of Gigi's Cupcakes and Gigi's Operating and indirect parent of Gigi's Operating II.

#### 3.   Phillips and Mann

25.   Robert J. Phillips, Jr. ("Phillips") owns and operates Gatti's and Gigi's and is Sovrano's Chairman and CEO.   Phillips holds an 80% interest in Sovrano and KeyCorp.

26.     Kyle C. Mann ("Mann") owns and operates Gatti's and Gigi's and is Sovrano's Vice-Chairman.  Mann holds a 20% interest in Sovrano and KeyCorp.

IV.     **BACKGROUND**

        A.     **Equity Bank's Business**

27.     Equity Bancshares is a bank holding company and its wholly-owned banking subsidiary, Equity Bank, purports to provide a broad range of financial services primarily to businesses, business owners and individuals.  Equity Bank has branches in Arkansas, Kansas, Missouri, and Oklahoma.

28.     Equity Bank was founded in 2002 in Andover, Kansas by Defendant Elliot and has since expanded by acquiring and consolidating community banks and branch networks. Between June 2003 and August 2018, Equity Bank acquired fourteen (14) community banks.

29.     These acquisitions are purportedly reflective of Equity Bank's strategy. Equity Bank describes to its investors, "We believe we are a leading provider of commercial and personal banking services to businesses and business owners as well as individuals in our targeted Midwestern markets. Our strategy is to continue strategically consolidating community banks within such markets and maintaining our organic growth, while preserving our asset quality through disciplined lending practices."

        1.     **Equity Bank Touted Its Focus On Commercial Loans**

30.     During the Class Period, Defendants touted Equity Bank's focus on identifying and disposing of problematic loans and its growth in the commercial loan portfolio, which Defendants considered to offer higher return opportunities.

31.     According to Equity Bank's 2018 10-K, Equity Bank reported that it was primarily a commercial bank and, as of December 31, 2018, commercial loans comprised over 71.2% of Equity Bank's loan portfolio.  Defendants touted their "relationship-based approach" to

commercial lending, stating that the approach seeks to grow lending relationships with customer

as they expand their businesses.

32.     In Equity Bank's SEC filings, Defendants assured investors that Equity Bank had

policies in place to identify and address non-performing loans through risk management. For

example, Equity Bank stated:

> **Strong Risk Management Practices**. We place significant emphasis on risk management as an integral component of our organizational culture without sacrificing growth. We believe our comprehensive risk management system is designed to make sure that we have sound policies, procedures and practices for the management of key risks under our risk framework (which includes market, operational, liquidity, interest rate sensitivity, credit, insurance, regulatory, legal and reputational risk) and that any exceptions are reported by senior management to our board of directors or audit committee. Our risk management practices are overseen by the Chairmen of our audit and risk committees, who have many years of combined banking experience, and our Chief Risk Officer, who has more than 30 years of banking experience. We believe that our enterprise risk management philosophy has been important in gaining and maintaining the confidence of our various constituencies and growing our business and footprint within our markets. We also believe our strong risk management practices are manifested in our asset quality statistics.

## 2.     Equity Bank's Purported Classification Of Non-Performing Loans

33.     The underlying performance of a bank's loans is critical to its financial health and

financial results. As a result, of paramount importance to investors is a bank's adherence to

lending standards and careful attention to potentially non-performing loans.

34.     Equity Bank similarly assured investors that it had strategies in place for

identifying and classifying potential problem loans based on risk categories.   According to

Equity Bank's 2018 10-K, these included four categories: (i) Pass; (ii) Special Mention; (iii)

Substandard; and (iv) Doubtful.

35.     More specifically, Equity Bank's 2018 10-K described these four categories as

follows:

> **Pass**: Loans classified as pass do not have any noted weaknesses and repayment of the loan is expected. These loans are considered unclassified.

**Special Mention**: Loans classified as special mention have a potential weakness that deserves management's close attention. If left uncorrected, these potential weaknesses may result in deterioration of the repayment prospects for the loan or of our credit position at some future date. These loans are considered classified.

**Substandard**: Loans classified as substandard are inadequately protected by the current net worth and paying capacity of the obligor or of the collateral pledged, if any. Loans so classified have a well-defined weakness or weaknesses that jeopardize the liquidation of the debt. They are characterized by the distinct possibility that the institution will sustain some loss if the deficiencies are not corrected. These loans are considered classified.

**Doubtful**: Loans classified as doubtful have all the weaknesses inherent in those classified as substandard, with the added characteristic that the weaknesses make collection or liquidation in full, on the basis of currently existing facts, conditions, and values, highly questionable and improbable. These loans are considered classified.

Potential problem loans consist of loans that are performing in accordance with contractual terms, but for which management has concerns about the borrower's ability to comply with repayment terms because of the borrower's potential financial difficulties. Potential problem loans are assigned a grade of special mention or substandard. At December 31, 2018, the Company had $52.9 million in potential problem loans which were not included in either nonaccrual or 90 days past due categories, compared to $21.1 million at December 31, 2017.

### 3. Equity Bank's Accounting Policies For Non-Performing Loans And Loan Loss Reserves

36.     Accounting for non-performing loans and loan loss reserves are critical aspects of the financial performance of a bank.

37.     In Equity Bank's SEC filings, Defendants assured investors that Equity Bank had critical accounting policies in place for non-performing loans, *i.e.*, for impaired loans:

**Impaired Loans**: A loan is considered impaired when, ***based on current information and events***, ***it is probable that we will be unable to collect all contractual principal and interest due according to the terms of the loan agreement***. All loans are individually evaluated for impairment. Impaired loans are measured based on the present value of expected future cash flows discounted at the loan's effective interest rate or on the value of the underlying collateral if the loan is collateral dependent. We evaluate the collectability of both principal and interest when assessing the need for a loss accrual. Factors considered by management in determining impairment include payment status, collateral value, and the probability of collecting scheduled principal and interest payments when due. Loans that experience insignificant payment delays and payment shortfalls

generally are not classified as impaired. Management determines the significance of payment delays and payment shortfalls on a case-by-case basis, taking into consideration all of the circumstances surrounding the loan and the borrower, including the length of the delay, the reasons for the delay, the borrower's prior payment record, and the amount of the shortfall in relation to the principal and interest owed.

38.     Similarly, in Equity Bank's SEC filings, Defendants assured investors that Equity Bank had critical accounting policies in place for loan loss reserves. Specifically, Equity assured investors that it maintained an adequate allowance for loan losses that is determined by management after a careful loan review process:

> **Allowance for Loan Losses**: The allowance for loan losses is a valuation allowance for probable incurred credit losses. Loan losses are charged against the allowance when management believes the collectability of a loan balance is unlikely. Subsequent recoveries, if any, are credited to the allowance. Management estimates the allowance balance required using past loan loss experience, the nature and volume of the portfolio, information about specific borrower situations and estimated collateral values, economic conditions, and other factors. *A loan review process, independent of the loan approval process, is utilized by management to verify loans are being made and administered in accordance with company policy, to review loan risk grades and potential losses, to verify that potential problem loans are receiving adequate and timely corrective measures to avoid or reduce losses, and to assist in the verification of the adequacy of the loan loss reserve*. Allocations of the allowance may be made for specific loans, but the entire allowance is available for any loan that, in management's judgment, should be charged off.

39.     Equity Bank's allowance for loan losses had specific and general components. The *general* component of Equity Bank's allowance for loan losses covers non-impaired loans and is based on historical loss experience adjusted for current factors. The *specific* component relates to loans that are individually classified as impaired. As Equity Bank described, "If a loan is impaired, a portion of the allowance is allocated so that the loan is reported net at the present value of estimated future cash flows using the loan's existing rate or at the fair value of collateral if repayment is expected solely from the sale of the collateral."

40.     Additionally, Equity Bank, like other banks, maintained a critical accounting policy for troubled debt restructurings (or "TDRs") where Equity Bank made modifications or

concessions for borrowers who are experiencing financial distress. According to Equity Bank's

Q2 2018 Quarterly Report on Form 10-Q:

> Troubled Debt Restructurings: ***In cases where a borrower experiences financial difficulties and we make certain concessionary modifications to contractual terms, the loan is classified as a troubled debt restructured loan and classified as impaired.*** Generally, a nonaccrual loan that is a troubled debt restructuring remains on nonaccrual until such time that repayment of the remaining principal and interest is not in doubt, and the borrower has a period of satisfactory repayment performance.

41.   With respect to allowance for loan losses and TDRs, Equity Bank noted that

TDRs were separately identified for impairment disclosures unless the TDRs subsequently

defaulted:

> Troubled debt restructurings are separately identified for impairment disclosures and are measured at the present value of estimated future cash flows using the loan's effective rate at inception. If a troubled debt restructuring is considered to be a collateral dependent loan, the loan is reported, net, at the fair value of the collateral. For troubled debt restructurings that subsequently default, we determine the amount of reserve in accordance with the accounting policy for the allowance for loan losses.

### B.   Loan Loss Reserves Are A Crucial Financial Metric For A Bank And Can Be Used To Manipulate A Bank's Financial Results/Performance

42.    Loan loss reserves serve as an important metric for a bank and can be

manipulated to manage apparent income and expenses, which, in turn, can be used by banks to

maintain higher stock prices.

43.   Specifically, loan loss reserves are a "contra-asset" account, which reduces the

loans by the amount the bank managers expect to lose when some portion of the loans are not

repaid.  When a bank's managers decide to add to the loan loss reserves account the amount is

charged against the bank's current earnings.  The provision for loan losses is recorded as an

expense item on the bank's income statement.  Bank managers, therefore, can use loan loss

provisions as a way to smooth income.

44.   Thus, the desire not to take an expense against the bank's income statement can

create an incentive not to classify or impair non-performing loan(s) and take a charge against loan reserves in order to meet the Street's expectations and keep the bank's stock price high.

## V. OVERVIEW OF THE FRAUD PERPETRATED BY DEFENDANTS

### A. Defendants Misled Investors By Touting Equity Bank Strong Financial Results And Compliance With Equity Bank's Internal Policies While Concealing The Known Material Impairment Of Equity Bank's Largest Credit Relationship

45. By most accounts, 2018 was a seemingly positive year for Equity Bank. Throughout 2018, Defendants reported record earnings and multiple acquisitions of other banks that kept the Company's stock price high. In reality, however, Equity Bank was only able to report positive financial results by fraudulently concealing the financial distress of its largest credit relationship.

46. At the start of the Class Period (*i.e.*, April 20, 2018), Equity Bank held a conference call with investors and analysts to discuss and tout its "record earnings" for the first quarter of 2018. Defendant Elliott claimed that Equity Bank had "been busy continuing to work down nonperforming assets, most of which we acquired through mergers[,]" and told investors that Defendants "*believe the current business environment is suitable for reducing nonperforming assets*; and as such, Tim Kerr, *our special asset manager, has done an excellent job reducing these with his team and on terms within our expectations*."

47. On the April 20, 2018, conference call, Defendant Kossover reported that the "[p]rovision for loan losses was $1,170,000 in the quarter, essentially where we planned. Net charge-offs for the quarter were only $352,000, and nothing large was in that number. ALLL as a percentage of total loans was 44 basis points at quarter end and total reserves with purchase accounting discounts was 1.19%." Defendant Elliott reassured investors that Equity Bank "continually monitor our portfolio and markets for macro trends, we continue to see muted credit weakness. However, and as I have stated before, *we are also not loosening our credit criteria*."

AMENDED CLASS ACTION COMPLAINT

48.     On July 20, 2018, Equity Bank held another public conference call with analysts and investors to discuss its Q2 2018 financial results.  Defendant Elliott reported "second quarter core earnings, defined as after-tax net income without merger expenses, was another record for our company. ***Our credit quality remains strong***. Our net interest margin continues to be solid, and our balance sheet growth continues to be responsible. This comes as a result of the hard work from the Equity Bank team, both through mergers and through the organic efforts of our outstanding production, operating and support teams day-to-day at our bank."

49.     Defendant Kossover assured investors of Equity Bank's quality loan portfolio, claiming "***our portfolio of credit quality has once again improved as we have worked down classified assets***, which originated primarily from mergers. Our percentage of nonperforming assets to total assets has improved from 1.52% at 12/31/17 to 1.23% at June 30. Our classified assets have gone from 2.19% to 1.59% during the same time frame, and the percent of regulatory classified assets to capital went from 24.7% in the fourth quarter to 18.3% at June 30. Our net charge-offs are a muted 3 basis points, and our total reserves for loan losses, including purchase discounts, are 1.11%. Our ALLL has gone from 40 basis points to 42 basis points even with our acquisitions during the same time frame. ***Tim Kerr and our special assets teams have done excellent work in staying focused on the quality of our credit and managing special assets***."

50.     On the July 20, 2018, Defendant Elliot chimed in, touting Equity Bank's "[focus] on asset quality," and reported that Equity Bank's "[p]rovision for loan losses was $750,000 in the quarter, ***reflecting the high credit quality we alluded to earlier***. And we have net loan recoveries for the quarter of $17,000. Greg referenced recoveries on OREO, and it was primarily on a senior living facility we acquired through the Eastman merger. ALLL as a percentage of total loans was 42 basis points at quarter-end, up since year-end, and total

reserves with purchase accounting discounts was 1.11%. Elliott further touted Equity Bank's "responsible" lending practices, claiming that "[a]lthough we are not tightening credit at this point, we are not loosening either. We believe this cycle is long in the tooth, and we are still seeing some exuberant behavior from some other lenders in our markets. ***And I want our stakeholders to know that is not who we have ever been or who we will become. I simply expect our lending teams to continue to work hard, be smart, provide excellent service and expertise and grow our portfolio wisely***."

51.     Securities analysts were pleased with Equity Bank's financial results. For example, on July 20, 2018, analysts from Keefe, Bruyette & Woods observed, "[f]or the third consecutive quarter, EQBK either met or beat expectations, and overall we think the earnings consistency at the company is continuing to slowly improve. A stable core NIM and solid loan growth have been positive contributors to this, and while expenses continue to be a bit higher given the bank's M&A-heavy strategy, EQBK is still driving consistent positive operating leverage on an annual basis."

52.     On August 9, 2018, Equity Bank filed its Quarterly Report on Form 10-Q for Q2 2018. The Form 10-Q was signed by the Individual Defendants and included SOX Certifications signed by the Individual Defendants. The Form 10-Q repeated Equity Bank's financial results and expressly stated: "***The Company had no loans modified under troubled debt restructurings as of June 30, 2018 or December 31, 2017***."

53.     Defendants held another public conference call with analysts and investors on October 17, 2018 to discuss Equity Bank's 2018 3Q financial results.  Defendant Elliott reported that Equity Bank "had another outstanding quarter [ ] in terms of organic and acquisitive growth and a solid quarter for performance, with an earnings per share adjusted for mergers and acquisitions at $0.68 per share. . . . ***Our credit quality remains strong, with year-***

*to-date net charge-offs at a very small 3 basis points of loans. And our balance sheet growth continues to be brisk and responsible*." Defendant Kossover informed investors that Equity Bank's "annualized organic loan growth during the first 9 months of 2018 was approximately 8.5%, about where we forecasted in our legacy portfolio credit. *Quality has improved year-to-date as we have worked down nonaccruals*. Our OREO has decreased $900,000 to about $7 million. And as Brad said earlier, our year-to-date net charge-offs are a mere 3 basis points of loans. *Our percentage of nonperforming assets to total assets has improved from 1.52% at 12/31/17 to 1.28% at September 30*. Our ALLL has gone from 40 basis points to 43 basis points, even with our acquisitions during the same time frame. Our total reserves with purchase accounting discounts stand at 1.12%."

54.     Analysts relied on Defendants' representations and absorbed them throughout the Class Period.  For example, on January 3, 2019, Keefe, Bruyette & Woods praised Equity Bank's 2018 annual performance: "[o]ver the past year, EQBK's shares have significantly outperformed its peers on a relative basis, holding flat relative to a -19% decrease in the KRX. We believe this has largely been due to EQBK's simple but effective strategy of acquiring smaller banks in its footprint and utilizing the incremental core deposits to grow while recognizing higher returns from cost synergies."

B.     <u>**Unbeknownst To Investors, Equity Bank's Largest Borrowers Were Insolvent And Incapable Of Repaying Substantial Debt Relating to Approximately $30 Million Of Loans**</u>

55.     During 2018, Equity Bank's largest credit relationship was effectively insolvent, and was never disclosed to investors.

56.     Gigi's and Gatti's were financially troubled companies – and had been well before Equity Bank lent them $29.5 million in June 2018. The June 2018 loans were a purported "refinancing," which in reality was an extend and pretend loan issued because Gatti's and

Gigi's lacked the ability to pay their obligations to make debt repayments of approximately $6.1 million due in 2018 (let alone the substantial sums due in later years).

57.     Despite this financial history, Defendants knowingly and recklessly extended credit to these entities while concealing the truth about Equity Bank's largest credit relationship from investors.

**1.     Equity Bank's Relationship With Gatti's (a/k/a Sovrano) And Gigi's, As Well As Their Owners Phillips And Mann**

58.     On June 1, 2015, Sovrano, LLC purchased Gatti's.  Gatti's does business under the company name, and under the trade names and service marks "Gatti's", "Gatti's Pizza", "Mr. Gatti's", "Mr Gatti's Pizza", "GattiTown."  Gatti's parent is Sovrano, LLC.  Gatti's operates and grant franchises for larger dining and entertainment facilities featuring an all-you-care-to-eat pizza, pasta and salad buffet with menu ordering and appetizer, dessert and beer and wine plus redemption and non-redemption games and amusements.

59.     On or about June 1, 2016, Gigi's Cupcakes, LLC, and affiliate of Sovrano, LLC, purchased all or substantially all of the assets of the Gigi's Cupcakes franchise system, which are bakery shop units offering a variety of upscale cupcakes baked onsite, prepared and packaged specifically for delivery, take-out and onsite consumption, and concurrently became the franchisor for the Gigi's Cupcakes franchise system.

60.     Equity Bank's relationship began with Gatti's (Sovrano) on or around December 2015.  Between December 2015 and January 2018, Equity Bank loaned Gigi's and Gatti's (or made loan facilities available) approximately $29,500,000.  These loans were amended and expanded throughout this period, as the entities were not generating sufficient cash to repay the loans.

61.     Equity Bank had substantial ties and connections with Phillips and Mann that

went beyond their investments in Gatti's and Gigi's.

62.     Equity Bank's lending relationship with Phillips went back to early 2015 if not later.  According to the Cross Default/ Cross Collateral Agreement dated October 18, 2018, Equity Bank had extended Phillips at least two prior loans:

| Borrower | Loan Number | Origination Date | Principal Balance | Accrued Interest | Due Date | Amount Due | Maturity Date |
|----------|-------------|------------------|-------------------|------------------|----------|------------|---------------|
| Phillips | [omitted] | 2/12/18 | $4,963,210.20 | $36,884.13 | 1/1/19 | $36,884.13 | 2/28/2038 |
| Phillips | [omitted] | 2/24/15 | $4,339,999.99 | $32,252.74 | 10/31/18 | $32,252.74 | 3/1/2035 |

63.     Further, on October 18, 2018, Equity Bank loaned Phillips an addition $1,070,000 to "provide working capital for Gatti's and/or Gigi's[.]"

64.     The June 2018 repapered loans, for both Gigi's and Gatti's, were personally guaranteed by Phillips and Mann.

65.     Equity Bank considered the overall credit relationship with Gigi's, Gatti's, and Phillips when it conducted its financial analysis.  As stated by Defendant Kossover on the April 23, 2019 earnings call, " [t]he total relationship is $28 million on commercial credits. There is roughly a little over $12 million on personal relationships as well." Accordingly, Equity Bank's credit relationship with Gigi's, Gatti's and Phillips was approximately $40 million.

### 2.      Gigi's Was Insolvent, Owed Equity Bank More Than $9 Million And Was Causing Substantial Financial Strain On Gatti's/Sovrano, Phillips, And Mann

66.     Phillips and Mann's investment in Gigi's had been a total disaster from the outset. Gigi's had been bleeding cash and a source of substantial financial distress for not only Phillips and Mann, but also for their investment in Gatti's.

67.     Gigi's suffered from operational issues and was apparently insolvent for years. According to a complaint filed in the United States District Court for the Northern District of Texas in the action styled *KeyCorp, LLC v. Gigi's Holdings, LLC and Gigi's Franchising, LLC,*

*et al.*, No 3:16-cv-2930, on May 3, 2016, KeyCorp and Gigi's Holdings entered into an asset purchase agreement.  After the transaction closed, KeyCorp (Phillips and Mann) discovered that the prior owner, Gigi's Holdings, had allegedly made several material misrepresentations in order to make the sale. The alleged misrepresentations included concealing supplier payments for inventory, concealing the number of franchises that desired to leave or close, and compliance with FDA nutrition labeling laws.

68.     KeyCorp's (Phillips/Mann) troubles with the Gigi's franchise – discovered shortly after the purchase of Gigi's – resulted in major problems with Gigi's franchisees that ultimately cumulated into more litigation.  Gigi's was forced to bring franchisee litigation, about a year later.   The consolidated action styled *Gigi's Cupcakes, LLC v. 4 Box, LLC et al.*, No. 3:17-cv-03009-B filed in the United States District Court for the Northern District of Texas, was commenced by Gigi's in November 2017 (following failed mediation attempts). Gigi's reported that in June 2016, it discovered a number of undisclosed financial and structural issues with the franchise system that required immediate attention – including supply chain issues.  Gigi's was required to select a new vendor.  Many of the franchisees disagreed with the vendor decision and began refusing to abide by their franchise agreements.

69.     Further, in response to Gigi's lawsuit, a number of franchisees commenced their own litigation against Gigi's.[1]  In one of the franchisee complaints, the franchisee alleges that Gigi's was insolvent as of 2016:

---

[1] D&B Rubinstein Enterprises, LLC, Icing on the Cupcake, LLC, Barry Rubinstein, Doris Rubinstein (No. 3:18-cv-2377); JMJ Florida Holdings, LLC, Kevin McGaharan, and Jodi McGaharan (No. 3:18-cv-2381); Gourmet Cupcakes, LLC, Justin Swartz, and Kristin Swartz (No. 3:18-cv-2826); Morgan Foods, Inc. and Mark Morgan (No. 3:18-cv-2828); 614 Cupcakes, LLC, Ron Freeman, and Dawn Freeman (No. 3:18-cv-2831); Sugarlips Bakery, LLC, Jason Vinyard, and Cheryl Vinyard (No. 3:18-cv-2843), Cupcakes of Orlando, Inc., L&J Cupcakes, LLC, Lee St. John, and Judy Kenney (No. 3:18-cv-2846), and Sugar on Top Corporation and William C. Kenisell, III (Cause No.18-16186, 298th Judicial District Court, Dallas County, Texas).

- On or about December 25, 2016, Gigi's Cupcakes, LLC was operationally insolvent by at least $360,000, and upon information and belief, Gigi's Cupcakes, LLC continues to be unable to meet its financial obligations.

- On or about December 25, 2016, Gigi's Cupcakes, LLC's audited financial statements declared that "[Plaintiff] has sustained losses from operations during the period June 2, 2016 through December 25, 2016. [Gigi's Cupcakes, LLC] ability to meet its obligations in the ordinary course of business depends upon its ability to generate positive cash flows. Management plans to meet its obligations in the ordinary course of business by collecting revenue and utilizing its existing debt financing. If these sources of cash do not adequately fund current levels of operations of the Company, management will adjust the level of operations and cash expenditures to an internally sustainable level.

- In Gigi's Cupcakes, LLC's most recent FDD filed with the State of Minnesota, as amended on June 9, 2017, Gigi's Cupcakes, LLC admitted that "[GIGI'S CUPCAKES, LLC'S] FINANCIAL CONDITION, AS REFLECTED IN ITS FINANCIAL STATEMENTS (SEE ITEM 21), CALLS INTO QUESTION THE [GIGI'S CUPCAKES, LLC'S] FINANCIAL ABILITY TO PROVIDE SERVICES AND SUPPORT TO [THE FRANCHISEE]."

70.    By June 2018, Gigi's owed Equity Bank more than $9 million. However, it was clear well before June 2018 that Gigi's was insolvent and would not be capable of repaying its debt to Equity Bank. Gigi's was apparently cash flow negative and generating negative EBITDA. When Gigi's later filed for bankruptcy in January of 2019, Gigi's bankruptcy Form 207, Statement of Financial Affairs, Gigi's reported it only had gross revenue of $4,970,334 in 2018 and $6,182,262 in 2017.

### 3.    Unbeknownst to Investors, Equity Bank's Largest Borrowers Were Suffering Extreme Financial Distress And Liquidity Problems In 2017

71.    The financial strain from Gigi's was negatively impacting Gatti's/Sovrano. However, Gatti's/Sovrano had its own liquidity problems which were being further exacerbated by the Gigi's problems.

72.    Indeed, Sovrano had accumulated substantial debt in 2015 and 2016, nearly all of which was to Equity Bank. As reflected in its financial statements, as of December 28, 2015, Sovrano had total liabilities of approximately $12,192,000, which increased to $19,336,326 by

December 25, 2016. A copy of Sovrano's financial statements is attached hereto as Exhibit 1.

73.     In 2017, Sovrano accumulated yet even more debt.  As of December 31, 2017 Sovrano's total liabilities were $21,509,622.  Thus in two years, between December 2015 to December 2017, Sovrano accumulated additional debt of approximately $9.5 million during a time when its revenue and income were declining.

74.     Sovrano had substantial liquidity problems and was already having trouble servicing its debt in 2017.

75.     As an initial matter, Sovrano saw its revenue decline in 2017 from 2016. Revenue decreased from $23,178,945 in 2016 to $22,006,911 in 2017.

76.     Sovrano's income in 2017 was a loss of $1,582,417 versus 2016, which operated at a of profit of $347,814.

77.     According to Sovrano's 2017 financial statements, Sovrano was reliant on its debt financing to be able to continuing operating.

78.     In fact, Gatti's/Sovrano had already struggled to repay loan amounts due in 2017, and the company was forced to sell all of the assets of two company-owned franchises to related parties for $2,750,000 to repay the bank in 2017.[2]  As noted in the consolidated statements of cash flows in Sovrano's 2017 financial statements, these funds were used to pay Equity Bank directly.

79.     Sovrano's financial statements reflect that Equity Bank had already agreed to push out the dates for the 2017 loan payments through loan amendments and expansions.  For example, the language in Note 6 to the consolidated financial statements reflected that the

_____

[2] Presumably, the related parties purchased Sovrano's two most profitable/valuable stores, as opposed to the stores that were operating at a substantial cash loss.

timing of the balloon payment on a $12.5 million term loan was December 2021 "as amended." Similarly, an expansion line of credit of $2.5 million had a balloon payment due in December 2022 "as extended with a January 2018 amendment."

80.     Similarly, when comparing the notes to the 2017 financial statements to the notes to the 2016 financial statements, it is quite clear that substantial payments were being pushed out to later dates. For example, the schedule of payments due in future years contained in the 2017 financial statements versus the schedule in the 2016 financial statements shows a substantial shift in the timing of payments due from year 2020 to 2021:

From the 2016 statements (schedule of principal payments):

|  | Principal |
|---|---|
| 2017 | $3,683,888 |
| 2018 | $2,448,209 |
| 2019 | $2,490,704 |
| ***2020*** | ***$7,154,637*** |
| 2021 | $978,932 |
| Total | $16,456,370 |

From the 2017 financial statements (schedule of payments):

|  | Principal |
|---|---|
| 2018 | $4,677,203 |
| 2019 | $4,124,809 |
| 2020 | $2,164,509 |
| ***2021*** | ***$7,471,021*** |
| 2022 | $895,030 |
| Total | $19,350,572 |

**4.     Gatti's/Sovrano Were Required To Make Substantial Debt Repayments To Equity Bank During 2018, Including At Least $2.75 Million Due In June 2018**

81.     As noted in the chart of future debt payments from Sovrano's 2017 financial statements, Sovrano owed a crippling $4.677 million of repayments in 2018 (as of December 31, 2017):

Schedule of Sovrano's future principal maturities of all outstanding borrowing arrangements as of December 31, 2017:

|       | Principal    |
|-------|--------------|
| 2018  | $4,677,203   |
| 2019  | $4,124,809   |
| 2020  | $2,164,509   |
| 2021  | $7,471,021   |
| 2022  | $895,030     |
| Total | $19,350,572  |

82.     Making matters even worse, Sovrano owed even more loan payments in 2018 for substantial sums.  After January 1, 2018, Sovrano/Gatti's was forced to take on even more debt (presumably to cover ongoing quarterly payments to Equity Bank and rising cash losses). Based on Note 6 to the consolidated financial statements, as of December 31, 2017, Sovrano took on an additional $1,500,000 in from a "New Additional Term Loan" that was issued jointly to Sovrano and Gigi's, which required unpaid principal and interest to be paid in December 2018. In other words, Sovrano/Gatti's was required to make total debt payments in excess of $6.1 million in 2018.

83.     Among the $6.1 million of payments due in 2018 was a $2.75 million payment due to Equity Bank in June 2018.

84.     Sovrano could not pay the $2,750,000 due in June 2018 on its Revolving Credit Loan, which had already been amended in April 2017, let alone the $6,100,000 in total debt due on the principal payments and the New Additional Term Loan.

85.     Further, Sovrano's delinquency also included unknown amounts due and owing in the first quarter of 2018.  Not only had the company been experiencing operating losses but the company had insufficient cash flow to repay the loans due in 2017.

86.     In addition, Note 1 to the consolidated financial statements contained the following going concern warning: "in order to fund operations in the year beginning on May 31,

2018, the company will have to rely on debt financing."  Additionally, as noted later in the complaint, as per an adversary complaint filed in Sovrano's bankruptcy, the thirteen company-owned Gatti's Austin locations that Sovrano was trying to sell were each losing an estimated $100,000 per month, *i.e.*, $1.3 million total per month.

87.     In sum, Gatti's/Sovrano was insolvent and incapable of making payments to Equity Bank in 2018.

**C.     Defendants Engaged In An "Extend And Pretend" Scheme To Repaper Gatti's/Gigi's Old Debt Into New Loans To Delay The Disclosure Of The Borrowers' Insolvency And The Borrowers' Inability To Repay The Bank**

88.     "Extend and pretend" is a practice sometimes employed by banks when those banks have non-performing loans that the bank does not want to admit to having in its portfolio. Instead of calling the loan a loss, because the borrower cannot pay, the bank will rewrite the contract so the loan has been extended.  This way the borrower is not technically behind in payments and the bank can pretend that the borrower's debt as recorded in its reported financial statements is a collectible and valuable asset.

89.     Defendants engaged in a scheme to mislead investors by repapering the Gatti's/Sovrano and Gigi's loan in June 28, 2018.

90.     The June 28, 2018, loan documents reflect that these loans were purportedly refinancing.  Excerpts of the repapered loan documents are attached hereto as Exhibits 2-11.

91.      However, Defendants were in actuality repapering these loans because Gatti's/Sovrano and Gigi's lacked the ability to meet their current repayment obligations in 2018, were insolvent, and the value of their assets was insufficient for Equity Bank to be repaid.

92.     Through repapering the Gigi's and Gatti's in June 2018, Defendants were delaying classifying these problematic loans through "extend and pretend" practices.

1.      **In June 2018, Defendants Repapered Gatti's and Gigi's Old Debt Into New Loans**

93.     On June 28, 2018, a mere six months prior to these entities' bankruptcies, Equity Bank entered into repapered loan agreements with Gigi's Cupcakes, LLC and Gigi's Operating, LLC, Sovrano, LLC, Mr. Gatti's L.P., and Gatti's Great Pizza, Inc.  The consolidated term loan agreement between Equity Bank, Sovrano and Mr. Gatti's was ***$20,250,000***.  Equity Bank also entered into a consolidated term loan agreement with Gigi's Cupcakes and Gigi's Operating for ***$9,250,000***.  Personal guaranties were executed by the owners of Sovrano and KeyCorp, Phillips and Mann, who owned and operated these entities.

94.     These June 2018 loans represent repapering of loans that were extended to Gigi's and Gatti's from approximately December 2015 through December 2017.  According to Gatti's 2017 FDD, the loan/credit facilities balances as of December 31, 2017 were as follows:

| Loan Name | Balance (12/31/2017) |
|---|---|
| Revolver | $        2,750,000[3] |
| Term Loan | $        9,968,299 [4] |
| Expansion Line | $        1,163,900[5] |
| Additional Expansion Line | $        2,090,625[6] |
| Amortizing Expansion Note No. 1 | $        1,185,547 |
| Additional Revolver | $           750,000 [7] |
| Expansion Line Converted to Term Loan | $        1,443,201 |
| Totals: | $        19,351,572 |

[3] Issued in December 2015 for $500,000, and amended to $1,500,000 in June 2016, and again to $2,750,000 in April 2017 (with unpaid principal and interest due in June 2018).

[4] The deed of trust securing the term loan document is included in the repapered loans documents, attached hereto as Exhibit 12.

[5] Loan executed in January 2016.  Initially due in January 2017, but maturity extended until December 2022 as per a January 2018 amendment.

[6] The loan was executed for $5,125,000 in April 2017, and was increased to $5,500,000 as per a January 2018 amendment.

[7] Executed as a $500,000 loan in September 2017, and increased to $750,000 in October 2017. Per the loan terms, the loan was to convert to a term loan in January 2018.

95.     Further, in January 2018 two new loans were issued to Sovrano in the amounts of $1,250,000 and $1,500,000, bringing the total due to Equity Bank to $22,101,572.

96.     In addition, per the Sovrano FDD, Gigi's and Gatti's were struggling to repay the loan amounts due in 2017, and the company was forced to sell all of the assets of two company-owned franchises for $2,750,000 during 2017 to repay the bank.  Upon information and belief, the sale was to Phillips and Mann, as the sales proceeds were recorded as "related party receivables" on December 31, 2017.

97.     Gigi's and Gatti's were also struggling to repay the $6.1 million loan payments due in 2018, and according to CW1, around the end of the first quarter of 2018 Defendants were very worried about the credit relationship.  Thus, Defendants Elliott and Kossover instructed Mayo and Machain to travel to Fort Worth around April or May 2018 to investigate the credit relationship.  CW1 believed that in September 2018 the Gigi's and Gatti's loans had been delinquent for approximately four to five months, thus precipitating the June 2018 repapering.

98.     In October 2018, when the first repapered June 2018 loan payments were due, Gigi's, Gatti's and their owners once again came looking for more money.  Equity Bank lent Phillips an additional ***$1,070,000*** to provide working capital for Gatti's and Gigi's.  As a part of the agreement, on October 18, 2018, Equity Bank, Gigi's/KeyCorp, Gatti's/Sovarano, Phillips and Mann entered into a Cross Default/ Cross Collateral Agreement.  The cross-collateralization agreement is attached hereto as Exhibit 13.

### 2.     The Account Of A Former Equity Bank Employee Corroborates The "Extend And Pretend" Nature Of The June 28, 2018 Loans

99.      Furthermore, according to Confidential Witness ("CW") 1, a special asset administrator that worked at Equity Bank from April 2017 to September 2018, who reported to Equity Bank's Chief Credit Officer, Scott Smits, until he was fired in December 2017, and then

for his replacement, Craig Mayo, beginning in March 2018, reported that the Gigi's and Gatti's loans had been problematic for Equity Bank.  CW1 recalls that around the end of the first quarter of 2018 Defendants Elliott and Kossover became worried about the credit relationship with Gigi's, Gatti's and Phillips.  Defendants Elliott and Kossover instructed Mayo, along with Equity Bank's SVP and Wichita Market President, Jeremy Machain, who was the Gigi's and Gatti's loan officer, to travel to Fort Worth around April or May 2018 to find out what was going on with the credit relationship.  When CW1 left Equity Bank in September 2018, CW1 believed the Gigi's and Gatti's loans had been delinquent for approximately four to five months.

100.    As a part of CW1's duties, CW1 attended every special assets meeting.  These meetings occurred on Tuesday either bi-weekly or monthly depending on the availability of Defendant Elliott.  According to CW1, Elliott wanted to attend every special assets meeting.  CW1 stated that Defendant Kossover also attended the special assets meetings along with Mayo.  In the special assets meetings, the group would review every problem loan report, and the meetings would last all day.  The group assigned loan risk ratings to problem loans, spanning from 1-9, with zero indicating a write-off.  Loans rated a "6" were on a watch list that required quarterly write ups, and loans rated an "8" indicated that the bank "didn't know if the loan would make it or not."

101.    CW1 recalls that the Gigi's and Gatti's loans (during the period CW1 worked at Equity Bank from April 2017-September 2018) were given a "6" risk rating.  In other words, they were problem loans that required quarterly write-ups.  CW1 reported that the loans should have been given an "8" rating, but Defendants Elliott and Kossover had directed Mayo to keep the loans at a "6" rating for "audit reasons."  CW1 reported that Defendants kept the Gigi's and Gatti's loans at a "6" rating because management did not want to address the issue until absolutely forced to do so.

AMENDED CLASS ACTION COMPLAINT

**3.     At The Time Of The June 2018 Extend And Pretend Loans, Gatti's And Gigi's Were Insolvent And It Was Clear That Equity Bank Would Not Be Able To Fully Collect On The Outstanding Debt**

102.    By the start of the Class Period, Gatti's was insolvent and Equity Bank was well aware, based on Sovrano/Gatti's ongoing problems, that Sovrano was incapable of paying back its debt to Equity Bank.

103.    It was clear based on Sovrano's 2017 financial statements, that Sovrano was effectively insolvent and only capable of continuing to operate as a result of concessions from Equity Bank.

104.    Thus, by the start of the Class Period, it was even more obvious, and especially at the time the loans were repapered in June 2018, that Equity Bank would not be repaid. For example, Gigi's had substantial debt in excess of its revenues and was generating negative cash flow and negative EBITDA.

105.    Similarly, Sovrano/Gigi's financial statements reflected its condition was deteriorating and that its business was worth far less than its debt. Sovrano's revenues were declining, its losses were growing, and it was selling off its company owned stores, which would only limit its ability to generate sufficient income to pay back Equity Bank. While at first blush Sovrano purported to generate positive EBITDA in 2017, that number appears to be vastly overstated. A cursory review reveals that the purported $2.7 million of EBITDA in 2017 appears to be drastically overstated by: (i) not eliminating approximately $570,000 of unexplained "other income"; (ii) including an upward adjustment of $1.2 million for "loss on discontinued operations" even though there does not appear to be a line on the income statement; and (iii) the improper accounting for "advertisement and marketing program", which appears to be an improper capitalization (i.e., it should have been recorded as an expenses and excluded form EBITDA).

**D.    After Equity Bank Declines To Issue Any More Debt In December 2018, Gigi's And Gatti's File For Bankruptcy In Early January 2019**

106.    Defendants later admitted (during the April 23, 2019 conference call) that in December 2018, Phillips and/or Mann approached Equity Bank and asked them to extend even further funds for Gatti's and Gigi's. However, the entities financial condition was so bad that Equity Bank declined to extend any further debt.

107.    On January 4, 2019, a mere one day after analysts had been praising Equity Bank's 2018 performance, Equity Bank's biggest credit relationship filed for Chapter 11 bankruptcy in the Northern District of Texas.

**1.    The Bankruptcy Proceedings**

108.    Specifically, on January 4, 2019, Sovrano, LLC, Mr. Gatti's, LP, Gatti's Great Pizza, Inc., Gigi's Cupcakes, LLC, Gigi's Operating, LLC and Gigi's Operating II, LLC each filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code. Gigi's holding company, KeyCorp, filed its voluntary petition on January 25, 2019.

109.    In connection the auction of Gigi's, a bidder emerged to purchase Gigi's for $2 million. However, after that bidder backed out, Gigi's was later sold for approximately $1.2 million. Equity Bank split some of the proceeds from that sale with another financial institution that had lent money to Gigi's as well.   Pursuant to the sale order entered in the bankruptcy on June 1, 2019, Equity Bank was to receive approximately $786,958.

110.    With respect to Gatti's/Sovrano, the chapter 11 plan provides the following treatment of Equity Bank's claim:

> The Reorganized Gatti's Debtors will execute and deliver a secured promissory note to Equity Bank on the Effective Date, in the approximate amount of $19,568,190.77, subject to any necessary credits or debits. The note will provide for interest only payments due monthly at an interest rate mutually agreed upon by Equity Bank and the Gatti's Debtors, beginning on the 60th day following the Effective Date of the Plan. The note will be secured by all assets, real and

personal, of the Reorganized Debtors and will mature on the earlier of the sale of the Gatti's Debtors or December 31, 2020, unless extended by agreement of the Reorganized Gatti's Debtors and Equity Bank. The note shall be guaranteed by R. J. Phillips and Kyle C. Mann.

111.    Equity Bank has not voted for the plan and has, to date, sought extensions of time to either object to this treatment and/or submit its ballot.

### 2.    Gatti's Desperate Scheme During 2018 To Sell 13 Franchise Locations To Pay Equity Bank

112.    According to an adversary complaint filed in the bankruptcy, styled *Three Dough Boys v. Gatti's Great Pizza, Inc., R.J. Phillips Jr., Kyle C. Mann*, Case No. 19-ap-04070 ("Three Dough Boys"), Phillips and Mann were so desperate to make a payment to Equity Bank that they fraudulently represented the financial position of thirteen of their Mr. Gatti's Pizza stores to sell them to former Papa John's executives, Tisdel and Starks.  The complaint alleges that Michael Poates, then-president of Gatti's, brokered a deal with Tisdel and Starks, who were high-level corporate officers at Papa Johns, and then that deal was passed off to Mann and Phillips, who provided Tisdel and Starks with misrepresented financial statements prior to the sale of some Austin Gatti's locations.

113.    The adversary complaint provides insight into Gatti's 2018 financial condition, it alleges:

•    Had the Austin Stores been operating as ordinary franchisees and paying royalties, *it is estimated that on a consolidated basis the Stores would have been losing money at a rate of approximately $100,000 per month*.

•    Tisdel and Starks then attempted to secure an SBA loan from their bank, Regions Bank ("Regions"), to finance a significant portion of the purchase price. In or about early August 2018 Regions requested from Gatti's the FDD, which Poates provided to Regions. Regions denied the SBA loan application shortly thereafter without explanation.

•    Unbeknownst to Tisdel and Starks, Phillips and Mann had obtained and personally guaranteed a loan of roughly $20,000,000 from Equity Bank,  much of which, upon information and belief, was used on a boondoggle project to construct and/or renovate five high-end Mr. Gatti's Pizza stores in the Dallas, Texas area.

- *Further, Phillips and Mann were extraordinarily poor managers of the Gatti's franchise system* and the other franchise system they owned, Gigi's Cupcakes, which, *combined with the burdensome multi-million-dollar loan, upon information and belief caused Phillips and Mann to experience dire financial straits.*

- *Defendants nevertheless insisted that Plaintiffs wire to Equity Bank $1.1million* and the remaining funds for the purchase price to Gatti's on September 18, 2018, Plaintiffs would be allowed to immediately take control of the Austin Stores, and the future APA and other agreements would be back-dated to September 18, 2018. *Upon information and belief, Defendants insisted on this arrangement because of their increasing financial pressure to repay outstanding debts to other creditors.*

- No official closing actually occurred, and *Plaintiffs did wire to Equity Bank and Gatti's the funds on September 18, 2018* and took over operations of the Store shortly thereafter.

- Within the APA is a specific representation and warranty by Gatti's that it is solvent and will be able to meet its obligations as they become due.

- *According to Gatti's' financial statements, it was indeed insolvent on and before September 18, 2018; however, nowhere in the APA does Gatti's disclose that it was actually insolvent or that it was imminently planning on filing a Chapter 11 bankruptcy petition.*

- *Phillips stated to Tisdel on that telephone call that the alleged reason for having to file bankruptcy was the failure of a sale of the Mr. Gatti's Pizza franchise system to a private equity firm, Satori, and the losses from the Gigi's Cupcakes brand. Upon information and belief, Satori canceled the transaction when it discovered Gatti's insolvency.*

114.     The loan documents in connection with the June 28, 2018 extend and pretend loan to Gatti's reflects that Equity Bank was well aware of the Gatti's financial constraints as well as their plans to sell the 13 stores to pay Equity Bank. The loan documents note that Gatti's/Sovrano had agreed to pay Equity Bank $1 million from the initial sale proceeds and agreed to pledge another $700,000 to Equity Bank from a promissory note issued by the buyer.

E.     **THE TRUTH EMERGES**

1.     **Defendants Reveal Two Problematic Loans in January 2019**

115.     On January 24, 2019, Defendants disclosed that, during fourth quarter 2018, a

AMENDED CLASS ACTION COMPLAINT

credit relationship was downgraded to Watch and Substandard for $19 million and $9 million, respectively. On this news, the Company's share price fell $2.14, or more than 6%, to close at $32.15 per share on January 24, 2019, on unusually heavy trading volume.

116.   Defendants made no mention of the significance of the credit relationship, *i.e.*, that these two loans comprised the bank's largest credit relationship, or that these borrowers were in Chapter 11 bankruptcy.  While this material omission prevented analysts from drilling down on the issue, a journalist for QSR reported in an article dated January 2019 entitled *Gigi's Cupcakes, Mr. Gatti's File for Bankruptcy*, that Gigi's bankruptcy documents showed ***"Gigi's Cupcakes borrowed $9.25 million from Equity Bank and hasn't made a payment on the loan in the last six months.*** Mr. Gatti's loan agreement, dated June 28, was for $20.25 million between Sovrano/Mr. Gatti's and Equity Bank. The filing said Gigi's was hurt by underperforming locations that it chose to operate at a loss instead of closing."

117.   Further, a February 22, 2019 article entitled *Gigi's, Mr. Gatti's bankruptcy filing begs $30-million question* published in the Franchise Times questioned to loans to Gigi's and Gatti's:

> Jeffrey Cohen, an attorney representing 18 Gigi's Cupcakes franchisees in ongoing litigation, is on the hunt for $30 million. That's the amount borrowed in two loans from Equity Bank last June—$20.2 million by pizza restaurant franchise Mr. Gatti's and Sovrano, its parent company, and $9.2 million by Gigi's Cupcakes, the cupcake franchise purchased by KeyCorp and its affiliate FundCorp in 2016.

> Both loans are dated June 28, 2018. A bit over six months later, on January 4, 2019, the three debtor firms claimed "a liquidity crisis" in a Chapter 11 bankruptcy filing and petitioned the court to use cash collateral held by Equity Bank. The filings said the companies needed "immediate access to its cash to pay employees and to pay for ordinary operational expenses."

> Cohen, of Cohen Law in Denver, is trying to track down the money. "It's a term loan, not a line of credit," he said. "What happened to the cash?"

## 2. **Equity Bank Reveals It is Unable to Timely File Its 2018 10-K**

118.    After the market closed on March 19 2019, Equity Bank filed Form 12b-25 with the SEC stating that the Company had determined that it is unable to file its annual report for the fiscal year ended December 31, 2018 within the prescribed time period.  Equity Bank reported that it was still conducting its audit for the year ended December 31, 2018.

119.    On this news, the Company's share price fell $1.69 per share, or 5.24%, to close at $30.56 per share on March 20, 2019. During the next two days, the Company's share price further declined another $0.83, or about 2.7%, to close at $29.73 on March 21, 2109, and another $1.77 per share, or 5.95%, to close at $27.96 on March 22, 2019.

## 3. **Defendants Reveal Loss Against Largest Credit Relationship**

120.    On April 22, 2019, Defendants shocked the market when they issued a press release to report the Company's Q1 2019 financial results and disclosed that a $14.5 million provision for loss against a credit relationship had impacted its financial results for first quarter 2019.  The Company stated, in relevant part:

> In the first quarter, we recorded a $14.5 million provision for loss against a credit relationship. We will discuss this on our earnings call Tuesday, April 23, 2019. However, it is important for us to convey we do not believe this represents a systemic trend; rather an isolated individual relationship which is unique to our portfolio.

121.    On April 23, 2019, Defendants held a press conference to discuss 2019 1Q results. Defendants started the call with announcing their concealment of the problematic Gigi's and Gatti's loans.  Defendant Elliott stated:

> In 2011, we entered a relationship with a strong borrower who specialized in increasing revenues and profitability of underperforming companies. We had a significant banking relationship with this borrower for several years and they performed well, and ultimately sold 2 of their portfolio companies for substantial profits. We bought a franchisor with approximately 80 operating licenses and grew it during the course of their ownership. We also financed the purchase of a second franchisor company that was underperforming, but with good name recognition. We anticipated they could continue to manage as they had in the

earlier concepts and turn them substantially profitable and generate terminal value.

We were comfortable the new relationship remained adequately secured with personal guarantees, crosscollateralization with a profitable company and based on the extent of the pledged personal assets. ***Unfortunately, as they continued to borrow funds on personal assets from Equity and other financial institutions for capital injections, the ability to service debt on the overall structure began to deteriorate***.

122.    On the April 23, 2019, conference call, Equity Bank's Chief Credit Officer, Craig

Mayo, continued:

> ***In the fourth quarter of 2018, these borrowers came to Equity and they asked us to advance funds, which we declined. Under the premise, it was time for the companies to cash flow their obligations or to execute on the sale of the businesses, which they had committed to complete in previous quarters***. The approximate balance of the loans were $19.2 million for the larger company and $9 million for the smaller company. There were at least 2 letters of intent to purchase the larger company for amounts sufficient to pay off our credits on both companies.
>
> All the credits are cross-collateralized and secured by personal guarantees from the borrowers. As of December 31, 2018, the loans were current.
>
> In January, the borrowers filed for Chapter 11 bankruptcy for both companies: 1 with a positive cash flow and 1 without a positive cash flow. We presume this was not strictly because of Equity Bank's debt, but also because of the obligations to other institutions.
>
> We prepared an impairment analysis in the first quarter for December 31, 2018, using the data points available at the time for the larger credit, including the most recent LOI from December 2018 and the early indications of the stalking-horse bidder for the smaller company mentioned above. The calculation did not show an impairment and therefore, no specific loan loss was provided on these credits or warranted at that time. We did place the credits on nonaccrual late in the first quarter.
>
> In late March, the smaller company was auctioned in bankruptcy to a stalking-horse bidder for an amount that was acceptable to us and in the range of values we had used in determining that the overall valuation for the relationship was adequate. For various reasons, the bidder did not close and a second bidder was found in early April, but for an amount substantially less than the first bidder.
>
> As of today, the second bidder has not closed, but we believe it will complete the transaction in the next few weeks. In early April, we received the most current trailing 13 periods of operating performance from the larger company and our analysis shows that although profitable, this company may not sell in the future at

the level indicated in the previous valuations. This is due in part to a lower level of EBITDA than was performed and in part to our belief that the multiples of EBITDA used in the previous periods would be unlikely given our recent sales experience in bankruptcy. Greg?

123.    During the conference call, Defendant Kossover joined in stating:

Given the change in circumstances occurring in early April, a new impairment analysis was performed utilizing the lower bid for the smaller company and applying the lower EBITDA number and lower estimated multiple on the larger company. ***This analysis determines the need for a $14.5 million total specific provision on these 2 credits and the other assets pledged by the borrowers.*** Brad?

124.    During the April 23, 2019, conference call, Defendant CEO Elliott "owned" the

credit decisions to further extend the borrowers additional debt in 2018 and earlier:

> ***As CEO of our company, I own this credit decision. Our team extended credit to these borrowers based on a long history of success in their businesses and with us as their bank. Unfortunately, circumstances changed and we did not discontinue advancing funds early enough*** …

125.    Analysts drilled down on Defendants' concealment of the problematic loans and

were shocked that Defendants had previously failed to provide any insight into the issue with the

bank's largest credit relationship:

[ANALYST]: Can we spend a minute on that? So you provided $14.5 million against this $28 million total relationship. Is that the right way to think about it?

[DEFENDANT KOSSOVER]: The total relationship is $28 million on commercial credits. There is roughly a little over $12 million on personal relationships as well.

[ANALYST]: So it's closer to $40 million all in?

[DEFENDANT KOSSOVER]: Correct.

[ANALYST]: And right now, that $40 million just has a $14.5 million allowance against it?

[DEFENDANT KOSSOVER]: Correct.

[ANALYST]: Okay. And this $40 million, how does that rate amongst some of the larger overall borrowing relationships on your balance sheet?

[DEFENDANT ELLIOTT]: Well, so we don't -- I mean, these are separate credits in that single-family residences aren't aggregated. I mean, we do aggregate them when we look at credit relationship. But from an individual risk standpoint, one of these credits is currently current, one of these credits is currently not past due enough to make it a nonaccrual loan. So the personal residences, the primary residences, I would separate from that. These were 2 separate individual operating companies. And the reason we aggregate them now is we, 1 year ago, got them to cross-collateralize those relationships along with their personal residence. So we aggregated them together at that point.

[ANALYST]: So maybe asking the question differently. I mean, what are the largest commercial relationships all-in on your books today and how does the $28 million value compare?

[DEFENDANT ELLIOTT]: ***It would be the largest relationship we have***.

126.   One analyst questioned Defendants' concealment of the loans and whether such loans were delinquent, but Defendant Elliott doubled down on the "extend and pretend" story:

[ANALYST]: Just looking at some press reports from January, in one of the publications, it said a payment hadn't been made on one of these loans for 6 months, and I'm guessing it's the smaller commercial loan. I guess I'm just curious why, if that was the case, we didn't hear about this relationship until today.

[DEFENDANT ELLIOTT]: I think you're referencing an article that was written by an attorney who doesn't -- who does not have the facts. I mean, we did not provide any of that information. None of the loans were -- all the loans were current as of December 31, Terry.

127.   On this news, the Company's share price fell $4.76, or more than 16%, to close at $24.71 per share on April 23, 2019, on unusually heavy trading volume.

## F.   ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER

128.   Numerous facts demonstrate that Defendants Elliott and Kossover knew, or were severely reckless in  not  knowing, that  Equity Bank's  financial  statements and disclosures during the Class Period were materially false and/or misleading and/or misstated when issued.

### 1.   Defendants Elliot And Kossover Were Members Of The Loan Committee And Risk Committee

129.   Defendants Elliot and Kossover, as members of the Loan Committee and Risk

Committee, were intimately involved in the process of approving loans, modifying loans when they became delinquent, and extending new credit to borrows who could not make their payments.

130. According to Equity Bank's 2018 10-K, Defendants Elliott and Kossover sat on the "internal loan committee" and were delegated additional "lending authority." According to CW1 the Special Asset meetings were attended by Defendants Elliott and Kossover and Chief Credit Officer Craig Mayo.

131. CW1 reported that Defendant Elliot attended all the special assets meetings, which is the equivalent of the collection services, which reviewed non-performing loans, including the Gigi's and Gatti's loans. The Special Assets Committee would meet with the Risk Committee regarding the delinquent loans and the executive management would become involved anytime the level of risk was increased on any loan.

132. According to CW1, the Gigi's and Gatti's loans should have been elevated to a risk level "8," but at Defendants Elliott and Kossover's direction, Mayo was prevented from elevating the risk level for "audit purposes." Accordingly, because Defendants Elliott and Kossover sat on these committees, they were closely familiar with the value and credit quality of Equity Bank's loans, including the Gigi's and Gatti's loans.

### 2. Gatti's, Gigi's, And Phillips/Mann Were Equity Bank's Largest Credit Relationship

133. The Gigi's and Gatti's loans comprised Equity Bank's "largest relationship." Defendants Elliott admitted this during Equity Bank's April 23, 2019 earnings call.

134. According to CW1, Defendant Elliott was a highly involved CEO and knew everything about the Gigi's and Gatti's loans.

135. Further, the health and credit quality of not only the Gigi's and Gatti's loans in addition to Equity Bank's commercial loan portfolio was critical to the Company's financial

performance during the Class Period.

136.    During the Class Period, the commercial loan portfolio was the Bank's largest asset, which comprised  71.2% of Equity Bank's 2018 loan portfolio, was a focus of investor concern, and was the subject of dozens of Defendants' public statements—yet Defendants concealed the true impaired nature of Equity Bank's largest credit relationship.  Having spoken repeatedly and reassuringly on the subject of the financial health of Equity Bank, Defendants were obligated to ensure that their disclosures were accurate and complete. Any failure to do so on a subject as important as this one constitutes severely reckless conduct at minimum.

### 3.    Defendant Elliot Admitted Responsibility For Not Discontinuing Loans To Gatti's And Gigi's Earlier

137.    Defendant Elliot *admitted* he made the decision to continue lending to Gigi's and Gatti's despite the companies' insolvency and inability to repay the loans.  In Equity Bank's April 23, 2019, earnings call Elliott stated:

> *As CEO of our company, I own this credit decision*. Our team extended credit to these borrowers based on a long history of success in their businesses and with us as their bank. *Unfortunately, circumstances changed and we did not discontinue advancing funds early enough*.

138.    Further, on Equity Bank's 2019 Q2 earnings call, Defendants admitted to irresponsibly extending Gigi's and Gatti's credit in 2018.  Defendant Elliott stated:

> Although *I've obviously been disappointed by the performance of these credits, and it is a responsibility myself and our executive team completely own*, I'm happy to see the hard work of our legal and credit teams to get this remaining business out of bankruptcy and returned to normal operation.

139.    Defendants *knew* that Gigi's and Gatti's loans should be classified and impaired, but Defendants chose to continue their to "extend and pretend" practices in hopes that the loans would be repaid in 2018 and Equity Bank would not have to impair the loans and take a loss against its loan reserves.   Defendants' "extend and pretend" practices constituted, at a minimum, severely reckless conduct.

### 4. Defendants' Admittedly Monitored And Payed Close Attention To The Performance Of Loans

140. Fourth, in its SEC filings, Equity Bank claimed to conduct "early-stage review of loans, regular credit evaluations and management reviews of loans, which supplement the ongoing and proactive credit monitoring and loan servicing provided by our bankers." Defendants' review of Equity Bank's loan portfolio on the Loan, Risk and Special Assets Committees gave Defendants first-hand knowledge of the true quality and value of the Gigi's and Gatti's loans.

141. In particular, Defendants would have had access to and reviewed Gatti's financial statements, including the 2017 financial statements that were dated in May 2018. These financial statements would have alerted Defendants to Gatti's serious financial problems and their effective insolvency. To the extent Defendants did not review Gatti's 2017 financial statements, Defendants' actions would constitute extreme recklessness given the amount of debt issued to Gatti's (and Gigi's) as well as the substantial new loans issued to Gatti's and Gigi's in June 2018.

## VI. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS DURING THE CLASS PERIOD

### A. First Quarter 2018 False and Misleading Statements and Omissions

142. On April 20, 2018, Equity Bank held an earnings call to tout its "record earnings" for the first quarter of 2018. Defendant Elliott claimed that Equity Bank had "been busy continuing to work down nonperforming assets, most of which we acquired through mergers[,]" and the "As we have said on our last call, *we believe the current business environment is suitable for reducing nonperforming assets*; and as such, Tim Kerr, *our special asset manager, has done an excellent job reducing these with his team and on terms within our expectations*." Defendant Kossover reported that the "[p]rovision for loan losses was $1,170,000 in the quarter, essentially where we planned. Net charge-offs for the quarter were only $352,000, and nothing

large was in that number. ALLL as a percentage of total loans was 44 basis points at quarter end and total reserves with purchase accounting discounts was 1.19%." Defendant Elliott assured investors that Equity Bank "continually monitor our portfolio and markets for macro trends, we continue to see muted credit weakness. However, and as I have stated before, *we are also not loosening our credit criteria*." These statements were materially false and misleading because Defendants were not reducing their nonperforming assets. Rather, Defendants omitted that they were engaged in an "extend and pretend" scheme and were continuing to lend and extend credit to the insolvent Gigi's and Gatti's. The statements were also materially misleading because Equity Bank was, in fact, loosening its credit criteria by repapering and lending to Gigi's and Gatti's and was not complying with its own stated policies to manage risk and properly classify problem loans.

143.    On May 1, 2018, Equity Bank filed with the SEC its Form 10-Q for the quarter ended March 31, 2018. The 2018 1Q 10-Q reported: (i) net income allocable of $8.7 million, as compared $4.9 million for the three months ended March 31, 2017, an increase of $3.8 million or 79.1%; (ii) provision for loan losses of $1.2 million as compared to $1.1 million for the three months ended March 31, 2017, and net loan charge-offs for the three months ended March 31, 2018, of $352 thousand compared to net charge-offs of $479 thousand for the same period in 2017; and (iii) allowance for loan losses to total loans of 0.44%, compared to 0.40% at December 31, 2017; (iv) total reserves, including purchase discounts, to total loans of approximately 1.19% as of March 31, 2018, compared to 1.21% at December 31, 2017; and (v) nonperforming assets of $42.4 million as of March 31, 2018, were 1.33% of total assets and nonperforming assets as of December 31, 2017, of $48.2 million or 1.52% of total assets. These statements were materially false and misleading because of Defendants' "extend-and-pretend" scheme, which caused Equity Bank to materially misstate its income and expenses, provision for

loan losses, allowance for loan losses and nonperforming assets.

> **B.** **Second Quarter 2018 False and Misleading Statements and Omissions**

144.    On July 18, 2018, Equity Bank issued a press release entitled "Equity Bancshares, Inc., Reports Record Net Income for Second Quarter 2018, Completes Expansion in Southwest Kansas and Kansas City Metro Area, Announces Additional Expansion in Oklahoma."   That same day, Equity Bank filed with the SEC a Form 8-K for 2018 2Q. The 8-K reported: (i)  net income allocable to common stockholders was $15.6 million for the six months ended June 30, 2018 as compared to $11.2 million for the six months ended June 30, 2017, an increase of $4.4 million or 38.9%; (ii)  the provision for loan losses was $1.9 million for the six months ended June 30, 2018 as compared to $1.7 million for the six months ended June 30, 2017, and net charge-offs for the six months ended June 30, 2018 were $335 thousand compared to net charge-offs of $587 thousand for the comparable period of 2017; (iii) net income allocable to common stockholders was $6.9 million for the three months ended June 30, 2018, as compared to $6.4 million for the three months ended June 30, 2017, an increase of $513 thousand or 8.1%; (iv) the provision for loan losses was $750 thousand for the three months ended June 30, 2018, as compared to $628 thousand for the three months ended June 30, 2017; and for the three months ended June 30, 2018 we had a net recovery of $17 thousand compared to net charge-offs of $108 thousand for the same period in 2017; (v) as of June 30, 2018, Equity's allowance for loan losses to total loans was 0.42%, compared to 0.40% at December 31, 2017; total reserves, including purchase discounts, to total loans were approximately 1.11% as of June 30, 2018, compared to 1.21% at December 31, 2017; nonperforming assets of $45.6 million as of June 30, 2018, were 1.23% of total assets and included nonperforming assets of $3.2 million and $1.6 million acquired in the KBC and Adams mergers; nonperforming assets at December 31, 2017, were $48.2 million or 1.52% of total assets.  These statements were materially false

and misleading because of Defendants' "extend-and-pretend" scheme, which caused Equity
Bank to materially misstate its income and expenses, provision for loan losses, allowance for
loan losses and nonperforming assets.

145.   On July 20, 2018, Equity Bank held an earnings call to discuss its 2018 Q2
results.   Defendant Elliott reported "second quarter core earnings, defined as after-tax net
income without merger expenses, was another record for our company. ***Our credit quality
remains strong***. Our net interest margin continues to be solid, and ***our balance sheet growth
continues to be responsible***. This comes as a result of the hard work from the Equity Bank
team, both through mergers and through the organic efforts of our outstanding production,
operating and support teams day-to-day at our bank."  These statements were materially false
and misleading because Defendants' credit quality was not strong and Equity Bank's balance
sheet was not responsible.  Defendants omitted that only one month prior they had made two
repapered high-risk loans to Gigi's and Gatti's in their extend and pretend scheme.

146.   On the same July 20, 2019 earnings call Defendant Kossover assured investors of
Equity Bank's quality loan portfolio, claiming "***our portfolio of credit quality has once again
improved as we have worked down classified assets***, which originated primarily from mergers.
Our percentage of nonperforming assets to total assets has improved from 1.52% at 12/31/17 to
1.23% at June 30. Our classified assets have gone from 2.19% to 1.59% during the same time
frame, and the percent of regulatory classified assets to capital went from 24.7% in the fourth
quarter to 18.3% at June 30. Our net charge-offs are a muted 3 basis points, and our total
reserves for loan losses, including purchase discounts, are 1.11%. Our ALLL has gone from 40
basis points to 42 basis points even with our acquisitions during the same time frame. ***Tim Kerr
and our special assets teams have done excellent work in staying focused on the quality of
our credit and managing special assets***."  These statements were false and misleading because

Defendants' credit quality had not improved with the addition of the two high-risk Gigi and Gatti's loans in June 2018 and, in fact had *increased* assets that should have been qualified in 2018.  Defendants omitted that only one month prior they had made two high-risk repapered loans to Gigi's and Gatti's in their extend and pretend scheme.

147.    Also during the July 20, 2018 earnings call, Defendant Elliot touted Equity Bank's "[focus] on asset quality," and reported that Equity Bank's "[p]rovision for loan losses was $750,000 in the quarter, ***reflecting the high credit quality we alluded to earlier***. And we have net loan recoveries for the quarter of $17,000. Greg referenced recoveries on OREO, and it was primarily on a senior living facility we acquired through the Eastman merger. ALLL as a percentage of total loans was 42 basis points at quarter-end, up since year-end, and total reserves with purchase accounting discounts was 1.11%. Elliott further touted Equity Bank's "responsible" lending practices, claiming that "[a]lthough we are not tightening credit at this point, we are not loosening either. We believe this cycle is long in the tooth, and we are still seeing some exuberant behavior from some other lenders in our markets. ***And I want our stakeholders to know that is not who we have ever been or who we will become. I simply expect our lending teams to continue to work hard, be smart, provide excellent service and expertise and grow our portfolio wisely***."  These statements were false and misleading because Defendants' credit quality had not improved with the addition of the two repapered high-risk Gigi and Gatti's loans in June 2018 and did not grow Equity Bank's portfolio wisely. Defendants omitted that only one month prior they had made two high-risk repapered loans to Gigi's and Gatti's in their extend and pretend scheme.

148.    On August 9, 2018, Equity Bank filed with the SEC its Form 10-Q for the quarter ended June 30, 2018.  The 2018 2Q 10-Q was false and misleading for the same reasons as Equity Bank's July 19, 2018 8-K because it reported the same financial results that were

materially false and misleading because of Defendants' "extend-and-pretend" scheme, which caused Equity Bank to materially misstate its income and expenses, provision for loan losses, allowance for loan losses and nonperforming assets. Moreover, the statements were materially false and/or misleading because Defendants failed to disclose that it had deviated from its lending standards by issuing new loans to Gatti's and Gigi's when there was substantial indications that the entities were insolvent and when it was unclear whether the entities were sufficiently capable of repaying the amounts of the loans.

149.    Additionally, the Form 10-Q expressly stated: "***The Company had no loans modified under troubled debt restructurings as of June 30, 2018 or December 31, 2017***." The foregoing statement was materially false and/or misleading because Defendants' failed to disclose, among others, the new loans that were issued to Gatti's and Gigi's in June 2018 to repaper their existing debt, which Gatti's and Gigi's were financially incapable of repaying.

### C.    Third Quarter 2018 False and Misleading Statements and Omissions

150.    On October 16, 2018, Equity Bank issued a press release entitled "Equity Bancshares, Inc., Reports Net Income for Third Quarter 2018, Continue to Build Oklahoma Franchise."   That same day, Equity Bank filed with the SEC a Form 8-K for 2018 3Q. The 8-K reported: (i) net income allocable to common stockholders was $25.9 million for the nine months ended September 30, 2018, as compared to $16.4 million for the nine months ended September 30, 2017, an increase of $9.5 million, or 58.2%; (ii) net income allocable to common stockholders was $10.3 million for the three months ended September 30, 2018, as compared to $5.2 million for the three months ended September 30, 2017, an increase of $5.2 million or 100.2%.; (iii) net interest income was $32.8 million for the three months ended September 30, 2018, as compared to $20.3 million for the three months ended September 30, 2017, a $12.4 million or 61.2% increase; the additional net interest income was primarily driven by growth in

loans and securities balances and to a lesser extent an increase in average yield on loans, partially offset by an increase in interest expense as we funded the growth in earning assets with more deposits and borrowings and an overall increase in the average cost of deposits; (iv) the provision for loan losses was $1.3 million for the three months ended September 30, 2018, as compared to $727 thousand for the three months ended September 30, 2017; for the three months ended September 30, 2018, we had net charge-offs of $364 thousand, as compared to net charge-offs of $326 thousand for the same period in 2017; (v)  as of September 30, 2018, Equity's allowance for loan losses to total loans was 0.43%, as compared to 0.40% at December 31, 2017; total reserves, including purchase discounts, to total loans were approximately 1.12% as of September 30, 2018, as compared to 1.21% at December 31, 2017; nonperforming assets of $50.3 million as of September 30, 2018, were 1.28% of total assets and included nonperforming assets of $2.8 million acquired in the KBC merger, $1.4 million acquired in the Adams mergers and $6.4 million acquired in the CBT merger; nonperforming assets at December 31, 2017, were $48.2 million or 1.52% of total assets.  These statements were materially false and misleading because of Defendants' "extend-and-pretend" scheme, which caused Equity Bank to materially misstate its income and expenses, provision for loan losses, allowance for loan losses and nonperforming assets. In addition, Equity Bank's 2018 3Q interest income was overstated by $600,000, as admitted by Defendant Elliott on the April 23, 2019 earnings call, "the financial impact really is in 3 potential areas. The first one is opportunity cost. On these loans, in the aggregate, our quarterly lack of interest from nonaccrual is about $600,000. So the sooner we take care of the resolution, the faster we can put those assets back to work."

151.    Defendants held an earnings call on October 17, 2018 to discuss Equity Bank's 2018 3Q results.  Defendant Elliott reported that Equity Bank "had another outstanding quarter

[ ]in terms of organic and acquisitive growth and a solid quarter for performance, with an earnings per share adjusted for mergers and acquisitions at $0.68 per share. . . . **Our credit quality remains strong, with year-to-date net charge-offs at a very small 3 basis points of loans. And our balance sheet growth continues to be brisk and responsible**." Defendant Kossover informed investors that Equity Bank's "annualized organic loan growth during the first 9 months of 2018 was approximately 8.5%, about where we forecasted in our legacy portfolio credit. **Quality has improved year-to-date as we have worked down nonaccruals**. Our OREO has decreased $900,000 to about $7 million. And as Brad said earlier, our year-to-date net charge-offs are a mere 3 basis points of loans. **Our percentage of nonperforming assets to total assets has improved from 1.52% at 12/31/17 to 1.28% at September 30**. Our ALLL has gone from 40 basis points to 43 basis points, even with our acquisitions during the same time frame. Our total reserves with purchase accounting discounts stand at 1.12%.  These statements were false and misleading because Defendants' credit quality had not improved with the addition of the two repapered high-risk Gigi and Gatti's loans in June 2018, and knew that Phillips had come to the bank asking for more money for the insolvent Gigi's and Gatti's and, only *one day later,* on *October 18, 2018,* Equity Bank, Gigi's, Gatti's and Phillips entered into a cross-collateralization agreement and Defendants loaned Phillips another $1,070,000. Defendants omitted that only one month prior they had made two repapered high-risk loans to Gigi's and Gatti's and made *another* loan to Phillips *that day* in their extend and pretend scheme.

152.    On November 9, 2018, Equity Bank filed with the SEC its Form 10-Q for the quarter ended September 30, 2018.  The 2018 3Q 10-Q was false and misleading for the same reasons as Equity Bank's October 16, 2018 8-K because it reported the same financial results that were materially false and misleading because of Defendants' "extend-and-pretend" scheme,

AMENDED CLASS ACTION COMPLAINT

which caused Equity Bank to materially misstate its income and expenses, provision for loan losses, allowance for loan losses and nonperforming assets.  In addition, Equity Bank's 2018 3Q interest income was overstated by $600,000, as admitted by Defendant Elliott on the April 23, 2019 earnings call, "the financial impact really is in 3 potential areas. The first one is opportunity cost. On these loans, in the aggregate, our quarterly lack of interest from nonaccrual is about $600,000. So the sooner we take care of the resolution, the faster we can put those assets back to work."

**D.**      **2018 Annual False and Misleading Statements and Omissions**

153.    On March 19, 2019, Equity Bank filed with the SEC form 12b-25 stating:

Equity Bancshares, Inc. (the "Company") has determined that it is unable to file with the Securities and Exchange Commission its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "Form 10-K") within the prescribed time period without unreasonable effort or expense. The Company is still preparing analyses and providing documentation requested by its auditors in connection with its audit for the year ended December 31, 2018. The Company expects to file the Form 10-K no later than fifteen calendar days following the due date of the Form 10-K.

Notwithstanding the Company's inability to file its Form 10-K within the prescribed time period, the Company currently does not expect to report in its Form 10-K any material changes to its financial results from those previously reported in the press release for the Company's financial results for the periods ended December 31, 2018.

This statement is materially misleading because it omits that Equity Bank's largest credit relationship filed for bankruptcy and that Defendants were engaged in an extend and pretend scheme to permit Equity Bank not to report any material changes to its financial results for the year ended December 31, 2018.

154.    On March 20, 2019, Equity Bank filed with the SEC its 10-K for the year ended December 31, 2018 claiming that:

Potential problem loans consist of loans that are performing in accordance with contractual terms, but for which management has concerns about the borrower's ability to comply with repayment terms because of the borrower's potential

financial difficulties. Potential problem loans are assigned a grade of special mention or substandard. At December 31, 2018, the Company had $52.9 million in potential problem loans which were not included in either nonaccrual or 90 days past due categories, compared to $21.1 million at December 31, 2017.

This statement was materially false and misleading because the Gigi's and Gatti's loans of $29.5 million should have been included in the potential problem loans of $52.9 million for 2018.  As of September 2018 Defendants knew that Gatti's was not sold to Satori for $25.5 million and, as of December 31, 2018 had not been sold to another buyer, and therefore the non-likelihood of repayment required the loans to be downgraded to special mention or substandard.

155.    Similarly the chart and statements under "Risk Categories of Loans By Class" were materially false and misleading.

**Risk Category of Loans by Class**

| | As of December 31, 2017 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Unclassified | | Classified | | Total |
| | | (Dollars in thousands) | | | | |
| Commercial and industrial | $ | 486,150 | $ | 21,369 | $ | 507,519 |
| Real estate: | | | | | | |
| Commercial real estate | | 787,894 | | 13,597 | | 801,491 |
| Real estate construction | | 183,564 | | 2,606 | | 186,170 |
| Residential real estate | | 370,151 | | 6,554 | | 376,705 |
| Agricultural real estate | | 77,084 | | 9,402 | | 86,486 |
| Total real estate | | 1,418,693 | | 32,159 | | 1,450,852 |
| Consumer | | 48,777 | | 584 | | 49,361 |
| Agricultural | | 88,261 | | 7,286 | | 95,547 |
| Total | $ | 2,041,881 | $ | 61,398 | $ | 2,103,279 |

| | As of December 31, 2016 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Unclassified | | Classified | | Total |
| | | (Dollars in thousands) | | | | |
| Commercial and industrial | $ | 341,307 | $ | 7,158 | $ | 348,465 |
| Real estate: | | | | | | |
| Commercial real estate | | 464,095 | | 14,720 | | 478,815 |
| Real estate construction | | 111,975 | | 2,318 | | 114,293 |
| Residential real estate | | 333,298 | | 5,089 | | 338,387 |
| Agricultural real estate | | 36,190 | | 2,141 | | 38,331 |
| Total real estate | | 945,558 | | 24,268 | | 969,826 |
| Consumer | | 40,382 | | 520 | | 40,902 |
| Agricultural | | 24,134 | | 278 | | 24,412 |
| Total | $ | 1,351,381 | $ | 32,224 | $ | 1,383,605 |

At December 31, 2018, loans considered unclassified decreased to 96.7% of total loans from 97.1% of total loans at December 31, 2017. Approximately $17.9 million of loans considered classified increase were a direct result of the KBC, Adams and City Bank mergers. In accordance with applicable regulation, appraisals or evaluations are required to independently value real estate and, as an important element, to consider when underwriting loans secured in part or in whole by real estate. The value of real estate collateral provides additional support to the borrower's credit capacity.

> With respect to potential problem loans, all monitored and under-performing loans are reviewed and evaluated to determine if they are impaired. If we determine that a loan is impaired, then we evaluate the borrower's overall financial condition to determine the need, if any, for possible write downs or appropriate additions to the allowance for loan losses based on the unlikelihood of full repayment of principal and interest in accordance with the contractual terms or the net realizable value of the pledged collateral.

These statements were materially false and misleading because they materially omitted that the Gigi's and Gatti's loans, which should have been classified as special mention or substandard in 2018.

156.    In addition, Equity Bank's 2018 10-K was false and misleading because of Defendants' "extend-and-pretend" scheme, which caused Equity Bank to materially misstate its income and expenses, provision for loan losses, allowance for loan losses and nonperforming assets.

### E.    First Quarter 2019 False and Misleading Statements and Omissions

157.    On January 24, 2019, during the earnings call to discuss 1Q 2019 results, Defendants stated that during fourth quarter 2018, a credit relationship was downgraded to Watch and Substandard for $19 million and $9 million, respectively.  Specifically Defendant Kossover stated, "[w]e do have 1 credit relationship that has been downgraded to watch and substandard for $19 million and $9 million, respectively, at December 31, 2018. These 2 credits are related to the same operator. This relationship is not indicative of a systemic issue in the portfolio, rather one operator who is experiencing difficulty and is working with us to possibly restructure or liquidate his business to resolve his relationship with us. At December 31, 2018, we do not expect a credit impairment based on the collateral and circumstances. Our total reserves to loans are 1.03% at December 31, 2018, of which 45 basis points is traditional ALLL." Defendants' statements were materially misleading because Defendants omitted the significance of the credit relationship, *i.e.*, that these two loans comprised the bank's largest

credit relationship, that these borrowers were in Chapter 11 bankruptcy resulting in a needed credit

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

158.    Numerous facts demonstrate that Defendants Elliott and Kossover knew, or  were severely  reckless  in  not  knowing,  that  Equity Bank's  financial  statements  were misstated when issued.

159.    First, Defendants Elliot and Kossover, as members of the Loan Committee and Risk Committee, were intimately involved in the process of approving loans, modifying loans when they became delinquent,  and  extending   new  credit  to  borrows  who  could  not  make their  payments.  According to Equity Bank's 2018 10-K, Defendants Elliott and Kossover sat on the "internal loan committee" and were delegated additional "lending authority."   According to CW1 the Special Asset meetings were attended by Defendants Elliott and Kossover and Chief Credit Officer Craig Mayo. CW1 reported that Defendant Elliot attended all the special assets meetings, which is the equivalent of the collection services, which reviewed non-performing loans, including the Gigi's and Gatti's loans. The Special Assets Committee would meet with the Risk Committee regarding the delinquent loans and the executive management would become involved anytime the level of risk was increased on any loan.  According to CW1, the Gigi's and Gatti's loans should have been elevated to a risk level "8,"  but at Defendants Elliott and Kossover's direction, Mayo was prevented from elevating the risk level for "audit purposes." Accordingly, because Defendants Elliott and Kossover sat on these committees, they were closely familiar with the value and credit quality of Equity Bank's loans, including the Gigi's and Gatti's loans.

160.    Second,  the  Gigi's  and  Gatti's  loans  comprised  Equity  Bank's  "largest relationship," as stated by Defendant Elliott in Equity Bank's April 23, 2019 earnings call.

According to CW1, Defendant Elliott was a highly involved CEO and knew everything about the Gigi's and Gatti's loans.  Further, the health and credit quality of not only the Gigi's and Gatti's loans in addition to Equity Bank's commercial loan portfolio was critical to the Company's financial performance during the Class Period.  Indeed, the commercial loan portfolio was the Bank's largest asset, which comprised  71.2% of Equity Bank's 2018 loan portfolio, was a focus of investor concern, and was the subject of dozens of Defendants' public statements—yet Defendants concealed the true impaired nature of Equity Bank's largest credit relationship. Having spoken repeatedly and reassuringly on the subject of the financial health of Equity Bank, Defendants were obligated to ensure that their disclosures were accurate and complete. Any failure to do so on a subject as important as this one constitutes severely reckless conduct at minimum.

161.    Third, Defendant Elliot *admitted* he made the decision to continue lending to Gigi's and Gatti's despite the companies' insolvency and inability to repay the loans.  In Equity Bank's April 23, 2019, earnings call Elliott stated:

> *As CEO of our company, I own this credit decision*. Our team extended credit to these borrowers based on a long history of success in their businesses and with us as their bank. *Unfortunately, circumstances changed and we did not discontinue advancing funds early enough*.

162.    Further, on Equity Bank's 2019 Q2 earnings call, Defendants admitted to irresponsibly extending Gigi's and Gatti's credit in 2018.  Defendant Elliott stated:

> Although *I've obviously been disappointed by the performance of these credits, and it is a responsibility myself and our executive team completely own*, I'm happy to see the hard work of our legal and credit teams to get this remaining business out of bankruptcy and returned to normal operation.

163.    Defendants *knew* that Gigi's and Gatti's loans should be classified and impaired, but Defendants chose to continue their to "extend and pretend" practices in hopes that the loans would be repaid in 2018 and Equity Bank would not have to impair the loans and take a loss

against its loan reserves. Defendants' "extend and pretend" practices constitute severely reckless conduct.

164. Fourth, in its SEC filings, Equity Bank claimed to conduct "early-stage review of loans, regular credit evaluations and management reviews of loans, which supplement the ongoing and proactive credit monitoring and loan servicing provided by our bankers." Defendants' review of Equity Bank's loan portfolio on the Loan, Risk and Special Assets Committees gave Defendants first-hand knowledge of the true quality and value of the Gigi's and Gatti's loans.

## VIII. CORPORATE SCIENTER ALLEGATIONS

165. Throughout the Class Period, Defendants Elliott and Kossover served as CEO and CFO. As CEO and CFO, Individual Defendants signed each of the Class Period SEC filings on behalf of Equity Bancshares. Defendants Elliott and Kossover, therefore, acted with apparent authority to speak on behalf of the Company and their statements were made with the imprimatur of the Company that selected them to speak on its behalf. Moreover, as CEO and CFO, Elliott and Kossover were highly involved in the preparation, review, finalization, and issuance of the Company's financial statements, and investors relied on his honesty and integrity.

166. Based on the foregoing, Defendant Elliott's and Kossover's actions and scienter are imputable to Equity Bank at all times during the Class Period. Defendants Elliott and Kossover acted as an agent of Equity Bank, both with respect to the SEC filings that they signed and also with respect to the SEC filings and earnings releases that he assisted in preparing and/or that their  oversaw or participated in the accounting for. Therefore, Defendants Elliott's and Kossover's state of mind is imputable to Equity Bank for all of the challenged statements in this Complaint, whether or not they personally signed those statements.

AMENDED CLASS ACTION COMPLAINT

IX.    <u>**LOSS CAUSATION**</u>

167.    The market price of Equity Bank's publically traded common stock was artificially inflated by the material misstatements and omissions complained of herein, including the GAAP violations related to the Gigi's and Gatti's loans.

168.    The artificial inflation in Equity Bank's stock price was removed when the facts, conditions, and risks misstated and omitted by Defendants were revealed to the market.  The information was disseminated through partial disclosures on: January 23-24, 2019; March 19, 2019; and April 22-23, 2019, which revealed on a piecemeal basis the nature and true extent of the non-performing loans of Gigi's and Gatti's, Equity Bank's misstated financial statements and their material negative impacts on Equity Bank.  These disclosures, more particularly described below, reduced the amount of artificial inflation in the price of Equity Bank's publically traded stock, causing economic injury to Lead Plaintiffs and other Class members.

169.    On January 23 and 24, 2019, when Equity Bank disclosed that, during fourth quarter 2018, a credit relationship was downgraded to Watch and Substandard for $19 million and $9 million, respectively. On this news, the Company's share price fell $2.14, or more than 6%, to close at $32.15 per share on January 24, 2019, on unusually heavy trading volume.

170.    Then, on March 19, 2019, Equity Bank filed Form 12b-25 with the SEC stating that the Company had determined that it is unable to file its annual report for the fiscal year ended December 31, 2018 within the prescribed time period.  Equity Bank reported that it was still conducting its audit for the year ended December 31, 2018.  On this news, the Company's share price fell $1.69 per share, or 5.24%, to close at $30.56 per share on March 20, 2019. During the next two days, the Company's share price further declined another $0.83, or about 2.7%, to close at $29.73 on March 21, 2019, and another $1.77 per share, or 5.95%, to close at $27.96 on March 22, 2019.

171.    Equity Bank's January 24, 2019 and March 19, 2019 disclosures partially corrected, *inter alia,* Defendants' prior materially misleading statements and omissions concerning the Bank's financial health. These disclosures also partially revealed the risks associated with the Bank's inadequate loan impairment process that had been partially concealed from investors. Notwithstanding that partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the January 24, 2019 and March 20, 2019 disclosures failed to disclose that: (a) the Bank had issued materially misstated financial statements, including by failing to impair the Gigi and Gatti's loans in 2018, and overstating its net income and earnings per share by failing to properly reserve for delinquent loans and; (b) Equity Bank concealed the material amounts of Gigi's and Gatti's past due loans and failed to take required reserves and charge-offs in 2018 through its "extend and pretend" scheme.

172.    On April 22, 2019, the Company disclosed a $14.5 million provision for loss against the bank's largest credit relationship had impacted its financial results for first quarter 2019.  On this news, the Company's share price fell $4.76, or more than 16%, to close at $24.71 per share on April 23, 2019, on unusually heavy trading volume.

173.    None of these disclosures was sufficient on its own to fully remove the inflation from Equity Bank's stock price, because each only partially revealed the risks and conditions that had been concealed from investors. The corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions about Equity Bank's purported success in managing the financial health of Equity Bank and the quality of its commercial loan portfolio. These misrepresentations and omissions continued to maintain the prices of Equity Bank's publicly traded stock at levels that were artificially inflated, inducing members of the Class to continue purchasing Equity Bank stock even after the truth began to

partially enter into the market. The disclosures that corrected the market prices to reduce the artificial inflation caused by Defendants' material misstatements and omissions are detailed below.

174.    Accordingly, the decline in Equity Bank's stock price was a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of Equity Bank's stock price decline negates any inference that the economic losses and damages suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Bank-specific facts unrelated to the Defendants' fraudulent conduct.

## X.    **THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Equity Bancshares who knew that the statement was false when made.

XI.    **THE PRESUMPTION OF RELIANCE**

175.    The market for Equity Bancshares's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Equity Bancshares's securities traded at artificially inflated prices during the Class Period. On June 19, 2018, the Company's share price closed at a Class Period high of $43.87 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Equity Bancshares's securities and market information relating to Equity Bancshares, and have been damaged thereby.

176.    During the Class Period, the artificial inflation of Equity Bancshares's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Equity Bancshares's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Equity Bancshares and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

177.    At all relevant times, the market for Equity Bancshares's securities was an efficient market for the following reasons, among others:

(a)    Equity Bancshares shares met the requirements for listing, and was listed

and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Equity Bancshares filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Equity Bancshares regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Equity Bancshares was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

178.    As a result of the foregoing, the market for Equity Bancshares's securities promptly digested current information regarding Equity Bancshares from all publicly available sources and reflected such information in Equity Bancshares's share price. Under these circumstances, all purchasers of Equity Bancshares's securities during the Class Period suffered similar injury through their purchase of Equity Bancshares's securities at artificially inflated prices and a presumption of reliance applies.

179.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial

prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.   CLASS ACTION ALLEGATIONS

180.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Equity Bancshares securities between April 20, 2018 and April 20, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

181.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Equity Bancshares's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Equity Bancshares common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Equity Bancshares or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

182.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

183.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

184.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Equity Bancshares; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

185.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   CAUSES OF ACTION

**COUNT I**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

186.    Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

187.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Equity Bancshares's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

188.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Equity Bancshares's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

189.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Equity Bancshares's financial well-being and prospects, as specified herein.

190.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Equity Bancshares's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Equity Bancshares and its

business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

191.   Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

192.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Equity Bancshares's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they

did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

193.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Equity Bancshares's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Equity Bancshares's securities during the Class Period at artificially high prices and were damaged thereby.

194.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Equity Bancshares was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Equity Bancshares securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

195.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

196.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases

and sales of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

197.    Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein.

198.    Individual Defendants acted as controlling persons of Equity Bancshares within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

199.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

200.    As set forth above, Equity Bancshares and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section

20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## XV.   <u>JURY DEMAND</u>

Lead Plaintiffs hereby demand a trial by jury.

Dated: October 15, 2019

**GLANCY PRONGAY & MURRAY LLP**

By: <u>*s/ Lesley F. Portnoy*</u>
Lesley F. Portnoy (LP-1941)
230 Park Avenue, Suite 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: lportnoy@glancylaw.com

-and-

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Jennifer M. Leinbach
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email: info@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Lead Plaintiffs Stephen Burr and David Tangeman*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 15, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 15, 2019.


*s/ Lesley F. Portnoy*
Lesley F. Portnoy