**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X
                :

STEPHEN BURR and DAVID
TANGEMAN, individually and on behalf of  :
all others similarly situated,

        Plaintiffs,

      -against-                      Case No. 19-cv-04346-AJN

EQUITY BANCSHARES, INC., BRAD S.
ELLIOTT, and GREGORY H.
KOSSOVER,

        Defendants.

-------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE AMENDED CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT FACTUAL BACKGROUND ................................................................................. 3

    I.      Key Accounting Concepts .................................................................................. 3

          A.      Allowance for Loan Losses and Loan Loss Provisions ............................ 3

          B.      Credit Quality Indicators ........................................................................ 4

    II.     The Subject Loans .............................................................................................. 5

    III.    The Allegedly "False and Misleading" Statements and Omissions ...................... 6

          A.      Q1 2018 Earnings Call ............................................................................ 7

          B.      Q1 2018 Form 10-Q ................................................................................ 7

          C.      July 2018 Press Release, Form 8-K, and Earnings Call ........................... 7

          D.      October 2018 Press Release, Form 8-K, and Earnings Call ...................... 8

          E.      January 2019 Earnings Call ..................................................................... 8

          F.      March 2019 Form 12b-25 and Form 10-K ................................................ 9

          G.      April 2019 Form 8-K and Earnings Call .................................................. 10

    IV.    Equity Bancshares' Cautionary Statements ........................................................ 10

LEGAL STANDARDS .......................................................................................................... 11

ARGUMENT AND AUTHORITIES ....................................................................................... 13

    I.      Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5 .................. 13

          A.      Plaintiffs Fail to Allege a Materially False or Misleading Statement or Omission .......................................................................................... 16

                 1.      Statements Concerning Credit Quality and Lending Practices ................................................................................ 17

                 2.      Statements Concerning the Gatti's and Gigi's Loans ................. 19

                       a.      The Statements in Question Were Matters of Judgment and Opinion About Future Performance ......... 21

                       b.      Equity Bancshares Had No Duty to Disclose that the Gigi's and Gatti's Loans Were Its "Largest Credit Relationship" ........................................................ 23

                       c.      Equity Bancshares Had No Duty to Disclose the Bankruptcies ................................................................ 24

                   3.      Statements Concerning Figures on Equity Bancshares' Balance Sheet ............................................................................ 25

# TABLE OF CONTENTS
(continued)

**Page**

B.     Plaintiffs Fail to Allege Facts Giving Rise to a Strong Inference of Scienter ...................................................................................... 26

     1.     Plaintiffs' Inference of Scienter Is Neither Cogent Nor Compelling.................................................................................. 26

     2.     Plaintiffs Do Not Adequately Allege Motive and Opportunity.................................................................................. 28

     3.     Plaintiffs Do Not Adequately Allege Facts Giving Rise to a Strong Inference of Conscious Misbehavior or Recklessness .............................................................................. 29

         a.     The "Confidential Witness" Allegations ......................... 30

         b.     Defendants' Titles and Membership on Corporate Committees ..................................................................... 33

         c.     Mr. Elliott's Statements on Equity Bancshares' 2019 Earnings Calls ......................................................... 33

         d.     Equity Bancshares' Monitoring System for Loans .......... 34

II.     Plaintiffs Fail to State a Claim Under Section 20(a).......................................... 35

CONCLUSION............................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F. 3d 47 (2d Cir. 1995)....................................................................................2, 22

*In re Alpharma Inc. Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004)..................................................................................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................11

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) ..........................................................................29

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015)....................................................12, 26, 32, 33

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................................................................16

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)................................................................................25

*Caiafa v. Sea Containers Ltd.*,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007)...............................................................22, 25

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)..................................................................................25

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008)....................................................................33

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)..................................................................................15

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Public Ltd. Co.*,
  655 F. Supp. 2d 262 (S.D.N.Y. 2009)....................................................................20

*City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*,
  No. 17 Civ. 3501 (JFK), 2019 WL 452051 (S.D.N.Y. Feb. 5, 2019)......................18

*In re CRM Holdings, Ltd. Sec. Litig.*,
  No. 10 Civ. 975 (RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...................26

*In re Duane Reade Inc. Sec. Litig.*,
  2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ......................................................27

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...........................................12, 13, 16, 18, 24, 28, 29

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008)..................................................................................31

*In re Eros Int'l Sec. Litig.*,
   No. 15-CV-8956 (AJN), 2017 WL 6405846 (S.D.N.Y. 2017)...............................................17

*In re Express Scripts Holdings Co. Sec. Litig.*,
   773 F. App'x 9 (2d Cir. 2019) ...........................................................................................15

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011)......................................................................................2, 15, 28

*Fila v. Pingtan Marine Enter. Ltd.*,
   195 F. Supp. 3d 489 (S.D.N.Y. 2016)..........................................................................12, 16, 35

*First Nationwide Bank v. Gelt Funding Corp.*,
   820 F. Supp. 89 (S.D.N.Y. 1993) .......................................................................................1, 4

*Frankfurt-Trust Inv. Lux. AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018).............................................................................16, 21

*Green v. Deutsche Bank Aktiengesellschaft*,
   No. 18-CV-5104 (AJN), 2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019) ...............................13

*Gross v. Summa Four, Inc.*,
   93 F.3d 987 (1st Cir. 1996)................................................................................................25

*Haw. Structural Ironworkers Pension Trust Fund v. AMC Entm't Holdings, Inc.*,
   No. 18-CV-00299 (AJN), 2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019) ......12, 17, 18, 19, 30

*Higginbotham v. Baxter Int'l Inc.*,
   495 F.3d 753 (7th Cir. 2007) ..............................................................................................29

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)..........................................................................................29, 34

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010)..........................................................................30, 32, 33

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   No. 09 MD 2030 ..............................................................................................................21

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................20, 21, 25, 29, 30, 35

*In re Omega Healthcare Investors, Inc. Sec. Litig.*,
   375 F. Supp. 3d 496 (S.D.N.Y. 2019).........................................................16, 21, 23, 27, 30, 34

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
   153 F. Supp. 3d 628 (S.D.N.Y. 2015)..................................................................................30

*Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings, Inc.*,
   No. 16-CV-3068 (AJN), 2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017).........16, 17, 19, 23, 24

*In re Radian Sec. Litig.*,
   612 F. Supp. 2d 594 (E.D. Pa. 2009) ...................................................................................20

*In re Refco, Inc. Sec. Litig.*,
　　503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................35

*Rice v. Charles Schwab*,
　　No. 10-00398-CJC, 2010 WL 5156654 (C.D. Cal. Oct. 22, 2010) .........................21

*Rombach v. Chang*,
　　355 F.3d 164 (2d Cir. 2004)....................................................................................29

*S. Cherry St., LLC v. Hennessee Grp., LLC*,
　　573 F.3d 98 (2d Cir. 2009)......................................................................................29

*SEC v. Price Waterhouse*,
　　797 F. Supp. 1217 (S.D.N.Y. 1992)........................................................................26

*Shapiro v. UJB Fin. Corp.*,
　　964 F.2d 272 (3d Cir. 1992).....................................................................................22

*Shields v. Citytrust Bancorp, Inc.*,
　　25 F.3d 1124 (2d Cir. 1994)........................................................................22, 27, 35

*Silsby v. Icahn*,
　　17 F. Supp. 3d 348 (S.D.N.Y. 2014)................................................20, 23, 24, 28

*Slayton v. Am. Express Co.*,
　　604 F.3d 758 (2d Cir. 2010)....................................................................................17

*In re Sotheby's Holdings, Inc.*,
　　No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)...............33

*Stevelman v. Alias Research Inc.*,
　　174 F.3d 79 (2d Cir. 1999)......................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　　551 U.S. 308 (2007).....................................................................................13, 26, 35

*Tongue v. Sanofi*,
　　816 F.3d 199 (2d Cir. 2016)....................................................................................19

*In re UBS AG Sec. Litig.*,
　　No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)...............22

*In re Wachovia Equity Sec. Litig.*,
　　753 F. Supp. 2d 326 (S.D.N.Y. 2011)......................................................................18

*Woodward v. Raymond James Fin., Inc.*,
　　732 F. Supp. 2d 425 (S.D.N.Y. 2010)......................................................................17

**Rules and Statutes**

15 U.S.C. § 78u-4(b)(1) ..................................................................................................12

15 U.S.C. § 78u-5(c) .......................................................................................................17

## PRELIMINARY STATEMENT

This case presents yet another iteration of the classic—albeit impermissible—hindsight theory of securities fraud. In January 2019, Equity Bancshares, Inc. ("Equity Bancshares")[1] announced that it had downgraded a credit relationship totaling approximately $28 million. The credit relationship involved two related borrowers: Gatti's Pizza ("Gatti's") and Gigi's Cupcakes ("Gigi's"). In April 2019, when Equity Bancshares released its Q1 results, it announced that it had elected to record a $14.5 million provision for loss against that same credit relationship. Plaintiffs now allege that Equity Bancshares should have predicted a loss sooner, and therefore essentially all of Equity Bancshares' public statements from April 2018 to April 2019 were false and misleading.

The complaint should be dismissed for at least three reasons. *First*, Plaintiffs fail to allege with particularity any facts showing that the statements they challenge were actually false. Many of the statements Plaintiffs pluck from Equity Bancshares' financial reports are mere expressions of optimism about the bank's credit quality or the job performance of its officers—garden-variety puffery that the securities laws rightly protect from liability. Other statements are plainly opinions concerning the credit quality or future performance of the bank's borrowers, which Plaintiffs cannot plead with particularity to have been objectively or subjectively false when made. Indeed, the complaint is devoid of facts supporting Plaintiffs' retrospective contention that Equity Bancshares—to say nothing of the executives named as defendants here—knew that the Gigi's and Gatti's loans would be uncollectible and chose to delay their inevitable impairment by simply "repapering" them. To the contrary, the very documents cited by Plaintiffs and incorporated by reference in the complaint indicate that Equity Bancshares agreed to restructure Gigi's and Gatti's existing debts on aggressive terms that protected the bank's investment, including collateralization

---

[1] References in this motion to "Equity Bancshares" or "the bank" refer to Equity Bancshares, Inc. and its consolidated subsidiaries, including Equity Bank.

of virtually all of the companies' assets and personal guaranties from the companies' owners, and that Equity Bancshares anticipated a sale of Gatti's for an amount sufficient to cover the entire credit relationship. Further, as this discussion makes plain, the decisions at the heart of Plaintiffs' claims—whether to impair loans and record loan loss provisions due to concerns the loans may not be paid back in the future—are matters of business judgment turning on a wide range of factors, and so are presumptively shielded from liability under the law of the Second Circuit. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011).

*Second*, the complaint falls fatally short of the PSLRA's demanding pleading standards for scienter. As the Second Circuit bluntly put it almost 25 years ago, "lack of clairvoyance simply does not constitute securities fraud." *Acito v. IMCERA Grp., Inc.*, 47 F. 3d 47, 53 (2d Cir. 1995). Under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"), the exclusive source of Plaintiffs' causes of action, it is not enough for Plaintiffs to allege that Equity Bancshares failed to predict that some of its borrowers may fail to satisfy their loan obligations. Nor is it sufficient to second-guess Equity Bancshares' judgments as they relate to loan loss provisions, risk management, or impairment analyses. There must be more—specifically, there must be evidence that Equity Bancshares and its named executives each acted with *intent to deceive, manipulate, or defraud*. This element of intent is what distinguishes securities fraud from non-actionable fraud by hindsight. And, given Plaintiffs' inability to posit any plausible motive for fraud—indeed, the complaint's "extend-and-pretend" theory is belied by common sense as much as the record—the complaint cannot meet the Second Circuit's heightened standard for pleading scienter through circumstantial evidence of conscious misbehavior or recklessness.

*Finally*, Plaintiffs' claims of control person liability under Section 20(a) are derivative of their primary claims and therefore fail as well.

## RELEVANT FACTUAL BACKGROUND

### I.    Key Accounting Concepts

#### A.    Allowance for Loan Losses and Loan Loss Provisions

An allowance for loan losses (also referred to as "ALLL" and "loan loss reserves") is the amount banks set aside based on their expectations of future loan losses. Loan loss reserves are calculated based on management's estimate of the risk in the bank's loan portfolio. In making these estimates, management considers a wide range of factors, including past experience, the nature and volume of the portfolio, information about specific borrower situations and estimated collateral values, and economic conditions. ¶ 38.[2]

Equity Bancshares' loan loss reserve is comprised of specific and general components. The general component covers non-impaired loans and is based on historical loss experience adjusted for current factors. ¶ 39. The specific component relates to loans that are individually classified as "impaired," denoting loans for which, "based on current information and events, it is probable that [the bank] will be unable to collect all contractual principal and interest due according to the terms of the loan agreement." ¶ 37.[3]

Equity Bancshares' 2017 and 2018 10-Ks made clear to investors that the calculation of loan loss reserves depends on "management's best estimate of probable incurred losses in our loan

---

[2] Unless otherwise noted, references to "¶ __" are to the Amended Class Action Complaint filed on October 15, 2019 (ECF No. 26) (the "complaint"), references to "Compl. Ex. __" are to the exhibits attached to the complaint, and references to "Ex. __" are to the exhibits attached to the Declaration of Mark Oakes filed contemporaneously with this memorandum.

[3] Equity Bancshares' management considers a variety of factors when determining impairment, including payment status, collateral value, and the probability of collecting scheduled principal and interest payments when due. ¶ 37. Further, management determines the significance of payment delays and payment shortfalls on a case-by-case basis, taking into consideration all of the circumstances surrounding the loan and the borrower, including the length of the delay, the reasons for the delay, the borrower's prior payment record, and the amount of the shortfall in relation to the principal and interest owed. *Id.*

portfolio," and that "[m]anagement makes various assumptions and judgments about the collectability of our loan portfolio." Ex. A at 27; Ex. B at 27. Investors were expressly warned that "[i]f our assumptions, including our qualitative factors, prove to be incorrect, our current allowance may not be sufficient and adjustments may be necessary to allow for different economic conditions or adverse developments in our loan portfolio." Ex. A at 27; Ex. B at 27. Consistent with this framework, courts have long recognized that "the taking of loan loss reserves is based on managerial guesswork about the future." *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95 (S.D.N.Y. 1993), *aff'd*, 27 F.3d 763 (2d Cir. 1994).

### B.    Credit Quality Indicators

Equity Bancshares categorizes loans into four risk categories based on relevant information about the ability of borrowers to service their debt: Pass, Special Mention, Substandard, and Doubtful. ¶ 35. Loans rated Pass are considered "unclassified," and loans with any lower ratings are considered "classified." *Id.*[4] As with loan losses, the placement of a loan into a particular risk category calls for the exercise of managerial judgment, taking into account factors such as financial information, historical payment experience, credit documentation, public information, and current economic trends. Ex. B at F-31. Equity Bancshares also monitors and reports what it terms "potential problem loans"—those that are performing in accordance with contractual terms, but for which management has concerns about the borrower's ability to comply with repayment terms because of the borrower's potential financial difficulties. ¶ 154. With respect to potential problem loans, all monitored and underperforming loans are evaluated for impairment, and, if management determines that a loan is impaired, then it evaluates the borrower's overall financial condition to determine the need, if any, for write downs or additions to loan loss reserves based on the

---

[4] In its SEC filings, Equity Bancshares discloses the amounts of classified and unclassified loans and the allowance for loan losses but not the amounts of loans in each risk category.

unlikelihood of full repayment in accordance with contractual terms or the net realizable value of the pledged collateral. Ex. B at 71. In other words, loan impairment is a separate inquiry from loan rating and classification—the simple fact that a loan is classified or deemed a "potential problem loan" does not mean that the loan is or should be impaired.

## II.    The Subject Loans

Equity Bancshares extended various loans to Gatti's and Gigi's (via their respective parent companies, Sovrano, LLC and KeyCorp, LLC) starting in December 2015. The owners of Sovrano and KeyCorp, Robert J. ("R.J.") Phillips, Jr. and Kyle C. Mann, are established businessmen who had arranged successful investments with Equity Bancshares in the past. ¶ 121.

On June 28, 2018, Gigi's and Gatti's each refinanced and consolidated their loans. All existing loans to Sovrano, LLC and Mr. Gatti's LP were consolidated into a single term loan in the amount of $20,250,000 (the "Consolidated Gatti's Loan"). Compl. Ex. 10. The Consolidated Gatti's Loan was secured by a first lien on all business assets, including accounts, inventory, instruments, and equipment. Compl. Ex. 10 at 8. Messrs. Phillips and Mann executed limited guaranties securing the repayment obligations to varying extents, and Equity Bancshares received a $25,000 fee for the refinancing. *Id.* at 6–7. Similarly, all existing loans to Gigi's Cupcakes and Gigi's Operating were consolidated into a single term loan in the amount of $9,250,000 (the "Consolidated Gigi's Loan"). Compl. Ex. 3. The Consolidated Gigi's Loan was secured by a first lien on all business assets of Gigi's Cupcakes, LLC and Gigi's Operating, LLC, including accounts, inventory, instruments, and equipment. *Id.* at 7–8. Messrs. Phillips and Mann executed guaranties securing the repayment obligations in full, Compl. Exs. 4, 5, and Equity Bancshares received a $25,000 fee for the refinancing, Compl. Ex. 3 at 6. Both loans also required the borrowers to make a number of covenants limiting the businesses' leverage and disposition of assets, and

99001041.12                                                                 - 5 -

directing their owners to periodically deliver corporate and personal financial statements to Equity Bancshares. Compl. Ex. 3 at 12–17; Compl. Ex. 10 at 12–17.

In October 2018, Equity Bancshares loaned $1,070,000 to Mr. Phillips to be used as working capital for Gatti's and/or Gigi's (the "Phillips Loan"). ¶ 98. That loan was secured by a deed on property located in Sea Island, Georgia, as well as the same collateral securing the Consolidated Loans. Compl. Ex. 13 at 1. Further, in connection with the Phillips Loan, Gatti's and Gigi's agreed to cross-collateralize the Consolidated Loans. *Id.* at 2–3. In other words, the assets of Gatti's would be available to satisfy the Consolidated Gigi's Loan, and the assets of Gigi's would be available to satisfy the Consolidated Gatti's Loan.

Although Plaintiffs describe the Consolidated Gatti's Loan and Consolidated Gigi's Loan (together, the "Consolidated Loans") as "repapering," Plaintiffs make no effort to explain the changes made to the economic terms of the loans in connection with the refinancing, and the actual loan documents attached to the complaint show meticulous measures to protect Equity Bancshares from loss, including extensive collateral rights and personal guaranties from Messrs. Phillips and Mann. *See* Compl. Exs. 3–11, 13.

Further, while Plaintiffs gloss over this fact in the complaint, there were at least two letters of intent for the purchase of Gatti's at a price sufficient to pay off both of the Consolidated Loans, and as of December 31, 2018, both of the Consolidated Loans were current. ¶ 122.

III.   **The Allegedly "False and Misleading" Statements and Omissions**

Plaintiffs launch a scattershot volley of alleged false or misleading statements in Equity Bancshares' SEC filings, press releases, and earnings calls between April 20, 2018 and April 23, 2019. *See* ¶¶ 142–57. Bearing in mind that the Consolidated Loans were not executed until June 28, 2018, and the Gigi's and Gatti's bankruptcy proceedings were not instituted until January 2019, a representative sampling of the statements that Plaintiffs portray as false or misleading follows.

### A.    Q1 2018 Earnings Call

On April 20, 2018—over two months before the Consolidated Loans were executed, and roughly six months before the Phillips Loan was negotiated—Defendants made the following statements in a quarterly earnings call:

- "We have also been busy continuing to work down nonperforming assets, most of which we acquired through mergers." ¶ 142.

- "As we have said on our last call, we believe the current business environment is suitable for reducing nonperforming assets; and as such, Tim Kerr, our special asset manager, has done an excellent job reducing these with his team and on terms within our expectations." *Id.*

- "Provision for loan losses was $1,170,000 in the quarter, essentially where we planned. Net charge-offs for the quarter were only $352,000, and nothing large was in that number. ALLL as a percentage of total loans was 44 basis points at quarter end and total reserves with purchase accounting discounts was 1.19%." *Id.*

- "As we continually monitor our portfolio and markets for macro trends, we continue to see muted credit weakness. However, and as I have stated before, we are also not loosening our credit criteria." *Id.*

### B.    Q1 2018 Form 10-Q

On May 1, 2018, still months before the Consolidated Loans were executed, Equity Bancshares made factual statements in its Form 10-Q about its income, provision for loan loss, net loan charge-offs, allowance for loan loss, total reserves, and nonperforming assets. ¶ 143. As with all of the purported misstatements tracing to Equity Bancshares' financials, Plaintiffs allege that the numerical figures are misstated due to inadequate provisions for loan losses but do not specify by what amounts. *Id.*

### C.    July 2018 Press Release, Form 8-K, and Earnings Call

On July 18, 2018, Equity Bancshares issued a Form 8-K and accompanying press release, which reported the bank's income for Q2 2018 using a host of numerical figures that Plaintiffs allege to be misstated by unspecified amounts. ¶ 144. Equity Bancshares also held an earnings call on July 20, 2018, in which the following alleged misstatements were made:

- "[S]econd quarter core earnings, defined as after-tax net income without merger expenses, was another record for our company. Our credit quality remains strong. Our net interest margin continues to be solid, and our balance sheet growth continues to be responsible. This comes as a result of the hard work from the Equity Bank team, both through mergers and through the organic efforts of our outstanding production, operating and support teams day-to-day at our bank." ¶ 145.

- "Although we are not tightening credit at this point, we are not loosening either. We believe this cycle is long in the tooth, and we are still seeing some exuberant behavior from some other lenders in our markets. And I want our stakeholders to know that is not who we have ever been or who we will become. I simply expect our lending teams to continue to work hard, be smart, provide excellent service and expertise and grow our portfolio wisely." ¶ 147.

### D.     October 2018 Press Release, Form 8-K, and Earnings Call

Plaintiffs similarly challenge Equity Bancshares' October 16, 2018 press release and Form 8-K, which reported the bank's net income allocable to stockholders, net interest income, provision for loan loss, ratio of allowance for loan loss to total loans, total reserves, and nonperforming assets for Q3 2018. ¶ 150. Plaintiffs again repeat their allegation that these statements were misleading because Equity Bancshares had "materially misstate[d] its income and expenses, provision for loan losses, allowance for loan losses, and nonperforming assets," without elaboration. *Id.*

Statements purported to be misleading in the associated earnings call include:

- "Our credit quality remains strong, with year-to-date net charge-offs at a very small 3 basis points of loans. And our balance sheet growth continues to be brisk and responsible." ¶ 151

- "[A]nnualized organic loan growth during the first 9 months of 2018 was approximately 8.5%, about where we forecasted in our legacy portfolio credit. Quality has improved year-to-date as we have worked down nonaccruals . . . ." *Id.*

### E.     January 2019 Earnings Call

Plaintiffs challenge several statements from Equity Bancshares' earnings call to discuss its Q4 2018 results, but place particular emphasis on the following remarks:

- "We do have 1 credit relationship that has been downgraded to watch and substandard for $19 million and $9 million, respectively, at December 31, 2018. These 2 credits are related to the same operator. This relationship is not indicative of a systemic issue in the portfolio, rather one operator who is experiencing difficulty and is working with us to possibly

restructure or liquidate his business to resolve his relationship with us. At December 31, 2018, we do not expect a credit impairment based on the collateral and circumstances." ¶ 157.

**F.      March 2019 Form 12b-25 and Form 10-K**

On March 19, 2019, Equity Bancshares filed a Form 12b-25 notifying investors that it would file its 2018 annual report on Form 10-K late. Plaintiffs challenge a statement in the 12b-25 that "the Company currently does not expect to report in its Form 10-K any material changes to its financial results from those previously reported in the press release for the Company's financial results for the periods ended December 31, 2018." ¶ 153. According to Plaintiffs, this statement is misleading because Equity Bancshares did not disclose that Gigi's and Gatti's had filed for bankruptcy on January 4, 2019, regardless of whether those developments would cause a material change to the bank's financial results. *Id.* The 2018 Form 10-K, filed the very next day, did not disclose any material changes to the previously reported financial results—*because there were none*. The impairment at issue occurred in Q1 2019. Further, the Form 10-K included this fulsome disclosure:

> The Company has a credit relationship with two related borrowers whose principals have been customers of the Bank since 2011. At December 31, 2018, the total outstanding to these borrowers was $28,261[,000]. The relationship which consists of several loans to several related entities and categorized as commercial real estate and commercial and industrial ***was performing and current at its most recent renewal in 2018 and was current at December 31, 2018***. Despite one of the borrower's entities showing negative cash flow, the other entity generated enough earnings before interest, tax, depreciation and amortization and had cash flow to support the obligations of the overall relationship. Subsequent to December 31, 2018, the borrowing entities filed for Chapter 11 Bankruptcy protection based on overall obligations in excess of their willingness to invest more capital. ***The Company believes as of the date of the filing our Form 10-K that repayment of the principal and interest at December 31, 2018 is ultimately expected based on the values of the entities at sale***. ***The Company has not recorded any specific credit impairment on the relationship***, but the Company cannot be certain of future events that could impact the overall valuation of the assets or the price the assets will bring at disposition.

Ex. B at 74 (emphasis added). This disclosure made it clear that—though the credit relationship had been downgraded to watch and substandard as previously explained in the January 24, 2019 earnings

call—Equity Bancshares did not record any impairment on the relationship because at this time it expected full repayment of the Gigi's and Gatti's loans. And, not only did Equity Bancshares disclose the precise decision it had made with respect to this issue and why, it also expressly warned that it could not be certain of future events that could impact the value of the collateral.

### G.    April 2019 Form 8-K and Earnings Call

On April 22, 2019 when Equity Bancshares released its first quarter results, it announced it had recorded a $14.5 million provision for loss against a credit relationship. ¶ 120. Equity Bancshares explained on an earnings call the next day why it was now recording a specific allowance for loss, including that the sale of one of the companies fell through and a second bidder was found in April for an amount substantially less than the first bidder, and the receipt of updated financial information from the other entity showing lower than expected EBITDA (and therefore a potentially lower sales price). ¶ 122.

## IV.    <u>Equity Bancshares' Cautionary Statements</u>

Each of Equity Bancshares' press releases and conference calls cited in the complaint contained extensive cautionary and qualifying statements. Equity Bancshares started each conference call by telling listeners that the presentation will contain forward-looking statements that involve risks and uncertainties, advising listeners that outcomes may vary materially from those forecasted or expected, and referring listeners to the risk disclosures in Equity Bancshares' SEC filings. Ex. C at 4; Ex. D at 4; Ex. E at 4; Ex. F at 4.

Likewise, each of Equity Bancshares' 10-Qs warned that "inadequacies in our allowance for loan losses . . . could require us to take a charge to earnings and thereby adversely affect our financial condition." Ex. G at 3; Ex. H at 3; Ex. I at 3. Each 10-Q also warned that "inaccuracies in our assumptions about future events . . . could result in material differences between our financial projections and actual financial performance." Ex. G at 4; Ex. H at 4; Ex. I at 4.

99001041.12                                      - 10 -

Furthermore, all of the 2018 10-Qs and 8-Ks cited in the complaint directed investors to Equity Bancshares' FY 2017 10-K, in which it exhaustively chronicled risk factors that investors should be aware of. *See* Ex. G at 34; Ex. H at 39; Ex. I at 40; Ex. J Press Release at 6; Ex. K Press Release at 5; Ex. L Press Release at 9. The 2017 10-K includes:

- A warning that, "[a]s of December 31, 2017, our ten largest loan relationships totaled over $208.6 million in loan exposure, or 9.8% of the total loan portfolio. The concentration risk associated with having a small number of large loan relationships is that, if one or more of these relationships were to become delinquent or suffer default, we could be at serious risk of material losses." Ex. A at 24. Equity Bancshares also cautioned investors that the allowance for loan losses may not be adequate to cover losses associated with any of these relationships. *Id.* at 24–25.

- A warning that, when dealing with commercial loans, the principal economic risk associated with each class of loans is the creditworthiness of the borrower, as well as "the quality of the management of the business and the borrower's ability both to properly evaluate changes in the supply and demand characteristics affecting our market for products and services, and to effectively respond to those changes." *Id.* at 25. Equity Bancshares also cautioned that "a failure to effectively measure and limit the credit risk associated with our loan portfolio could have an adverse effect on our business, financial condition, and results of operations." *Id.*

- A warning that Equity Bancshares could suffer losses from a decline in the credit quality of the assets that it holds or "if borrowers, guarantors, and related parties fail to perform in accordance with the terms of their loans." *Id.* at 28.

- A warning that "a large portion of our loan portfolio is comprised of commercial loans, which are secured by accounts receivable, inventory, equipment or other asset-based collateral, and deterioration in the value of such collateral could increase our exposure to future probable losses. These commercial loans are typically larger in amount than loans to individuals, and therefore, have the potential for larger losses on a single loan basis. Additionally, asset-based borrowers are often highly leveraged and have inconsistent historical earnings and cash flows." *Id.* at 29.

- A warning that "[a]n increase in specific reserves and charge-offs related to our commercial loan portfolio could have a material adverse effect on our business, financial condition, results of operations and future prospects." *Id.* at 29.

The Form 10-K for FY 2018 contained nearly identical disclosures. *See* Ex. B at 25, 27, 30.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). While the Court "must 'accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor,' . . . the Court is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 493 (S.D.N.Y. 2016). The Court considers the well-pleaded facts in the complaint, as well as "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken." *Haw. Structural Ironworkers Pension Trust Fund v. AMC Entm't Holdings, Inc.*, No. 18-CV-00299 (AJN), 2019 WL 4601644, at *1 (S.D.N.Y. Sept. 23, 2019).

Claims of securities fraud under Section 10(b) and Rule 10b-5 are subject to the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which together mandate that the circumstances constituting fraud be stated with particularity. *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). The PSLRA "requires a complaint to 'specify each statement [or omission] alleged to have been misleading, the reason or reasons why the statement [or omission] is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which the belief is formed.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (quoting 15 U.S.C. § 78u-4(b)(1)). Similarly, under Rule 9(b), the complaint "must '(1) specify the statements that the [claimant] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Fila*, 195 F. Supp. 3d at 494.

On top of these exacting standards, the PSLRA further directs plaintiffs to "plead scienter (the intention to deceive, manipulate, or defraud) with particularity." *Id.* To satisfy the PSLRA, "a complaint must 'with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* The inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Accordingly, with respect to scienter, the PSLRA prescribes an exception to the ordinary interpretive rule applied to motions to dismiss: "'While [the Court] normally draw[s] reasonable inferences in the non-movant's favor . . . ,' the PSLRA 'establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter.'" *ECA, Local 134 IBEW*, 553 F.3d at 196 (alterations omitted).

## ARGUMENT AND AUTHORITIES

### I.    Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5

"The elements of a private securities fraud claim under Section 10(b) and Rule 10b-5 are '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Green v. Deutsche Bank Aktiengesellschaft*, No. 18-CV-5104 (AJN), 2019 WL 4805804, at *2 (S.D.N.Y. Sept. 30, 2019). Analyzing Plaintiffs' complaint through the critical lens of the PSLRA and the extensive law of the Second Circuit rejecting securities fraud claims premised on the same types of misstatements and omissions alleged here, Plaintiffs' claims fall short in several respects. In particular, Plaintiffs have failed to adequately allege a material misrepresentation or omission or scienter.

The failure of Plaintiffs' claims goes beyond deficient pleading, however. The complaint has a fundamental flaw at its core: Plaintiffs' entire theory of fraud is rooted in a false premise.

According to Plaintiffs, the June 28, 2018 Consolidated Loan agreements between Equity Bancshares, on the one hand, and Gatti's and Gigi's, on the other, represented no more than a "repapering" of those companies' debts to Equity Bancshares.[5] This arrangement, Plaintiffs contend, enabled Gatti's and Gigi's to delay their proverbial day of reckoning, while simultaneously allowing Equity Bancshares to avoid classifying the loans, declaring them to be impaired, or making corresponding provisions for loan losses. In other words, to use Plaintiffs' parlance, by "extending" the loan maturities, Equity Bancshares could "pretend" that the loans were less risky and more secure than the "true" facts indicated. But as the Background section above makes plain, Plaintiffs' narrative is belied by the very documents they cite in the complaint.

While Plaintiffs portray the Consolidated Loans as "repapered," they cite no facts in support of this bald characterization. Indeed, they largely omit the terms of the original loans. Regardless, the new agreements *on their face* restructure Gatti's and Gigi's debts, prescribing a number of terms protective of Equity Bancshares' position, including origination fees of $25,000 and covenants ensuring that the businesses and their owners would remain capable of repaying the loans. Further, the underlying debts are secured by substantial collateral, from the enterprise value of the businesses to liens on all of their assets, and are personally and unconditionally guaranteed by Messrs. Phillips and Mann—individuals whose collective net worth, to be confirmed through the personal financial statements and federal tax returns the loan agreements required the men to furnish to Equity Bancshares, was apparently sufficient to cover both loans.

Likewise, as the complaint acknowledges, Equity Bancshares' SEC filings explain that the key decisions challenged here—evaluating the classification or impairment of loans, setting loan loss reserves, and directing provisions for loan losses—are not mechanical calculations, but

---

[5] While Plaintiffs do not define the term "repaper," the import seems to be that Equity Bancshares merely consolidated the existing loans and extended their maturity dates. *See* ¶¶ 93–98.

99001041.12                                    - 14 -

matters of business judgment. *See* ¶¶ 34–35, 37–41. And those business judgments take into account a wide range of factors beyond payment delinquency, such as the value of the collateral, the borrower's history, and the likelihood of collection. *See id.* For these reasons, the Second Circuit has held that the core allegation undergirding Plaintiffs' entire complaint—that Equity Bancshares maintained inadequate loan loss reserves—reflects an "inherently subjective" determination and cannot be the basis of an actionable misstatement absent well-pleaded factual allegations of both objective and subjective falsity. *Fait*, 655 F.3d at 113. The complaint is devoid of any such allegations, resting entirely on the vague testimony of a single confidential witness who resigned from the company five months into the putative class period—*and who does not even allege that the loans were impaired during his or her tenure*.

In short, the allegations in the complaint and the documents properly before the Court on this motion refute Plaintiffs' "extend-and-pretend" theory and demonstrate, instead, that Defendants negotiated materially new loan terms with Gatti's and Gigi's and actually and reasonably believed, in their business judgment, that those loans were not impaired and required no provision for loan losses. That circumstances changed, including that anticipated sales of the businesses fell through, does not impugn Defendants' judgments, let alone give rise to the requisite strong, cogent, and compelling inference of scienter. To the contrary, Defendants openly disclosed all material information concerning the loans, and the holdings of Mr. Kossover and Mr. Elliott in Equity Bancshares stock *increased* during the class period. *See* Ex. M at 30; Ex. N at 32. Stripped of Plaintiffs' bombast, the complaint advances nothing more than a variation on the quintessential "fraud by hindsight" theories that the Second Circuit has consistently held to be inactionable. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014); *accord In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14–15 (2d Cir. 2019).

### A. Plaintiffs Fail to Allege a Materially False or Misleading Statement or Omission

Section 10(b) creates liability only for (1) a misrepresentation of a material fact, (2) an omission of a material fact "in contravention of an affirmative legal disclosure obligation," or (3) an omission of material "information that is necessary to prevent existing disclosures from being misleading." *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings, Inc.*, No. 16-CV-3068 (AJN), 2017 WL 4082482, at \*4–5 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018). "A statement or omission is misleading if 'the defendants' representations, taken together and in context, would have misled a reasonable investor,'" and "[a] misrepresentation or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'" *Fila*, 195 F. Supp. 3d at 494. When making these determinations, "the Court should consider not only the disclosures the company makes, but also 'information already in the public domain and facts known or reasonably available to the shareholders.'" *La Quinta*, 2017 WL 4082482, at \*5. The overarching focus of the securities laws is on statements of *fact*. *See ECA, Local 134 IBEW*, 553 F.3d at 197. Critically, "'[a] statement that was believed to be true when made, but was later shown to be false, is insufficient' to establish falsity," and "[a] statement is not false if it is merely a 'misapprehension, misunderstanding, or mistake of fact.'" *In re Omega Healthcare Investors, Inc. Sec. Litig.*, 375 F. Supp. 3d 496, 506 (S.D.N.Y. 2019).

As a corollary, numerous classes of statements are presumptively inactionable under Section 10(b), including accurate statements of historical fact,[6] statements of opinion,[7] expressions

---

[6] *See, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004) (a complaint alleging securities laws violations "may not rely upon statements that are true").

[7] *See, e.g.*, *Frankfurt-Trust Inv. Lux. AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 217 (S.D.N.Y. 2018) ("When the alleged misstatements or omissions are made within the context of statements of opinions, plaintiffs are also required to show that '(1) the speaker d[oes] not hold the belief . . . professed; (2) the fact[s] [] supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor.'").

of corporate optimism or puffery,[8] and forward-looking statements accompanied by meaningful cautionary language.[9] The same is true of omissions, with purported omissions of immaterial information[10] and of facts actually disclosed or publicly known[11] insulated from liability.

Nearly all, if not all, of the alleged misstatements and omissions identified in Plaintiffs' complaint fall into these well-worn categories. Those that do not nevertheless lack the factual particularity required by the PSLRA. For ease of reference, Plaintiffs' allegations can be divided into three broad groups: (1) purported misstatements or omissions concerning Equity Bancshares' credit quality and responsible lending practices; (2) purported misstatements or omissions concerning the status of the Gatti's and Gigi's loans and Equity Bancshares' treatment of same; and (3) purported misstatements or omissions concerning information on Equity Bancshares' balance sheet (e.g., income, expenses, loan loss reserves, and nonperforming assets).

### 1.    Statements Concerning Credit Quality and Lending Practices

Many of the statements that Plaintiffs allege to be false and misleading are no more than expressions of management's views on the quality of Equity Bancshares' credit criteria, its

---

[8] *See, e.g.*, *Haw. Structural*, 2019 WL 4601644, at *13 ("Statements are non-actionable if they are 'puffery' that is 'too general to cause a reasonable investor to rely upon them' or 'general expressions of corporate optimism' that are 'too indefinite to be actionable under the securities laws.'"); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 433 (S.D.N.Y. 2010) ("[S]tatements of puffery or mere generalizations are not material misstatements.").

[9] *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (under the safe harbor in 15 U.S.C. § 78u-5(c), "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading").

[10] *See, e.g.*, *In re Eros Int'l Sec. Litig.*, No. 15-CV-8956 (AJN), 2017 WL 6405846, at *7 (S.D.N.Y. 2017) ("[W]here misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,' a court may find the misstatements immaterial as a matter of law.").

[11] *See, e.g.*, *La Quinta*, 2017 WL 4082482, at *5–6 (a "securities fraud claim for misrepresentations or omissions does not lie when the company 'disclosed the very . . . risks about which [a plaintiff] claim[s] to have been misled" or when "publicly available information . . . sufficiently apprised investors of th[ose] risks").

business performance, and its lending philosophy. *See* ¶ 142 ("we believe the current business environment is suitable for reducing nonperforming assets"; "our special asset manager . . . has done an excellent job reducing these with his team and on terms within our expectations"; "we are also not loosening our credit criteria"); ¶ 145 ("[o]ur credit quality remains strong"; "our balance sheet growth continues to be responsible"); ¶ 146 ("our portfolio of credit quality has once again improved"; "our special assets teams have done excellent work in staying focused on the quality of our credit and managing special assets"); ¶ 147 ("the high credit quality we alluded to earlier"; "I simply expect our lending teams to continue to work hard, be smart, provide excellent service and expertise and grow our portfolio wisely"); ¶ 151 ("[o]ur credit quality remains strong . . . [a]nd our balance sheet growth continues to be brisk and responsible"; "[q]uality has improved year-to-date").

Without exception, these statements constitute textbook puffery or declarations of corporate optimism. *See ECA, Local 134 IBEW*, 553 F.3d at 205–06 (representations regarding company's "'highly disciplined' risk management" and "standard-setting reputation for integrity" were inactionable puffery); *Haw. Structural*, 2019 WL 4601644, at *13, *14 (company's expressed "intention to 'be laser-like in our pursuit of cost synergies'" and description of post-merger integration as "quick," "very smooth," and showing "great progress" were inactionable puffery); *City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*, No. 17 Civ. 3501 (JFK), 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5, 2019) (statement that company has made "good progress" was inactionable puffery); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353–54 (S.D.N.Y. 2011) (company's "repeated public declarations of their 'conservative' underwriting standards and credit risk management," including its reference to "the highly collateralized nature of our loan portfolio and our careful management of inherent credit risk," were inactionable puffery).

99001041.12

- 18 -

To the extent that any of these statements could be characterized as opinions, they equally would be inactionable because the complaint contains no particularized facts indicating that the statements were subjectively disbelieved, objectively false, or rendered misleading by omission; the only allegations even arguably in support turn on Plaintiffs' erroneous "extend-and-pretend" theory. As this Court has recognized, grounding a claim for securities fraud on a statement of opinion "is no small task for an investor," *Haw. Structural*, 2019 WL 4601644, at *11 (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)), and this Court as well as others in this circuit routinely dismiss similar claims, *see id.* at *12 (opinions regarding company's general prospects and management's faith in its team were not actionable); *Frankfurt-Trust Inv.*, 336 F. Supp. 3d at 227–31 (opinions regarding company's performance and market conditions were not actionable); *La Quinta*, 2017 WL 4082482, at *11 (dismissing claim where defendant opined that the sale of a property was "a 'win-win-win'" yet the company later recorded a $4 million loss on the property).

### 2.    *Statements Concerning the Gatti's and Gigi's Loans*

The vast majority of the alleged misstatements and omissions cited in the complaint trace to the status and the accounting treatment of the Gatti's and Gigi's loans. Indeed, those loans form the backbone of the entire case, as the purported "'extend-and-pretend' scheme" underlying all of Plaintiffs' allegations centers exclusively on those loans. The essence of Plaintiffs' argument is that Equity Bancshares continued to lend money to Gigi's and Gatti's when it should not have and that Equity Bancshares failed to timely write down or impair the Gigi's and Gatti's loans. ¶¶ 52, 56, 57, 92, 104. Plaintiffs claim that Equity Bancshares should have disclosed to its shareholders that it had "repapered" the Gigi's and Gatti's loans, ¶¶ 146, 149, that it was "engaged in an 'extend and pretend' scheme," ¶¶ 142, 153, and that it "had deviated from its lending standards by issuing new loans to Gatti's and Gigi's when there was [*sic*] substantial indications that the entities were insolvent," ¶ 148. Relatedly, Plaintiffs allege that the Consolidated Loans should have been

classified as "troubled debt restructurings," ¶ 149, and "should have been classified as special mention or substandard in 2018," ¶ 155.

These are precisely the types of claims courts routinely reject as contrary to a bedrock principle of securities law—fraud cannot be premised on the bare allegation that a defendant should have anticipated future events and made certain disclosures earlier than it actually did. *See, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Public Ltd. Co.*, 655 F. Supp. 2d 262, 271–72 (S.D.N.Y. 2009) (dismissing claim because the complaint "does not sufficiently allege when and why corrective actions were required of the Company"; "[t]hat [the Company] ultimately would take an impairment charge in 2006 does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent"). Moreover, the federal securities laws "are designed to promote the disclosure of facts"; a company need not adopt Plaintiffs' characterization of those facts or "accuse [itself] of wrongdoing." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 361–62 (S.D.N.Y. 2014). "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

Plaintiffs do not allege with any level of particularity when the Gigi's and Gatti's loans should have been classified as impaired under the applicable GAAP standard, why they were so impaired under that standard, or by how much they were impaired. *See In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 614 (E.D. Pa. 2009) (dismissing claim because "apart from the plaintiffs' bald assertions that the value of [defendant's] investment . . . was impaired at an earlier date, and that a write-down should have been made no later than March 31, 2007, the [complaint] fails to allege any such impairment with sufficient particularity"). Indeed, Plaintiffs do not even specifically allege a GAAP violation, beyond the unadorned use of that phrase one time in the "Loss

Causation" section of the complaint. *See* ¶ 167. Setting aside that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim," *Novak*, 216 F.3d at 309, the *absence* of such allegations is fatal, *Omega*, 375 F. Supp. 3d at 507.

> a.    *The Statements in Question Were Matters of Judgment and Opinion About Future Performance*

Plaintiffs' claims concerning the classification of the Gigi's and Gatti's loans also fail because it is clear that grades indicating the creditworthiness of a borrower are statements of opinion. *See In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030 LAP, 2011 WL 536437, at \*12 (S.D.N.Y. Feb. 9, 2011) ("Credit ratings are statements of opinion."), *aff'd sub nom. Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98 (2d Cir. 2012); *accord Rice v. Charles Schwab*, No. 10-00398-CJC, 2010 WL 5156654, at \*3 (C.D. Cal. Oct. 22, 2010) (credit ratings "are opinions or predictions of the future creditworthiness or value of companies"). Plaintiffs wholly fail to plead particularized facts showing that these opinions were based on untrue facts or disbelieved at the time they were expressed or were rendered misleading by omission. Statements of opinion or belief are only actionable under these narrow circumstances. *Frankfurt-Trust Inv.*, 336 F. Supp. 3d at 217. Here, Plaintiffs make no allegation that any of the supporting facts contained in Equity Bancshares' statements were untrue. Rather, the complaint states in conclusory fashion that Defendants "knew" that Gigi's and Gatti's would not be able to repay their loans, ¶ 154, and that there were "indications that the entities were insolvent," ¶ 148, but does not allege any particularized facts indicating either that Equity Bancshares did not actually categorize the loans in the ways disclosed or did not believe that its loan categorizations were correct.

Likewise, Plaintiffs' allegations that Equity Bancshares' loan loss provisions were too low or that the Gigi's and Gatti's loans should have been included in potential problem loans are rooted in the premise that Equity Bancshares failed to anticipate the extent of Gatti's and Gigi's future

financial distress. Plaintiffs chronicle various events between 2015 and 2018, including that at one point in 2017, Sovrano sold the assets of two company-owned franchises for $2.75 million and paid Equity Bancshares with the proceeds. ¶ 78. Plaintiffs also embark on a lengthy tale about how, according to an adversary complaint filed in the Sovrano bankruptcy action,[12] Messrs. Mann and Phillips sold thirteen stores in September 2018 and used funds from the purchase price to pay Equity Bancshares $1.1 million pursuant to the terms of the Consolidated Loans. ¶ 113. All these anecdotes indicate, however, is that Sovrano made payments to Equity Bancshares in both 2017 and 2018. The fact that Equity Bancshares did not accurately predict the circumstances rendering its loans uncollectible—including the borrowers' bankruptcy and the collapse of proposed sales of the businesses—is simply not actionable. *See Acito*, 47 F.3d at 53 ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud."); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) (allegation that "UJB failed to reveal that loan loss reserves were inadequate in light of the 'high risk of noncollectibility'" is not actionable because it only "charges defendants with essentially failing to predict the future"). As the Second Circuit long ago explained, "misguided optimism" in setting loan loss reserves "is not a cause of action." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). Because Plaintiffs have done no more than plead a *post hoc* disagreement with the timing of Equity Bancshares' adjustments to its loan loss reserves and loan write offs, they have not pleaded a securities fraud claim.

---

[12] The allegations drawn from pleadings in unrelated matters, such as the adversary complaint, do not meet the PSLRA's stringent pleading standards and should be disregarded. *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012) (declining to consider "allegations . . . taken directly from uncorroborated allegations embedded in a complaint in another action" and noting that "the Court . . . need not consider parroted allegations for which counsel has not conducted independent investigation"); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) (allegations "contained in pleadings from an unrelated lawsuit . . . are inadmissible").

> b.      *Equity Bancshares Had No Duty to Disclose that the Gigi's and*
>         *Gatti's Loans Were Its "Largest Credit Relationship"*

Plaintiffs also allege that Equity Bancshares failed to disclose on January 24, 2019 that the credit relationship that had been downgraded was its "largest credit relationship." ¶¶ 116, 153, 157. Plaintiffs, however, utterly fail to identify any duty Equity Bancshares would have to disclose that information as such. "[A] defendant can be held liable for failing to disclose particular information only if the defendant had 'an affirmative duty to disclose the information but fail[ed] to do so.'" *La Quinta*, 2017 WL 4082482, at *7. "Corporations are 'not required to disclose a fact merely because a reasonable investor would very much like to know that fact,'" nor must they disclose any particular characterizations of fact. *Silsby*, 17 F. Supp. 3d at 359, 361–62. "And while [a company] does have a 'duty to tell the whole truth' once [it] speak[s] on a matter, '[t]he requirement to be complete and accurate . . . does not mean that by revealing one fact . . . one must reveal all others that, too, would be interesting.'" *Omega*, 375 F. Supp. 3d at 511. It is beyond doubt that Equity Bancshares gave an accurate and complete picture of how the Gigi's and Gatti's credit relationship downgrade might affect Equity Bancshares' portfolio.

As the complaint recognizes, Equity Bancshares disclosed all relevant data concerning the Consolidated Loans, including the size of the credit relationships ($19 million and $9 million) and the total amount of loans in the bank's portfolio ($2,542,992,000 as of December 31, 2018). ¶ 115; Ex. L Press Release at 1; Ex. L Presentation at 12. Thus, any reasonable investor could easily determine that this credit relationship in the aggregate represented 1.1% of Equity Bancshares' loan portfolio. Absent from the complaint is any explanation of how the size of the credit relationship compared to any other individual, unrelated credit relationship is relevant, material,

or required to be disclosed.[13] *See Silsby*, 17 F. Supp. 3d at 362 (no duty to disclose that company was "insolvent" where investors were "supplied . . . with financial information from which [they] could draw their own conclusions"); *cf. ECA, Local 134 IBEW*, 553 F.3d at 205 (alleged accounting error affecting 0.3% of bank's assets was not material given "the relatively small size of the allegedly misstated transactions" and plaintiffs' failure to allege that proper treatment "would have made a qualitative difference in [company's] financial statements").

### c.        Equity Bancshares Had No Duty to Disclose the Bankruptcies

Plaintiffs insist that Equity Bancshares' January 24, 2019 earnings call and 12b-25 are false because they do not disclose that Gigi's, Gatti's, and Sovrano had filed for bankruptcy. ¶¶ 153, 157. However, Plaintiffs fail to identify any duty Equity Bancshares had to disclose the bankruptcy in either the earnings call or the 12b-25. Absent a duty to disclose the omitted facts, there is no violation. *La Quinta*, 2017 WL 4082482, at *7, *9 (dismissing omission claims for want of duty).

The mere fact that a borrower has filed for bankruptcy does not, standing alone, mean that the bankrupt entity will default on its loans—many first priority secured lenders are repaid in full, even if the borrower has filed for bankruptcy. Equity Bancshares' impairment analysis recognizes as much, taking stock of factors including the likelihood of repayment and the value of the collateral. ¶ 37. In the earnings call, Equity Bancshares disclosed all relevant and material information concerning the Gigi's and Gatti's credit relationship: the size of the relationship, that it had been downgraded because one operator was experiencing financial difficulty, and that the bank did not currently expect a credit impairment on the loans. ¶ 157. Indeed, as the complaint

---

[13] Though materiality is a mixed question of law and fact, a complaint may nonetheless be dismissed on the ground that the alleged omissions are not material when "they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Local 134 IBEW*, 553 F.3d at 197.

acknowledges, Equity Bancshares prepared an impairment analysis *after* the entities filed for bankruptcy, and even that analysis showed no impairment. ¶ 122.

### 3.    *Statements Concerning Figures on Equity Bancshares' Balance Sheet*

The remaining grouping of purported misstatements and omissions—those relating to figures reported in Equity Bancshares' financial statements—are essentially derivative of the others. That is, the only grounds Plaintiffs cite for the inaccuracy of line items in Equity Bancshares' balance sheet are the alleged impairment of the Gatti's and Gigi's loans and their insistence that Equity Bancshares should have written those loans off sooner. But Plaintiffs make no allegations as to when Equity Bancshares should have recorded an impairment or the amount of an impairment, dooming their claims. *See, e.g.*, *Caiafa*, 525 F. Supp. 2d at 410–11 (dismissing impairment claim because defendant "explained the timing of the $500 million impairment" and the complaint "fails to state the basis for its book-value allegations and fails to specify the amounts by which the ferries and containers were allegedly overvalued").

Indeed, the complaint comes nowhere near meeting the requirements to state a valid claim for securities fraud in this regard. Allegations of incorrect accounting practices, standing alone, are insufficient to state a securities fraud claim. *See Novak*, 216 F.3d at 309; *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999). Only where such allegations are coupled with evidence of "corresponding fraudulent intent" might they be sufficient. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). Lacking any particularized facts on this front, Plaintiffs' claims fail. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417–18 (3d Cir. 1997) ("[W]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, . . . plaintiffs [must] state what the unreasonable practices were and how they distorted the disclosed data."); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir. 1996) (plaintiffs failed to "allege[] the amount of the putative overstatement or the net effect it had on the company's

99001041.12                                                      - 25 -

earnings"); *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (recklessness "requires more than a misapplication of accounting principles").

### B.    Plaintiffs Fail to Allege Facts Giving Rise to a Strong Inference of Scienter

Even if Plaintiffs were able to identify any materially false or misleading statements or omissions in their grab bag of financial statements and earnings-call transcripts, their claims still would fail because the complaint is devoid of facts supporting the strong inference of scienter the PSLRA demands. For a Section 10(b) claim, the "required state of mind" is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 314, 319. "A strong inference of fraudulent intent 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *BioScrip*, 95 F. Supp. 3d at 732. Scienter "cannot be satisfied through group pleading." *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012). Further, courts must undertake a "comparative" analysis when weighing allegations of scienter, considering both "inferences urged by the plaintiff" and "competing inferences rationally drawn from the facts alleged," and may find the requisite mental state only if the inference of scienter is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

### 1.    Plaintiffs' Inference of Scienter Is Neither Cogent Nor Compelling

At the outset, Plaintiffs' overarching theory of scienter—that Defendants lent millions of dollars to companies they knew to be insolvent, with no expectation of repayment, and orchestrated an "'extend-and-pretend' scheme" to delay the unavoidable provision of loan losses—depends on a series of flawed premises and is far *less* compelling than the obvious opposing inference: That Defendants simply failed to foresee those companies' decline in value. As explained above, the Consolidated Loan agreements represented a refinancing of Gatti's and Gigi's debts, including

through the assessment of a $25,000 origination fee for each loan. Those agreements, moreover, placed strict limits on the borrowers' leveraging and disposition of assets, and were both secured by significant collateral and personally guaranteed by the companies' owners, established businessmen who had a history of successful investments with Equity Bancshares and demonstrated net worth that provided additional security to the lender. On top of this, as Plaintiffs concede, information in the marketplace signaled a reasonable prospect of repayment: The most recent financial statements of Gatti's parent company, Sovrano, announced "[m]anagement['s] beli[ef] that the Company's projected revenue receipts and available debt financing will be sufficient to fund its operations through at least one year from [May 31, 2018]," as well as the owners' "commit[ment] to continue funding operations if necessary," Compl. Ex. 1 at 7, and in Q4 2018 "[t]here were at least 2 letters of intent to purchase [Gatti's] for amounts sufficient to pay off [the] credits on both companies," ¶ 122.

Against this backdrop, the notion that Defendants pumped funds into crumbling enterprises with no hope of collection not only contradicts the record before the Court but, frankly, makes no sense. After all, Equity Bancshares insisted on $50,000 in loan origination fees and security adequate to cover the debts, and the sole motive for fraud posited by Plaintiffs—to ensure that the borrowers were "not technically behind in payments" so that Equity Bancshares could avoid "tak[ing] a charge against loan reserves," ¶¶ 44, 88—is dubious at best, as "[i]t is hard to see what benefits accrue from a short respite from an inevitable day of reckoning," *Shields*, 25 F.3d at 1130.[14] And "[w]here a plaintiff's theory of motive is 'belied by logic,' it must be rejected." *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *9 n.22 (S.D.N.Y. Nov. 25, 2003).

---

[14] *See also Omega*, 375 F. Supp. 3d at 512 n.10 ("[I]t is difficult to comprehend why Omega would disclose Orianna's deteriorating financial situation to investors and lend millions of dollars to Orianna if Omega did not see the potential for Orianna to recover.").

Plaintiffs' account also rests on a fundamental misunderstanding of Equity Bancshares' loan-evaluation process. This is particularly perplexing in light of the complaint's extensive use of block quotes from Equity Bancshares' SEC filings laying out that very process. *See* ¶¶ 35, 37, 38, 40, 41. While Plaintiffs portray loan classification and impairment as the product of a fixed set of objective inputs, Equity Bancshares' financial reports make clear that these are subjective determinations entrusted to management's business judgment. *See, e.g.*, ¶ 37 (explaining that "[a]ll loans are individually evaluated for impairment" based on a nonexclusive list of factors, and "[m]anagement determines the significance of payment delays and payment shortfalls on a case-by-case basis, taking into consideration all of the circumstances"); ¶ 38 (noting that "[l]oan losses are charged against the allowance when management believes the collectability of a loan balance is unlikely" and "the entire allowance is available for any loan that, in management's judgment, should be charged off"). Second Circuit law recognizes this reality, rejecting securities fraud claims for miscalculations of loan loss reserves absent well-pleaded allegations of falsity akin to those required for actionable opinion statements. *See Fait*, 655 F.3d at 113. Moreover, contrary to Plaintiffs' implication, payment delinquency is but one factor in the impairment calculus, and loan impairment does not inexorably compel a provision for loan loss. *See* ¶¶ 37, 38. For this reason as well, Plaintiffs' central theory of fraud—that Equity Bancshares "repapered" the Gigi's and Gatti's loans to make them appear current and thereby avoid adding to loan loss reserves—defies logic and yields to the opposing inference of nonfraudulent intent. *See Silsby*, 17 F. Supp. 3d at 369–70 (weighing competing inferences and granting motion to dismiss).

### 2.    *Plaintiffs Do Not Adequately Allege Motive and Opportunity*

To "raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that" the specific defendants "benefited in some concrete and personal way from the purported fraud." *ECA, Local 134 IBEW*, 553 F.3d at 198. "Motives that are common to

most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.* Instead, the archetypal "motive" is an officer's desire "to sell [his or her own] shares at a profit." *Id.* Plaintiffs plead no such facts with respect to Mr. Kossover and Mr. Elliott. Indeed, the complaint contains no facts *at all* bearing on Defendants' individual motives—not even generic references to corporate performance and executive compensation. The absence of allegations of stock sales in itself would cut against scienter,[15] but the inference of nonfraudulent intent is even stronger here given that both Mr. Kossover and Mr. Elliott *increased* their holdings in the company during the class period. *See, e.g.*, *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (increase in defendants' net shareholdings undermines inference of scienter); *accord Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (stock purchases countered inference of scienter because defendants "shared the pain when the company failed").

### 3. Plaintiffs Do Not Adequately Allege Facts Giving Rise to a Strong Inference of Conscious Misbehavior or Recklessness

No strong inference of "conscious misbehavior or recklessness" within the meaning of Second Circuit case law can be drawn from the complaint either. In the absence of any showing of motive, "the strength of the circumstantial allegations [of scienter] must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). The pleading standards for this alternative formulation of scienter are exacting: "Conscious misbehavior" denotes "deliberate illegal behavior," *Novak*, 216 F.3d at 308, and recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence," *S. Cherry St., LLC v. Hennessee Grp.,*

---

[15] *See Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (lack of stock sales by those "who would have been in the know . . . implies that nothing was thought to be out of the ordinary"); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004) (lack of stock sales negates scienter).

*LLC*, 573 F.3d 98, 109 (2d Cir. 2009). In general, recklessness is reserved for "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak*, 216 F.3d at 308. Insofar as Plaintiffs assert that Defendants had access to facts contradicting their public statements, "the complaint must 'specifically identify the reports or statements containing this information,'" *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 653 (S.D.N.Y. 2015), and recite "what specific contradictory information [Defendants] received [and] when they received it," *Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010). Additionally, "[a]llegations of scienter regarding a reckless material omission require a plaintiff to 'present facts indicating a clear duty to disclose,'" and "[w]here a duty is 'not so clear,' failure to disclose is insufficient to establish conscious misbehavior or recklessness." *Omega*, 375 F. Supp. 3d at 510.

Plaintiffs raise a scattering of circumstantial allegations of scienter. Each fails to satisfy Second Circuit law, and taken together, any resulting inference of fraud is neither cogent nor even remotely as compelling as the opposing inference of nonfraudulent intent.

### a.    The "Confidential Witness" Allegations

Plaintiffs principally attribute allegations to a single confidential witness, "CW1," whom Plaintiffs identify as "a special asset administrator that worked at Equity Bancshares from April 2017 to September 2018" and reported to its Chief Credit Officer. ¶ 99. To supply evidence of scienter, confidential sources "must . . . be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Haw. Structural*, 2019 WL 4601644, at *17. Plaintiffs "must also allege that 'the confidential sources would have known what information was communicated to senior executives.'" *Id.* These foundational standards prove problematic for CW1, as by Plaintiffs'

account, CW1 resigned from the company five months into the class period and just three months after the Gigi's and Gatti's loans were refinanced—notably before *any* payments on those loans were due. It follows that CW1's testimony cannot support any allegations of scienter based on information purportedly known to Defendants for the majority of the class period, let alone information concerning Gigi's and Gatti's financial condition in Q4 2018 and their performance under the refinanced loans. *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) ("Plaintiffs do not allege any facts indicating that [the confidential witness] was in a position to have knowledge regarding communications with [the company's] senior management or the conclusions reached by . . . senior management upon receipt of this information.").

Moreover, the substance of CW1's testimony does not move the needle. If anything, CW1's core allegation *undercuts* any inference of scienter. According to CW1, "the Gigi's and Gatti's loans (during the period CW1 worked at Equity Bancshares from April 2017-September 2018) were given a '6' risk rating," meaning that the loans "were on a watch list that required quarterly write ups," but "should have been given an '8' rating," indicating "that the bank 'didn't know if the loan would make it or not.'" ¶¶ 100–01. In other words, even with a "'6' risk rating," the Consolidated Loans were closely monitored for impairment. While CW1 does not explain how (if at all) the treatment of loans rated "6" and "8" diverges, CW1 conspicuously *does not* allege that the loans should have been assigned a "0" and written off. *See id.* Nor, for that matter, does CW1 plausibly allege that the "6" and "8" ratings—internal measures not disclosed in Equity Bancshares' SEC filings—would have any bearing on Equity Bancshares' financial reports, let alone render its public statements materially false or misleading. Rather, the import of CW1's testimony is that the Consolidated Loans *were not* impaired during his or her tenure.

The balance of CW1's allegations are equally unhelpful to Plaintiffs. CW1 alleges, for instance, that "Defendants Elliott and Kossover became worried about the credit relationship" and instructed two officials "to travel to Fort Worth around April or May 2018 to find out what was going on with the credit relationship," ¶ 99; that "[w]hen CW1 left Equity Bank in September 2018, CW1 believed the Gigi's and Gatti's loans had been delinquent for approximately four to five months," ¶ 99; that Mr. Elliott and Mr. Kossover were members of certain loan committees, ¶ 100; and that Mr. Elliott "was a highly involved CEO and knew everything about the Gigi's and Gatti's loans," ¶ 134. Setting aside the vague and conclusory character of CW1's account (e.g., "became worried," "find out what was going on," "highly involved CEO"), more telling is what CW1 *does not* allege. CW1 does not allege, for example, what specific information concerning the Gatti's and Gigi's loans was communicated to Mr. Elliott and Mr. Kossover at any particular committee meeting, nor does CW1 ever tie Mr. Elliott and Mr. Kossover to the financial reports or bankruptcy filings from which Plaintiffs draw their depiction of Gigi's and Gatti's financial state. The absence of these details severely undercuts the force of CW1's testimony.[16] Further, CW1's "belie[f]" that "the Gigi's and Gatti's loans had been delinquent for approximately four to five months" when "CW1 left Equity Bank in September 2018" is hopelessly ambiguous, ¶ 99, given that the loans were refinanced in June 2018 and called for their first payments in October 2018, Compl. Exs. 3, 10. At root, "[t]hese anecdotes and conclusory statements of belief cannot form the basis for a finding of reckless disregard." *Local No. 38 IBEW*, 724 F. Supp. 2d at 460.

---

[16] *See BioScrip*, 95 F. Supp. 3d at 739 (rejecting CW allegations that "*do not* specifically detail what . . . Defendants knew, when they learned it, or from whom" and that, despite averring that management "would often receive reports" on the subject matter, "do[] not allege the content of the reports, the date of the reports, or whether . . . Defendants ever read the reports"); *Local No. 38 IBEW*, 724 F. Supp. 2d at 461 (rejecting several CW statements that, on "close examination," lacked "any allegation that [contrary] data had been presented to management around the time of Defendants' allegedly misleading statements," and that "d[id] not establish what specific contradictory information the . . . Defendants received or when they received it").

b.       *Defendants' Titles and Membership on Corporate Committees*

Plaintiffs also fixate on Mr. Elliott's and Mr. Kossover's titles and their membership on the Loan Committee and the Risk Committee in an effort to bolster an inference of scienter. *See* ¶¶ 129–30, 160. This is unavailing under settled Second Circuit law. *See Local No. 38 IBEW*, 724 F. Supp. 2d at 462 ("To the extent the Complaint's allegations rest on the assumption that the Individual Defendants received information because of their corporate positions, they are deficient." (citing *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."))). The same is true of CW1's unadorned assertion that "Defendant Elliott was a highly involved CEO and knew everything about the Gigi's and Gatti's loans," ¶ 134. *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) ("It is not enough for a post-*Tellabs* plaintiff to allege that, because executives like the Individual Defendants were 'closely involved' in [the company's] business, one can strongly infer that they 'were furnished with financial data which contained the "errors" that later required restatement.'"). This is so regardless of the purported size of the loans. *See* ¶ 133. Indeed, this Court has refused to infer scienter from materially identical allegations concerning the undisclosed loss of a "major client." *See BioScrip*, 95 F. Supp. 3d at 738 (no scienter despite allegations that the business segment in question "composed a significant portion of the company's revenue and even a larger share of EBITA," and "the major client [the company] lost . . . provided nearly a third of the segment['s] revenue").

c.       *Mr. Elliott's Statements on Equity Bancshares' 2019 Earnings Calls*

Plaintiffs allege that Mr. Elliott "admitted he made the decision to continue lending to Gigi's and Gatti's despite the companies' insolvency and inability to repay the loans." ¶¶ 161–62.

This is a gross mischaracterization of Mr. Elliott's *mea culpa* during the Q2 2019 earnings call. Stating that, as CEO, Mr. Elliott "owns" the credit decision does not mean that he alone made the decision to extend credit to Gatti's and Gigi's—it merely means that, as CEO, the proverbial buck stops with him. Furthermore, Mr. Elliott's remark that, in hindsight, Equity Bancshares should have discontinued lending to Gigi's and Gatti's earlier is in no way equivalent to an admission that Mr. Elliott knew at the time the Consolidated Loan agreements were executed that Gigi's and Gatti's would be unable to repay them. Plaintiffs point to Mr. Elliott's statement that he's "been disappointed by the performance of these credits" as evidence that he somehow "knew that Gigi's and Gatti's loans should be classified and impaired" but chose to continue lending to them nonetheless. ¶¶ 162–63. This strained interpretation of Mr. Elliott's words goes far beyond the PSLRA's bounds. It would be nonsensical for Mr. Elliott to have been "disappointed" by the performance of the credits if, as Plaintiffs allege, he somehow knew at the time Equity Bancshares extended the loans that the borrowers would never pay them back. Moreover, Plaintiffs do not even attempt to offer any explanation as to why Mr. Elliott would want Equity Bancshares to continue to extend millions of dollars of loans to Gigi's and Gatti's if he expected those entities to default. *See Omega*, 375 F. Supp. 3d at 512 n.10. This Court need not accept—and, indeed, the PSLRA directs the Court to disregard—allegations that are illogical. *See Kalnit*, 264 F.3d at 140–41 (rejecting allegations that "make no sense" or "def[y] economic reason").

### d.        Equity Bancshares' Monitoring System for Loans

Lastly, Plaintiffs aver that Mr. Kossover and Mr. Elliott "admittedly monitored and payed [*sic*] close attention to the performance of loans," citing Equity Bancshares' description of its loan-review processes in its SEC filings and Mr. Kossover's and Mr. Elliott's membership "on the Loan, Risk, and Special Assets Committees." ¶¶ 140–41 (capitalization omitted). As explained above, these allegations do not support a strong inference of scienter because they impermissibly rest on

Defendants' titles alone and fail to identify specific contrary information *actually communicated to or known by* Defendants at the time of their public statements. *See supra* Sections I.B.3.a–b. Plaintiffs' last-gasp alternative theory of "extreme recklessness," relegated to a single sentence, ¶ 141, fares no better. Plaintiffs posit a false dichotomy—either Defendants reviewed the financial statements and had knowledge of assertedly "contrary facts" or they did not and were therefore extremely reckless—that flouts the PSLRA's pleading standards and the comparative analysis mandated by *Tellabs*. *See* 551 U.S. at 314. More to the point, though, Plaintiffs fail to explain how their allegation of inattention, if true, would demonstrate "an extreme departure from the standards of ordinary care," *Novak*, 216 F.3d at 308, in light of the covenants required in the Consolidated Loan agreements. At the end of the day, the complaint may "strongly suggest[] that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud." *Shields*, 25 F.3d at 1129.

## II.   <u>Plaintiffs Fail to State a Claim Under Section 20(a)</u>

Absent a principal violation, Plaintiffs' claims of control person liability fail as a matter of law. *See Fila*, 195 F. Supp. 3d at 499. Moreover, the complaint is devoid of any particularized facts showing that either Mr. Elliott or Mr. Kossover was "in some meaningful sense a culpable participant in the fraud." *Id.* (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007)). The Section 20(a) claims therefore must be dismissed as well.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant this motion and dismiss all of Plaintiffs' claims.

Dated: December 6, 2019                         Respectfully submitted,

                                            **NORTON ROSE FULBRIGHT US LLP**


By: */s/ Mark Oakes*
    Mark Oakes, Texas Bar No. 24062923
    (admitted *pro hac vice*)
    mark.oakes@nortonrosefulbright.com
    Ryan Meltzer, Texas Bar No. 24092821
    (admitted *pro hac vice*)
    ryan.meltzer@nortonrosefulbright.com
    Emily Wolf, Texas Bar No. 24106595
    (admitted *pro hac vice*)
    emily.wolf@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

*Attorneys for Defendants Equity Bancshares, Inc., Brad S. Elliott, and Gregory H. Kossover*

99001041.12