**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHEN BURR and DAVID TANGEMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>EQUITY BANCSHARES, INC., BRAD S. ELLIOTT, and GREGORY H. KOSSOVER,<br><br>　　　　　　　　Defendants. | Case No. 19-cv-04346-AJN |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE**
**AMENDED CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................................... 7

    A.    Defendants Misled Investors By Touting Equity Bank's Strong Financial Results While Concealing The Known Material Impairment Of Equity Bank's Largest Borrower ............................................................................................. 7

    B.    Unbeknownst To Investors, Equity Bank's Largest Borrower Was Incapable Of Repaying Equity Bank's Largest Loans ............................................................... 7

    C.    Defendants Engaged In An "Extend And Pretend" Scheme To Repaper Gatti's And Gigi's Old Debt Into New Loans To Delay The Disclosure Of The Borrowers' Insolvency And The Borrowers' Inability To Repay The Bank.......... 8

    D.    After Defendants Decline To Issue Any More Debt In December 2018, The Sovrano Parties File For Bankruptcy In Early January 2019 .............................. 10

    E.    Defendants Hint At Problematic Loans In Late January 2019 – But Misleadingly Claim No Expected Impairment ........................................................................... 11

    F.    The Truth Is Revealed: Defendants Disclose Concealed Impaired Loans Of Largest Borrower ............................................................................................... 11

III.  PLAINTIFFS HAVE ALLEGED VIOLATIONS OF THE EXCHANGE ACT............. 12

    A.    Motion To Dismiss Standard .............................................................................. 12

    B.    The Complaint Meets The Standards Of The PSLRA And Rule 9(b).................. 13

    C.    The Complaint Adequately Alleges Materially False And Misleading Statements And Omissions....................................................................................................... 13

        1.    Defendants' False And Misleading Statements And Omissions Regarding Impairment Of The Sovrano Parties' Loans ............................................. 13

        2.    Defendants' False And Misleading Statements And Omissions Regarding Equity Bank's Credit Quality, Credit Criteria And Monitoring Credit Quality....................................................................................................... 16

        3.    Defendants' False And Misleading Statements And Omissions In Equity Bank's Financial Statements..................................................................... 20

        4.    Defendants' Misstatements Are Not Non-Actionable Opinions ............. 22

    D.    The Complaint Raises A Strong Inference Of Defendants' Scienter ................... 23

1.      Sovrano's Financial Documents Establish That Defendants Knew Their Largest Borrower Was Insolvent And Defendants Misleadingly And Recklessly Reported Equity Bank's Non-Performing Loans And Financial Condition............................................................................................... 24

2.      Defendants Knew Of Equity Bank's Severely Reckless Asset Review Practices Related To The Gigi's and Gatti's Loans.................................. 25

3.      Defendants' Assurance That Equity Bank Did Not Expect Impairment Of The Gigi's And Gatti's Loans Was Severely Reckless At Minimum ...... 27

4.      Additional Factors Strengthen The Inference Of Scienter........................ 28

E.      Allegations Of Motive Are Not Required To Plead Scienter ............................... 30

F.      The Complaint Raises A Strong Inference Of Corporate Scienter ...................... 31

IV.     THE COMPLAINT STATES CONTROL PERSON CLAIMS ..................................... 32

V.      CONCLUSION.............................................................................................................. 32

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)...................................................................................................... 13

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)...................................................................................................... 12

*Brody v. Transitional Hosps. Corp.*,
 280 F.3d 997 (9th Cir. 2002) ........................................................................................ 15

*Conley v. Gibson*,
 355 U.S. 41 (1957)........................................................................................................ 12

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009)......................................................................................... 20

*Fait v. Regions Financial Corp.*,
 655 F.3d 105 (2d Cir. 2011)..................................................................................... 21, 23

*Foman v. Davis*,
 371 U.S. 178 (1962)...................................................................................................... 32

*Freudenberg v. E*Trade Fin. Corp.*,
 712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................. 16, 17, 19, 22

*Ganino v. Citizens Util. Co.*,
 228 F.3d 154 (2d Cir. 2000)...................................................................................... 24, 30

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
 2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019)............................................................ 26

*In re Alstom SA Securities Litigation*,
 406 F. Supp. 2d 433 (S.D.N.Y. 2005).................................................................... 25, 28

*In re Am. Express Co.*,
 2008 WL 4501928 (S.D.N.Y. 2008)............................................................................ 26

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
 693 F. Supp. 2d 241 (S.D.N.Y. 2010).......................................................................... 19

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
 381 F. Supp. 2d 192 (S.D.N.Y. 2004).......................................................................... 25

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
 763 F. Supp. 2d 423 (S.D.N.Y. 2011).......................................................................... 13

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012)...................................................................... 9, 10

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)............................................................................ 32

*In re BP p.l.c. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) ........................................................................ 30

*In re CIT Grp. Inc. Sec. Litig.*,
    2010 WL 2365846 (S.D.N.Y. June 10, 2010) ............................................... 17, 18, 19

*In re Lehman Bros. Sec. & Erisa Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011).......................................................................... 25

*In re Netbank, Inc. Sec. Litig.*,
    2009 WL 2432359 (N.D. Ga. Jan. 29, 2009)............................................................... 31

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 619 (S.D.N.Y. 2014).............................................................................. 9

*In re Reliance Sec. Litig.*,
    91 F. Supp. 2d 706 (D. Del. 2000)............................................................................... 21

*In re Reserve Fund Sec. & Deriv. Litig.*,
    732 F. Supp. 2d 310 (S.D.N.Y. 2010).......................................................................... 29

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009).......................................................................... 26

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).......................................................................... 25, 26, 28

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010).......................................................................... 20

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ................................................................................. 29

*In re Wells Fargo Sec. Litig.*,
    12 F.3d 922 (9th Cir. 1993) ......................................................................................... 22

*Lewis v. Straka*,
    535 F. Supp. 2d 926 (E.D. Wis. 2008)................................................................... 19, 21

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir.1976)............................................................................................ 9

*Lloyd v. CVB Financial Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ................................................................ 14, 15, 16, 28

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986)................................................................................ 32

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ............................................................................ 31

*Mateo v. Bristow*,
  2013 WL 3863865 (S.D.N.Y. July 16, 2013) ........................................................ 13

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)................................................................................ 13, 16, 23

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
  2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012)........................................................ 30

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)............................................................................. 27

*New Orleans Employees Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) .......................................................................... 29

*No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ............................................................................ 31

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)............................................................... 19, 23, 24, 26

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)................................................................................ 22, 23

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*,
  595 F.3d 86 (2d Cir. 2010)............................................................................... 15

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)............................................................... 6, 7, 14, 31

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992)........................................................................ 16, 19

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)............................................................................. 13

*Steamfitters Local 449 Pension Fund v. Alter*,
  2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) .......................................... 19, 20, 21

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
 531 F.3d 190 (2d Cir. 2008) .................................................................................. 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ............................................................................ 23, 24, 30, 31

*Tongue v. Sanofi*,
 816 F.3d 199 (2d Cir. 2016) .................................................................................. 23

*TSC Indus., Inc. v. Northway, Inc.*,
 426 U.S. 438 (1976) .............................................................................................. 15

*United States v. Morris*,
 80 F.3d 1151 (7th Cir. 1996) ................................................................................ 17

*Wilson v. LSB Indus., Inc.*,
 2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ........................................................ 22

*Winslow v. BancorpSouth, Inc.*,
 2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) .................................................... 21

## <u>STATUTES</u>

15 U.S.C. §78u-4(b)(2) ................................................................................................ 23

## <u>RULES</u>

Fed. R. Civ. P. 12(g) ................................................................................................... 13

Fed. R. Civ. P. 15(a)(2) ............................................................................................... 32

Fed. R. Evid. 408 .......................................................................................................... 9

Fed. R. Evid. 410 .......................................................................................................... 9

Lead Plaintiffs Stephen Burr and David Tangeman ("Lead Plaintiffs" or "Plaintiffs"), respectfully submit this memorandum of law in opposition to Defendants'[1] consolidated motion to dismiss the amended class action complaint for failure to state a claim (ECF No. 31).

## I.    PRELIMINARY STATEMENT

This is a straightforward case of securities fraud.  Near the beginning of the Class Period,[2] Equity Bank faced a major disaster with *its largest borrower*—two franchise restaurant companies, Mr. Gatti's Pizza ("Gatti's) and Gigi's Cupcakes ("Gigi's"), who were backed by common/related private equity sponsors (collectively, the "Sovrano Parties").  Gigi's and Gatti's were delinquent, effectively insolvent and *incapable of repaying nearly $30 million of loans* Defendants extended to them.  Rather than disclose the problem to investors and properly account for and classify the impaired credit relationship in the Company's financial statements and filings with the SEC, Defendants engaged in *a fraudulent "extend and pretend" scheme* to hide the problem from investors and delay what proved to be inevitable.  Specifically, in June 2018, Defendants *repapered the prior loans with new loans* to Gatti's and Gigi's, in the amounts of $20,250,000 and $9,250,000, respectively, which proved to be too little too late as *these entities promptly filed for bankruptcy a mere six months and six days later* on January 4, 2019.

Notably absent from Defendants' motion to dismiss is any acknowledgement of the financial documents attached as Exhibit 1 to the Complaint.  These financial documents are routine franchise disclosure documents, which contain the financial statements for Gatti's parent company, Sovrano[3], and are financial documents that Equity Bank or any other commercial

---

[1] Defendants include: Equity Bancshares, Inc. ("Equity Bank" or the "Company"), Brad S. Elliot, Equity Bank's Chairman and Chief Executive Officer ("CEO") and Greg Kossover, Equity Bank's Executive Vice President and Chief Financial Officer ("CFO").

[2] The Class Period is April 20, 2018 to April 23, 2019.

[3] Plaintiffs obtained these financial documents after the Class Period as part of Plaintiffs' investigation.  The information about the Sovrano Parties' debt as contained in the documents does not indicate the debt is owed to Equity Bank nor would investors or the public have known

lender would request and review in connection with underwriting the issuance of any loans to a business such as Gatti's.[4]  Just as Defendants' motion to dismiss ignores these crucial financial documents, as alleged in the Complaint, it is clear that Defendants similarly ignored the documents' information about the Sovrano Parties' grave financial condition when Equity Bank extended the Sovrano Parties "new" repapered loans in June 2018 just six months before their bankruptcy.

Specifically, the financial documents in Exhibit 1 to the Complaint, in addition to the Complaint's other allegations, detail, *inter alia*, the Sovrano Parties' obvious insolvency, negative cash flow and sole reliance on debt financing. These documents alone establish that Defendants knew during the Class Period, or *at minimum*, were severely reckless in not knowing, that Equity Bank's largest client was, at a minimum, impaired and incapable of repaying Equity Bank.  Indeed, Defendants Elliot and Kossover, as members of Equity Bank's loan committees were intimately involved in the process of approving loans, modifying loans when they became delinquent, and extending  new credit to borrows who could not make their payments.

The financial documents also establish that Equity Bank deviated from its stated critical policies and procedures for nonperforming loans and rating the risk associated with those loans, by serially pushing out substantial repayments (despite the Sovrano Parties' obvious insolvency, negative cash flow and inability to repay Equity Bank) and issuing the poorly timed $29.5 million of "new" loans to the Sovrano Parties a mere six months and six days before they filed for bankruptcy.

---

about the existence of the Sovrano Parties' loans until Equity Bank's disclosures at the end of the Class Period. However, based on these disclosures and information obtained from the Sovrano Parties' bankruptcies, it is now clear that the information in the Sovrano financial documents is in reference to loans extended by Equity Bank.

[4] Indeed, these financial disclosure documents ("FDD") are the same documents provided to prospective franchisees.  Obviously, a bank underwriting a loan would want the same, if not more detailed, financial information about a borrower, let alone their largest borrower.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

For example, these financial documents indicate that when Gigi's and Gatti's (vis-a-vis Sovrano) could not make the loan payments due to Equity Bank in 2017, Defendants agreed to push out the dates for the 2017 loan payments through loan amendments and expansions. However, these amendments left Sovrano with a crippling $6.1 million of debt repayments in 2018, and due to Gigi's and Gatti's liquidity issues, after January 1, 2018, the Sovrano Parties were forced to take on even more debt to cover ongoing quarterly payments to Equity Bank and rising cash losses. Among the $6.1 million of payments due in 2018 was a $2.75 million payment due to Equity Bank in June 2018. The Sovrano Parties could not pay the $2.75 million due in June 2018 on the Revolving Credit Loan, which had already been amended in April 2017, let alone the remainder of the $6.1 million in total debt due on the principal payments and the new additional term loan. Thus, in June 2018, Defendants once again repapered the Sovrano Parties' loans rather than impair the loans under Equity Bank's stated accounting policies and procedures and intentionally misclassified the loans under Equity Bank's internal risk ratings.

The Complaint's well-pled facts are corroborated by a former employee who recalled that around the end of the first quarter of 2018 (*i.e.*, at the beginning of the Class Period), Defendants Elliott and Kossover became worried about the credit relationship. Defendants Elliott and Kossover instructed Craig Mayo, Equity Bank's Chief Credit Officer, along with Equity Bank's SVP and Wichita Market President, Jeremy Machain, who was the Gigi's and Gatti's loan officer, to travel to Fort Worth around April or May 2018 to find out what was going on with the Sovrano Parties. Further, the former employee recounts that during special assets meetings, in which problem loans were discussed, Defendants Elliott and Kossover had directed the Chief Credit Officer, Mayo, to improperly classify the Sovrano Parties' loan risk ratings for audit reasons.

Defendants' motion to dismiss does not provide a sufficient explanation as to why Equity Bank failed to impair these $30 million of loans or disclose any sort of problem with its largest borrower *until after the Sovrano Parties filed for bankruptcy*. As alleged in the Complaint, when *the Sovrano Parties were incapable of even making the first payment due* in October 2018 on the repapered June 2018 loans, the Sovrano Parties once again came to Equity Bank looking for more money. Defendants once again repapered the problematic loans and lent Robert J. Phillips (the majority owner of Gatti's and Gigi's parent companies) an additional $1.07 million to provide working capital for the insolvent Gatti's and Gigi's.

As alleged the in the Complaint, while concealing the total disaster with its largest borrower in 2018, Defendants falsely portrayed Equity Bank as a growing and prosperous bank in dozens of earnings releases, SEC filings and other public statements issued during the Class Period. Defendants misleadingly touted Equity Bank's credit quality, lending standards, and assured investors that the bank had actually worked down classified assets during the Class Period. In response to Defendants' statements and omissions, Equity Bank's stock reached a Class Period high of $43.87 per share before the corrective disclosures revealed the truth to investors.

On January 4, 2019, after Equity Bank finally refused to extend the Sovrano Parties additional funds in December 2018, Equity Bank's largest borrower filed for Chapter 11 bankruptcy. Investors began to partially learn this truth on January 24, 2019, when Equity Bank disclosed that, during fourth quarter 2018, a credit relationship was downgraded to Watch and Substandard for $19 million and $9 million, respectively. Despite Defendants' extensive knowledge of the Sovrano Parties' financial distress and bankruptcies at the end of January 2019, Defendants misleadingly told investors "[a]t December 31, 2018, *we do not expect a credit impairment* based on the collateral and circumstances." On this news, the Company's share

price fell $2.14, or more than 6%, to close at $32.15 per share on January 24, 2019, on unusually heavy trading volume.

As alleged in the Complaint, just three months later on April 22, 2019, Defendants shocked the market and disclosed a $14.5 million provision for loss against the credit relationship, resulting in a $4.1 million net loss for first quarter 2019.   Indeed, Defendants *admitted* their reckless decision to continue lending to Gigi's and Gatti's despite the Sovrano Parties' insolvency and inability to repay the loans.   On Equity Bank's April 23, 2019 earnings call Defendant Elliott stated:

> *As CEO of our company, I own this credit decision*. Our team extended credit to these borrowers based on a long history of success in their businesses and with us as their bank. *Unfortunately, circumstances changed and we did not discontinue advancing funds early enough*.

In response to Defendants' unexpected disclosures, the Company's share price plummeted to $4.76, or more than 16%, to close at $24.71 per share on April 23, 2019, on unusually heavy trading volume.

Defendants try to brush these well-pled facts under the rug and claim that this case presents nothing more than fraud by hindsight.   As the financial documents make clear, Defendants either knew about the Sovrano Parties' dire financial condition during the Class Period or were extremely reckless in not knowing the financial wherewithal of Equity Bank's largest borrower.   It belies belief that Defendants Elliot and Kossover, members of Equity Bank's loan committees, including the special assets committee, would not have reviewed the financial documents of Equity Bank's largest borrower – that were at least as detailed as the Sovrano FDD, if not more – and would have known that the Sovrano Parties were effectively insolvent.   Indeed, Defendants do not challenge that these financial documents present the Sovrano Parties' grueling financial hardship, and like Defendants did during the Class Period, Defendants once again attempt to ignore the financial reality that these documents present.

Contrary to Defendants' claims, the Complaint clearly alleges facts based on these financials demonstrating that (1) Defendants' statements were false when made; (2) even *if* Defendants' statements contain an element of opinion, Defendants are liable because they omitted material information (*i.e.*, as shown in the financial documents) that made their statements misleading to a reasonable investor; and (3) that Defendants acted with extreme recklessness, *at minimum*, in engaging in the extend and pretend scheme.

Realizing that these financial documents show Defendants misled investors during the Class Period, Defendants attempt to introduce facts not contained in the Complaint in claiming that Defendants "protected the bank's investment" (*see, e.g.,* Dfs. Br. at 2, 14). Defendants assert these loans had sufficient personal guarantees from Phillips and Mann who had adequate collective net worth to cover the loans. These counter-facts are not properly considered on a motion to dismiss. *Roth v. Jennings*, 489 F.3d 499, 511 (2d Cir. 2007). Moreover, Defendants claim that they acted with reasonable business judgment because they believed Gatti's would be sold for "an amount sufficient to cover the entire credit relationship." Dfs. Br. at 2. This argument is undermined by the allegations in the Complaint, which make clear that Defendants knew in ***September 2018*** that Gatti's was not sold to the potential purchaser (and was still not sold to another purchaser by December 31, 2018). Nevertheless, Defendants recklessly (1) extended additional credit to the Sovrano Parties in October 2018 and (2) assured investors at the end of January 2019 that there was no expected impairment of the credit relationship (as of December 31, 2018) despite the Sovrano Parties' bankruptcies and failure to consummate a sale.

In sum, the Complaint adequately alleges both falsity and scienter and the Defendants' motion to dismiss should be denied.

## II.   FACTUAL BACKGROUND

### A.   Defendants Misled Investors By Touting Equity Bank's Strong Financial Results While Concealing The Known Material Impairment Of Equity Bank's Largest Borrower

Equity Bancshares is a bank holding company and its wholly-owned banking subsidiary, Equity Bank, purports to provide a broad range of financial services primarily to businesses, business owners and individuals. ¶ 27.  Equity Bank operates in Arkansas, Kansas, Missouri, and Oklahoma.  *Id.*[5]  During the Class Period, Defendants touted Equity Bank's focus on identifying and disposing of problematic loans and its growth in the commercial loan portfolio. ¶ 30.  For example, Defendants claimed that Equity Bank's special asset manager, Tim Kerr and his special assets team, reduced Equity Bank's nonperforming assets during the Class Period.  ¶¶ 46, 49, 142, 146.  In reality, however, Equity Bank was only able to report positive financial results by fraudulently concealing the financial distress of its largest borrower, the Sovrano Parties. ¶ 45.[6]

### B.   Unbeknownst To Investors, Equity Bank's Largest Borrower Was Incapable Of Repaying Equity Bank's Largest Loans

Gigi's and Gatti's were financially troubled companies that had experienced financial hardship well before Defendants repapered the $29.5 million loans in June 2018.  ¶ 56.  Gigi's suffered from operational issues and was apparently insolvent going back to at least 2016. ¶¶ 67-68.[7]  Indeed, Gigi's bankruptcy Form 207, Statement of Financial Affairs, Gigi's reported it only

---

[5] Unless otherwise indicated, all ¶__ references refer to Plaintiffs' Amended Class Action Complaint (ECF No. 26) ("the Complaint").  All capitalized terms not otherwise defined herein have the same meaning as stated in the Complaint.   Unless otherwise indicated all emphasis is added and quotations and citations are omitted.

[6] The Sovrano Parties include Robert J. Phillips ("Phillips"), who owns and operates Gatti's and Gigi's and is Sovrano's Chairman and CEO, and Kyle C. Mann ("Mann"), who owns and operates Gatti's and Gigi's and is Sovrano's Vice-Chairman.  ¶¶ 25-26, 61.

[7] Based on Gigi's December 25, 2016 audited financial statements and Gigi's June 9, 2017 FDD filed with the State of Minnesota, which stated "[Gigi's Cupcakes, LLC's] financial condition, as reflected in its financial statements (see item 21), calls into question the [Gigi's Cupcakes, LLC's] financial ability to provide services and support to [the franchisee.]"  The Court may properly consider these allegations.  *See infra* n.8.

had gross revenue of $4,970,334 in 2018 and $6,182,262 in 2017. ¶ 70. Similarly, Gatti's was also in financial distress. The financial strain from Gigi's was negatively impacting Gatti's/Sovrano. ¶ 71.

Sovrano accumulated substantial debt in 2015 and 2016, nearly all of which was to Equity Bank. ¶ 72. In 2017, Sovrano accumulated yet even more debt (specifically, $9.5 million in additional debt between December 2015-2017). ¶ 73. However, at the same time, Sovrano saw its revenue decline in 2017 from 2016. ¶¶ 75-76. According to Sovrano's 2017 financial statements, Sovrano was reliant on its debt financing to be able to continuing operating. ¶ 77.

C.    **Defendants Engaged In An "Extend And Pretend" Scheme To Repaper Gatti's And Gigi's Old Debt Into New Loans To Delay The Disclosure Of The Borrowers' Insolvency And The Borrowers' Inability To Repay The Bank**

Because the Sovrano Parties could not make their 2017 payments as contractually due, Defendants agreed to push out the dates for the 2017 loan payments through loan amendments and expansions. ¶ 79. For example, the schedule of payments due in future years contained in the 2017 financial statements versus the schedule in the 2016 financial statements shows a substantial shift in the timing of payments due. ¶ 80.

These continued amendments and expansions left Sovrano with a crippling $6.1 million of repayments in 2018, and the Sovrano Parties were forced to take on even more debt in early 2018. ¶¶ 81-82. Among the $6.1 million of payments due in 2018 was a $2.75 million payment due to Equity Bank in June 2018. ¶ 83. The Sovrano Parties could not pay the $2.75 million due in June 2018 on its Revolving Credit Loan, let alone the other payments due in 2018. ¶ 84.

The Sovrano Parties' inability to make payments as due in 2018 is corroborated by Confidential Witness 1 ("CW1"), who recalls that around the end of the first quarter of 2018 Defendants Elliott and Kossover became worried about the relationship with the Sovrano Parties. ¶ 99. Defendants Elliott and Kossover instructed the Chief Credit Officer, Mayo, along with

Equity Bank's SVP and Wichita Market President, Jeremy Machain, who was the Gigi's and Gatti's loan officer, to travel to Fort Worth around April or May 2018 to find out what was going on with the credit relationship. *Id.* When CW1 left Equity Bank in September 2018, CW1 believed the Gigi's and Gatti's loans had been delinquent for approximately four to five months. *Id.* Moreover, despite Defendants' knowledge of the Sovrano Parties' dire financial condition, rather than follow Equity Bank's policies and procedures for classifying loans, Defendants Elliott and Kossover had directed the Chief Credit Officer, Mayo, to improperly classify the loans' risk ratings for audit reasons. ¶ 101.

Thus, when the Sovrano Parties inevitably could not make the required payments in June 2018, in an effort to extend and pretend, on June 28, 2018, a mere six months and six days prior to these entities' bankruptcies, Defendants entered into repapered loan agreements with the Sovrano Parties for $29.5 million. ¶ 93.

The June 2018 repapered loans, however, did not fix the problem. The Sovrano Parties were still effectively insolvent and were having trouble selling Gatti's for an amount sufficient to cover the loans. According to an adversary complaint filed in the Sovrano bankruptcy, styled *Three Dough Boys v. Gatti's Great Pizza, Inc., R.J. Phillips Jr., Kyle C. Mann*, Case No. 19-ap-04070,[8] the Sovrano Parties were so desperate to make a payment to Equity Bank that on or

---

[8] Defendants incorrectly claim that the Court should disregard the Complaint's allegations based on allegations from another complaint. This argument stems from *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir.1976), but as numerous courts within the Circuit have recognized, this case does not stand for the proposition that all allegations based on another complaint must be disregarded as immaterial. *See, e.g., In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 621 (S.D.N.Y. 2014) (analyzing *Lipsky* and later Second Circuit law and concluding that "reference to the complaints or allegations in such actions would be permissible . . . . it would make little sense to strike references to pleadings in ongoing actions, which do not trigger the protections or policy concerns of FRE 410 or FRE 408[;]" and granting plaintiffs leave to amend their securities class action complaint to include allegations from related bankruptcy proceeding); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012). Similarly here, as with *OSG*, the allegations from adversary

around August or September 2018 they fraudulently represented the financial position of thirteen of their Mr. Gatti's Pizza stores to sell them to former Papa John's executives, Tisdel and Starks. ¶¶ 112-14.[9]  This sale only resulted in a $1.1 million payment to Equity Bank in September 2018 – an amount far insufficient to cover the repapered loan amount.  ¶ 113.   Moreover, the adversary complaint alleges that the Sovrano Parties' attempted sale of Mr. Gatti's to a private equity fund, Satori Capital, fell through in 2018 because Satori discovered the Sovrano Parties' insolvency.  *Id.*

Due to the Sovrano Parties' failed attempt at selling Gatti's, in October 2018, when the first repapered June 2018 loan payments were due, the Sovrano Parties unsurprisingly could not make the payment and once again came looking for more money.  Defendants again lent the Sovrano Parties an additional *$1,070,000* to provide working capital for the insolvent Gatti's and Gigi's.  ¶ 98.

### D.    After Defendants Decline To Issue Any More Debt In December 2018, The Sovrano Parties File For Bankruptcy In Early January 2019

As Defendants later admitted (during the April 23, 2019 conference call) that in December 2018, the Sovrano Parties approached Equity Bank and asked Defendants to extend even further funds for Gatti's and Gigi's.  ¶ 106.  However, the entities' financial condition was so bad that Defendants declined to extend any further debt.  *Id.*

On January 4, 2019, a mere one day after analysts had been praising Equity Bank's 2018 performance, Equity Bank's biggest credit relationship filed for Chapter 11 bankruptcy in the Northern District of Texas.  ¶ 107.

---

proceedings in Sovrano's bankruptcy strengthen Plaintiffs' securities claims and may be properly considered under Second Circuit law.
[9] Additionally, per the adversary complaint, the thirteen Company-owned Gatti's Austin locations that the Sovrano Parties were trying to sell were each losing an estimated $100,000 per month, *i.e.*, $1.3 million total per month. ¶¶ 86, 112-14.

**E.    Defendants Hint At Problematic Loans In Late January 2019 – But Misleadingly Claim No Expected Impairment**

On January 24, 2019, Defendants disclosed that, during fourth quarter 2018, a credit relationship was downgraded to Watch and Substandard for $19 million and $9 million, respectively. Defendants misleadingly assured investors:

> [w]e do have 1 credit relationship that has been downgraded to watch and substandard for $19 million and $9 million, respectively, at December 31, 2018. These 2 credits are related to the same operator. This relationship is not indicative of a systemic issue in the portfolio, rather one operator who is experiencing difficulty and is working with us to possibly restructure or liquidate his business to resolve his relationship with us. *At December 31, 2018, we do not expect a credit impairment* based on the collateral and circumstances.

On this news, the Company's share price fell $2.14, or more than 6%, to close at $32.15 per share on January 24, 2019, on unusually heavy trading volume. ¶ 115.

After the market closed on March 19 2019, Equity Bank filed Form 12b-25 with the SEC stating that the Company had determined that it is unable to file its annual report for the fiscal year ended December 31, 2018 within the prescribed time period.  Equity Bank reported that it was still conducting its audit for the year ended December 31, 2018.  On this news, the Company's share price fell $1.69 per share, or 5.24%, to close at $30.56 per share on March 20, 2019. During the next two days, the Company's share price further declined another $0.83, or about 2.7%, to close at $29.73 on March 21, 2109, and another $1.77 per share, or 5.95%, to close at $27.96 on March 22, 2019.  ¶¶ 118-19.

**F.    The Truth Is Revealed: Defendants Disclose Concealed Impaired Loans Of Largest Borrower**

On April 22, 2019, Defendants shocked the market when they issued a press release to report the Company's first quarter 2019 financial results and disclosed that a $14.5 million provision for loss against a credit relationship had impacted its financial results for first quarter 2019.  The Company stated, in relevant part:

> In the first quarter, we recorded a $14.5 million provision for loss against a credit relationship. We will discuss this on our earnings call Tuesday, April 23, 2019. However, it is important for us to convey we do not believe this represents a systemic trend; rather an isolated individual relationship which is unique to our portfolio.

¶ 120.

On April 23, 2019, Defendants held a press conference to discuss 2019 first quarter results. Defendants started the call with announcing their concealment of the problematic Gigi's and Gatti's loans. Defendant Elliott admitted, among other things:

> *As CEO of our company, I own this credit decision.* Our team extended credit to these borrowers based on a long history of success in their businesses and with us as their bank. *Unfortunately, circumstances changed and <u>we did not discontinue advancing funds early enough</u>* …

¶ 121.

Analysts drilled down on Defendants' concealment of the problematic loans and were shocked that Defendants had previously failed to provide any insight into the issue with the bank's largest borrower. On this news, the Company's share price fell $4.76, or more than 16%, to close at $24.71 per share on April 23, 2019, on unusually heavy trading volume. ¶ 127.

## III. PLAINTIFFS HAVE ALLEGED VIOLATIONS OF THE EXCHANGE ACT

### A. Motion To Dismiss Standard

A plaintiff's complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). For purposes of the motion to dismiss, all of the "factual allegations contained in the complaint" must be "accepted as true." *Id.* at 572. Though these allegations need not be "detailed," they must "state a claim to relief that is plausible on its face." *Id.* at 555. A complaint is facially plausible "when the pleaded factual

content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## B.      The Complaint Meets The Standards Of The PSLRA And Rule 9(b)

To state a claim under §10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission ("falsity"); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  Here, Defendants contest only falsity and scienter.[10]  As to these and all required elements, the Complaint is sufficient.

## C.      The Complaint Adequately Alleges Materially False And Misleading Statements And Omissions[11]

### 1.      Defendants' False And Misleading Statements And Omissions Regarding Impairment Of The Sovrano Parties' Loans

Defendants misled investors about the likelihood of impairment of the Gigi's and Gatti's loans.  Indeed, the first time Defendants mentioned the loans in late January 2019, Defendants represented:

> [w]e do have 1 credit relationship that has been downgraded to watch and substandard for $19 million and $9 million, respectively, at December 31, 2018.

---

[10] Defendants waived their right to challenge the other elements of §10(b), and these non-contested elements are not addressed herein. See Fed. R. Civ. P. 12(g); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013).

[11] Defendants' brief does not specifically argue their statements are protected from the safe harbor (Dfs. Br. at 13-26), but Defendants still point to purported cautionary warnings in hopes this will shield them from liability.  Dfs. Br. at 10-11.  It does not.  The safe harbor only potentially applies to Defendants' statements that are purely forward-looking statements and to the extent that the Complaint challenges those statements as affirmative misstatements rather than statements made misleading by omission. As for Defendants' affirmative misstatements, first, Defendants have not met their burden to show that the "cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co*., 604 F.3d 758,772 (2d Cir. 2010). Second, the safe harbor does not protect Defendants because they "fail[ed] to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig*., 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011).

These 2 credits are related to the same operator. This relationship is not indicative of a systemic issue in the portfolio, rather one operator who is experiencing difficulty and is working with us to possibly restructure or liquidate his business to resolve his relationship with us. ***At December 31, 2018, we do not expect a credit impairment*** based on the collateral and circumstances.

¶ 157.   It was misleading for Defendants to claim at the end of January 2019, after the Sovrano Parties' bankruptcies, that Equity Bank did "not expect a credit impairment" at December 31, 2018 because Defendants knew, for months (and even years) that there were serious doubts about the Sovrano Parties', Equity Bank's largest borrowers, ability to repay and consequently, that impairment was necessary. ¶¶ 66-114.  This knowledge included: (i) the Sovrano Parties' bankruptcies; (ii) that the Sovrano Parties' loans' had been previously been repapered (before June 28, 2018) because Gigi's and Gatti's had not paid as contractually obligated; (iii) Defendants extended the Sovrano Parties another loan in October 2018 for operating capital for Gigi's and Gatti's because the entities were insolvent; (iv) the Sovrano Parties came looking for more money in December 2018 because Gigi's and Gatti's were insolvent; (v) the special assets team had not properly classified the loans' risk at the instruction of Defendants Elliott and Kossover and; (iv) during 2018, Gatti's had not been sold to a purchaser in an amount sufficient to cover the repapered loans' debt. ¶¶ 66-114.[12]

The Ninth Circuit addressed a nearly identical situation in *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1208–09 (9th Cir. 2016).   There, CVB's largest borrower was repeatedly delinquent on its loan payments and had no liquidity to meet its ongoing obligations. *Id.*  The

---

[12] Defendants inappropriately attempt to introduce facts about Phillips and Mann's net worth and the value of the collateral to contradict the Complaint's well-pled allegations regarding impairment (Defs. Br. at 14, 27).  Defendants' assertions are not properly considered on a motion to dismiss. *Roth*, 489 F.3d at 511 (vacating and remanding district court for "improperly consider[ing] the representations in defendants' filings for the truth of their assertions" and concluding that those representations "raised issues of fact that should not have been determined at the pleading stage.").

complaint alleged that the borrower told CVB in that unless modifications to loan terms were made, the borrower could not meet its obligations and might file for bankruptcy. *Id.* Nonetheless, CVB represented to shareholders that as of December 31, there were "no serious doubts" about the borrower's ability to repay. *Id.* The Ninth Circuit concluded that these statements were false and made with knowledge of, or recklessness towards, their falsity. *Id.*

The Ninth Circuit noted that even though the defendants' statements regarding "no serious doubts" technically may have been true at the time defendants claimed there was no basis for "serious doubts" about the borrower's loans "as of December 31, 2009," given that the critical meeting with the borrower about repayment did not take place until January 2010, the statement was plainly misleading when made because ***at the time the statement was made in March 2010, CVB had known for two months that there was a basis for serious doubts about the ability of CVB's largest borrower to repay***. *Id.* (emphasis added). The Ninth Circuit held that the omission of that fact, combined with the reassurance that everything was fine as of December 31, 2009, meets the pleading standard for a material omission. *Id.* (citing *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 449 (1976) (An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"); *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt*., *LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.")).

Similarly, here, Defendants' statement regarding the impairment analysis as of December 31, 2018 may have been technically true given Defendants had repapered the Sovrano Parties' loans in June and October 2018 to avoid impairing the loans in 2018, but the statement is still misleading because at the time the statement was made (late January 2019) Defendants knew of Gigi's and Gatti's bankruptcies and the necessity of impairment as a result thereof.[13]   Indeed, only three months later, in the first quarter of 2019, Defendants took a $14.5 million loss on the loans against Equity Bank's loss reserves.  Defendants further charged off $9.2 million on the Sovrano Parties' loans in the second quarter of 2019, and in the third quarter of 2019, charged off another million (for a total charge off of $10.2 million during the first nine months of 2019). Defendants' statement regarding no expected impairment of the Gigi's and Gatti's loans, combined with the reassurance that everything was fine as of December 31, 2018, meets the pleading standard for a material omission.  *Lloyd*, 811 F.3d at 1208–09.[14]

### 2. Defendants' False And Misleading Statements And Omissions Regarding Equity Bank's Credit Quality, Credit Criteria And Monitoring Credit Quality

Defendants' statements about credit criteria, "working down classified assets," credit quality, "percentage of nonperforming assets" and prudent credit practices compared to other lenders, when properly considered in context, were clearly materially false and misleading, and fundamentally misstated the most significant aspect of Equity Bank's business.  *See e.g., Shapiro*

---

[13] Defendants claim that they did not impair the loans because they could not anticipate future events. Dfs. Br. at 20-22. Defendants' argument – suggesting that impairments and the corresponding changes to loan loss reserves are projections about future performance – misstates GAAP and SEC disclosure requirements, which provide that "allowances for loan losses should be based on past events and current economic conditions." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 194 (S.D.N.Y. 2010).

[14] Defendants claim that they had no duty to disclose the bankruptcies (Dfs. Br. at 24), but in so arguing, ignore that when Defendants discussed expected impairment, Defendants put the issue in play, as the bankruptcies would (and did) impact "expected impairment." Disclosure is required when necessary "to make ... statements made, in the light of the circumstances under which they were made, not misleading. *Matrixx*, 563 U.S. at 44.

*v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully."); *see also United States v. Morris*, 80 F.3d 1151, 1163 (7th Cir. 1996); *E\*Trade Fin. Corp.*, 712 F. Supp. 2d at 185 (finding defendants' statements such as "[w]e grew the balance sheet while adhering to our strict discipline with respect to credit quality," . . . and "[w]e also maintained strict discipline with respect to risk mitigation, all the way down to the level of the borrower," to be actionable where the company's essential operations were so at odds with the company's public statements); *In re CIT Grp. Inc. Sec. Litig.*, 2010 WL 2365846, at \*2–3 (S.D.N.Y. June 10, 2010) (finding statements indicating that CIT had "disciplined lending standards" . . . and was "much more conservative" than other lenders actionable because defendants' touting their lending standards put those standards in play and defendants failed to disclose that those lending standards were lowered).

For example, Defendants' April 2018 statements, including "Tim Kerr, our special asset manager, ***has done an excellent job reducing [non performing assets]*** with his team and on terms within our expectations[,]" (¶ 142) was false and misleading because at the time the statement was made Equity Bank's largest credit relationship was a nonperforming asset but for Defendants' loan repapering. ¶¶ 79-82. Similarly, Defendants' statement that Equity Bank was "***not loosening our credit criteria***[,]" (¶ 142) was false and misleading because Equity Bank had repeatedly made credit concessions by extending the Sovrano Parties' loan terms when the bank's largest borrower was effectively insolvent and had a lengthy history of failing to make loan payments when contractually due, thus necessitating amendments and expansions. ¶¶ 79-82. In fact, Defendant Elliott admitted that Defendants had loosened Equity Bank's lending

criteria too much with the Sovrano Parties when he confessed "we did not discontinue advancing funds early enough." ¶ 124.[15]

Defendants' July 2018 statements were false and misleading because by touting Equity Bank's lending practices, Defendants put those practices at issue, and at the time these statements were made, Defendants were not working down nonperforming assets or maintaining responsible credit practices:

- "[Equity Bank's] credit quality remains strong. Our net interest margin continues to be solid, and our balance sheet growth continues to be responsible" (¶ 145);

- "[O]ur portfolio of credit quality has once again improved as *we have worked down classified assets*, which originated primarily from mergers. Tim Kerr and our special assets teams have done excellent work in staying focused on the quality of our credit and managing special assets" (¶ 146) and;

- Equity Bank's "[focus] on asset quality," and "[p]rovision for loan losses was $750,000 in the quarter, reflecting the high credit quality we alluded to earlier" (¶ 147);

- "Although *we are not tightening credit at this point, we are not loosening either*. We believe this cycle is long in the tooth, and *we are still seeing some exuberant behavior from some other lenders in our markets. And I want our stakeholders to know that is not who we have ever been or who we will become*. I simply expect our lending teams to continue to work hard, be smart, provide excellent service and expertise and grow our portfolio wisely" (*Id.*).

In fact, at this time, Defendants had just repapered the two high-risk Gigi's and Gatti's loans (which Defendants intentionally misclassified as to risk level for audit reasons) only one month prior. ¶¶ 89-97, 101.

---

[15] Defendants claim that it wasn't until December 2018 when the Sovrano Parties came looking for additional funds that they realized their error in extending funds. This is contradicted by CW1, who was a member of the special assets team, who reported that Defendants were concerned about the credit relationship around the beginning of the Class Period, in the first quarter of 2018, and Defendants Elliott and Kossover instructed the Chief Credit Officer and the Gigi's/Gatti's loan officer to travel to Fort Worth to find out what was going on with the relationship. ¶ 99. In addition, during the Class Period Defendants Elliott and Kossover improperly classified the loans' risk ratings in order to avoid an audit. ¶ 101.

Similarly, Defendants' October 2018 statements were misleading, including the statements:

- "Our credit quality remains strong, with year-to-date net charge-offs at a very small 3 basis points of loans. ***And our balance sheet growth continues to be brisk and responsible***" (¶ 151) and;

- "***Quality has improved year-to-date as we have worked down nonaccruals. . . .Our percentage of nonperforming assets to total assets has improved from 1.52% at 12/31/17 to 1.28% at September 30***" (*Id.*).

During this time Equity Bank' largest borrower was delinquent on its loans and Equity Bank's percentage of nonperforming assets had not actually improved.  In October 2018, when the first repapered June 2018 loan payments were due, the Sovrano Parties could not make the required payment and once again came looking for more money.  ¶ 98.

In light of Defendants' touting of Equity Bank's responsible credit criteria and reduction of nonperforming assets, the failure to disclose the nonperforming loans and the lowering of Equity Bank's standards is actionable. *Shapiro*, 964 F.2d at 282; *E\*Trade Fin. Corp.*, 712 F. Supp. 2d at 185; *CIT Grp.*, 2010 WL 2365846, at \*2–3; *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 277 (S.D.N.Y. 2010).[16]

Defendants incorrectly claim that these statements constitute puffery or corporate optimism.  Dfs. Br. at 18.  This argument has been rejected by courts in similar circumstances. *E\*Trade Fin. Corp.*, 712 F. Supp. 2d at 189–90 ("However, misstatements regarding risk management, discipline, monitoring and credit quality are not "puffery" where, as alleged here, they were "misrepresentations of existing facts.") (citing *Novak v. Kasaks*, 216 F.3d 300, 315 (2d

---

[16] *See also Steamfitters Local 449 Pension Fund v. Alter*, 2011 WL 4528385, at \*6 (E.D. Pa. Sept. 30, 2011) (finding actionable defendants' representations regarding, *inter alia*, credit quality of their customers); *Lewis v. Straka*, 535 F. Supp. 2d 926, 930–31 (E.D. Wis. 2008) (finding falsity adequately pled where defendant "emphasized the health and the growth of CIB when in fact such health and growth was severely compromised by a nonperforming large-loan portfolio, inadequate loan loss reserves, inadequate policies addressing problem loans, and other deficiencies.").

Cir.2000) (statements that inventory situation was "in good shape" or "under control" when defendants knew the contrary was true were false and misleading)).  Here, Plaintiffs have pled ample facts demonstrating that Defendants knew contrary facts about Equity Bank's nonperforming assets, credit criteria and quality when they uttered those misstatements. ¶¶ 66-114.[17]

### 3. Defendants' False And Misleading Statements And Omissions In Equity Bank's Financial Statements

As detailed in the Complaint, Equity Bank materially understated its loan loss reserve, materially overstated its reported net income, and improperly classified Equity Bank's risk categories of loans. ¶¶ 143, 144, 146, 148, 149, 150, 152, 153, 154, 155, 156.   Specifically, Equity Bank failed to account for its concealed past due Gigi's and Gatti's loans, including the more than $29.5 million of loans that were fraudulently extended in 2016 through 2018. Courts in this District and elsewhere routinely hold that statements about loan loss reserves are materially false when, like here, a company fails to adequately account for its past due loans. *See, e.g., In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 550, 555 (S.D.N.Y. 2010) (finding "loan loss reserves" false where they "did not account for increased defaults," noting that "default rates" are "integral to calculating loan loss reserves under GAAP"); *Alter*, 2011 WL 4528385, at *2,*7 (finding plaintiff's allegations that delinquencies were misreported, that defendants knew of the misreporting, and defendants calculated and reported other financial

---

[17] Defendants rely on a number of inapposite cases.  For example, in *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) the court concluded that JPMC's statements were merely generalizations regarding JPMC's business practices.  Here, Plaintiffs cite to a number of statements Defendants made about the current status of Equity Bank's loan portfolio during the Class Period in which Defendants made specific false and misleading representations about working down nonperforming assets and, as a consequence, the credit quality of the portfolio.  In addition, Plaintiffs have alleged numerous facts and Defendants' knowledge of the relationship with Equity Bank's largest borrower at the time the misstatements were made to shareholders.

statistics and made projections based on these inaccurate delinquency numbers, understating credit losses by at least $25.2 million, to be sufficient); *In re Reliance Sec. Litig*., 91 F. Supp. 2d 706, 722-24 (D. Del. 2000) (finding false statements where company failed to disclose that loan loss reserves did not account for "sharp increase in [loan] loss rate[s]"); *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *1, *5, *14-17 (M.D. Tenn. Apr. 26, 2011) (finding "understated loan loss reserves" due to the "failure to disclose tens of millions of dollars in nonperforming" loans); *Lewis*, 535 F. Supp. 2d at 929-30 (loan loss reserve statements actionable where "company failed to adjust its loan loss reserves to reflect the high number of problem loans and, instead of writing off bad loans, extended them or rolled them into new loans").

First, relying on, *inter alia*, a case concerning Section 11 claims, *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011) (which is also a pre-*Omnicare* case that no longer represents controlling law), Defendants contend that the Complaint fails to adequately allege falsity because: (i) loan loss reserves are matters of business judgment that are not actionable unless Defendants misstated the reserves with scienter; and (ii) the Complaint fails to meet this standard. Dfs. Br. at 2. As further detailed in Section III.D, *infra*, the Complaint amply alleges that Defendants acted with scienter, given that they knew of the repeated repapering of the nonperforming Gigi's and Gatti's loans and intentionally misclassified the loans to purposefully to conceal Equity Bank's true financial condition. *See Alter*, 2011 WL 4528385, at *2 (loan loss reserves statements false where defendants deliberately "distorted" past due loan amounts).

Second, Defendants argue that Equity Bank's income statements are not false because the Complaint does not allege Defendants violated a specific GAAP provision. Dfs. Br. at 20-21. This is nonsense. There is no GAAP provision that allows a bank to fraudulently manipulate its financial statements. Plaintiffs provide particularized examples of how Defendants' financial statements were false and misleading. For example, Equity Bank's Form 10-Q for the quarter

ended September 30, 2018 was false and misleading because, as a result of improper classification of the Gigi's and Gatti's loans, Equity Bank's 2018 third quarter interest income was overstated by $600,000. ¶ 152. Further, Defendants' 10-K for the year ended December 31, 2018, filed March 20, 2019, was also misleading because the Gigi's and Gatti's loans of $29.5 million should have been included in the potential problem loans of $52.9 million for 2018 and should have been included in the chart and statements under "Risk Categories of Loans By Class." ¶¶ 154-55. Indeed, as of September 2018, Defendants knew that Gatti's was not sold to Satori, and, as of December 31, 2018, had not been sold to another buyer in an amount sufficient to repay the repapered loans, therefore requiring the loans to be downgraded to special mention or substandard. ¶¶ 113, 154.

### 4.      Defendants' Misstatements Are Not Non-Actionable Opinions

Defendants also claim these misstatements are statements of opinion. First, statements about working down classified assets or the percentage of nonperforming assets and the resulting health of a bank's loan portfolio are clearly not statements of opinion. *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir. 1993) (deeming actionable factual statements regarding the security of loans and allowance for loan losses); *E\*Trade Fin. Corp.*, 712 F. Supp. 2d at 189–90. Second, even assuming, *arguendo*, that some of these statements have a component of opinion, the Supreme Court has recognized that opinion statements may be actionable if either (1) the speaker did not hold the belief she professed, (2) the supporting fact she supplied were untrue, or (3) the speaker omits information that makes the statement misleading to a reasonable investor. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015); *see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at \*1 (S.D.N.Y. Mar. 2, 2017) ("In

*Omnicare*, the Supreme Court held that a statement of opinion is actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor.").[18]

Here, Defendants did not merely fail to disclose "some fact" cutting the other way; Defendants withheld profoundly adverse facts about Equity Bank's largest borrower. To wit, Defendants knew that they had made a number of credit concessions and had repapered the Gigi's and Gatti's loans for approximately three years because the insolvent Sovrano Parties repeatedly could not make the payments when due. ¶¶ 66-114. Defendants also knew that they had intentionally misclassified the credit risk related to the loans for audit reasons. ¶ 101. Further, Defendants knew as of September 2018, that Gatti's was not sold to Satori, and, as of December 31, 2018, had not been sold to another buyer in an amount sufficient to repay the repapered loans. ¶¶ 113, 122. In sum, Plaintiffs have pled numerous facts demonstrating that Defendants made a number of statements during the Class Period that did not "fairly align with the information in the issuer's possession at the time." *Omnicare*, 135 S.Ct. at 1329.

### D.    The Complaint Raises A Strong Inference Of Defendants' Scienter

Under the PSLRA, in order to adequately plead scienter, a plaintiff must allege facts that, when viewed holistically, give rise to a strong inference that the defendant acted with "the required state of mind." 15 U.S.C. §78u-4(b)(2); *see Matrixx*, 563 U.S. at 48 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007)). In the Second Circuit, a plaintiff may satisfy this standard by pleading facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. Recklessness amounts to actionable

---

[18] As noted above, Defendants rely on pre-*Omnicare* decisions by the Second Circuit that no longer represent controlling law. See Dfs. Br. at 2, 28 (citing, *e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011). As the Second Circuit has explicitly recognized, *Omnicare* "altered the standard announced by [the Second Circuit] in *Fait*." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016). *Omnicare* now makes clear that "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.* at 210.

scienter if the conduct was "highly unreasonable" and an "extreme departure from the standards of ordinary care." *Id.* at 308. Recklessness can be shown by alleging that the defendants "knew facts or had access to information suggesting that their public statements were not accurate [or] failed to check information they had a duty to monitor." *Id.* at 311.

Scienter is adequately alleged if the facts give rise to an inference that defendants intentionally or recklessly misled the public which is at least as compelling as any non-culpable inference. *Tellabs*, 551 U.S. at 324. The proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 & 326 (allegations are to be read "holistically"). Scienter allegations "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. A plaintiff is not required to plead scienter with "great specificity." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 169 (2d Cir. 2000).

> **1.    Sovrano's Financial Documents Establish That Defendants Knew Their Largest Borrower Was Insolvent And Defendants Misleadingly And Recklessly Reported Equity Bank's Non-Performing Loans And Financial Condition**

Sovrano's financial documents show that Defendants were aware of the Sovrano Parties' precarious financial conditions prior to, and during, the Class Period. Complaint, Ex.1. Indeed, the FDD represents documents provided to prospective franchisees. Obviously a bank underwriting a loan would want the same, if not more detailed, financial information about a borrower, let alone their largest borrower. Defendants would have reviewed this, or similar, information during, and just prior to, the Class Period because Defendants were constantly repapering the loans in their illicit extend and pretend scheme. ¶¶ 79-80, 82-85, 93-98.

These documents demonstrate that Defendants were fully aware of the Sovrano Parties' financial condition throughout the Class Period but intentionally, or severely recklessly, omitted

material information about the nonperforming loans from their public statements and financials, thus portraying Equity Bank's financial performance far more favorably than the full facts warranted. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76–77 (2d Cir. 2001) (finding recklessness where defendants had access to information suggesting returns were increasing but publicly represented to the contrary and failed to adjust revenues accordingly); *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433, 457–58 (S.D.N.Y. 2005) ("plaintiffs' allegations as to Alstom's knowledge of Renaissance's precarious financial condition further bolster their claims asserting recklessness and conscious misbehavior").

### 2. Defendants Knew Of Equity Bank's Severely Reckless Asset Review Practices Related To The Gigi's and Gatti's Loans

Defendants Elliot and Kossover, as members of the Loan Committee and Risk Committee, were intimately involved in the process of approving loans, modifying loans when they became delinquent, and extending new credit to borrows who could not make their payments. ¶ 129. According to Equity Bank's 2018 10-K, Defendants Elliott and Kossover sat on the "internal loan committee" and were delegated additional "lending authority."[19]

Further, according to CW1 the special asset meetings were attended by Defendants Elliott and Kossover and Chief Credit Officer Craig Mayo. ¶ 130. CW1 reported that Defendant Elliot attended all the special assets meetings, which is the equivalent of the collection services, which reviewed non-performing loans, including the Gigi's and Gatti's loans. The special assets committee would meet with the risk committee regarding the delinquent loans and the executive management would become involved anytime the level of risk was increased on any loan. ¶ 131.

---

[19] Defendants argue that their membership on these committees does not add to strong inference of scienter. Defendants' committee memberships *in conjunction with the Complaint's other well-pled facts* is what gives rise to a strong inference of scienter under *Tellabs*. Indeed, numerous courts have relied on defendants' committee membership in conducting their holistic scienter inquiry. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 76; *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 296 (S.D.N.Y. 2011); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 222 (S.D.N.Y. 2004).

According to CW1, the Gigi's and Gatti's loans should have been elevated to a risk level "8," but at Defendants Elliott and Kossover's direction, the Chief Credit Officer, Mayo, was prevented from elevating the risk level for "audit reasons."  ¶ 132.

Defendants' failure to follow Equity Bank's internal policies regarding credit ratings and impaired and nonperforming loans forms a basis for an inference of recklessness.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 77 ("defendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness"); *Novak*, 216 F.3d at 311 ("defendants knowingly sanctioned procedures that violated the Company's own markdown policy . . . [i]n doing so, they caused those filings to be materially misleading"); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 532 (S.D.N.Y. 2009) ("there is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis for an inference of recklessness.").

Defendants claim that CW1's testimony does not support a strong inference of scienter. Defendants are wrong.  Plaintiffs have "described [the witness] in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 2019 WL 4601644, at *18 (S.D.N.Y. Sept. 23, 2019) (quoting *Novak*, 216 F.3d at 300).  CW1 was a special asset administrator that attended every special assets meeting up through September 2018, which makes it probable that they would know about Equity Bank's credit rating system. ¶ 100. Plaintiffs also sufficiently allege that CW1 was aware of "what information was communicated to senior executives."  *AMC Entm't*, 2019 WL 4601644, at *18 (citing *In re Am. Express Co.*, 2008 WL 4501928, at *8).  CW1 was at every special assets meeting – and reported that Defendants Elliott and Kossover were also usually in attendance – and during the special assets meetings the Gigi's and Gatti's loans, and their risk ratings, were

discussed.  ¶ 100.  Thus, CW1 was aware of what information Defendants Kossover and Elliott received about problem loans.

Defendants incorrectly claim that because CW1 left Equity Bank before any payments were due on the repapered June 2018 loans that CW1's testimony does not contribute to the scienter analysis.  Dfs. Br. at 31.  This misstates Second Circuit law.  Former employee accounts must be credited for the portion of the Class Period during which that employee worked at the company.  *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 123–24 (2d Cir. 2013) (crediting complaint's allegations based on employee's accounts *during part* or all *of the relevant time period*.").

Further, contrary to Defendants' unsupported assertion, CW1 did indicate that the loans were impaired during CW1's tenure.  ¶ 99 ("When CW1 left Equity Bank in September 2018, CW1 believed the Gigi's and Gatti's loans had been delinquent for approximately four to five months.").[20]  Moreover, irrespective of CW1's tenure, Equity Bank *admitted* that the Sovrano Parties' financial hardship in the fourth quarter of 2018 caused the Sovrano Parties to come looking for additional money in December 2018. ¶ 122 ("In the fourth quarter of 2018, these borrowers came to Equity and they asked us to advance funds, which we declined.").

### 3.    Defendants' Assurance That Equity Bank Did Not Expect Impairment Of The Gigi's And Gatti's Loans Was Severely Reckless At Minimum

On January 24, 2019, during the earnings call to discuss first quarter 2019 results, Defendants stated that during fourth quarter 2018, a credit relationship was downgraded to Watch and Substandard for $19 million and $9 million, respectively.  Specifically Defendant Kossover stated:

---

[20] Plaintiffs' allegations regarding the Sovrano Parties' loans—as described by Equity Bank's former employee—all contain "factual content," which must be accepted as true.  *Royal Bank of Scotland*, 709 F.3d at 121.

[w]e do have 1 credit relationship that has been downgraded to watch and substandard for $19 million and $9 million, respectively, at December 31, 2018. These 2 credits are related to the same operator. This relationship is not indicative of a systemic issue in the portfolio, rather one operator who is experiencing difficulty and is working with us to possibly restructure or liquidate his business to resolve his relationship with us. ***At December 31, 2018, we do not expect a credit impairment based on the collateral and circumstances***. Our total reserves to loans are 1.03% at December 31, 2018, of which 45 basis points is traditional ALLL.

¶ 157.  These statements were plainly false, as less than a few months later, Equity Bank took a $14.5 million loss on the credit relationship.  ¶ 120.  At the time of the statement, Defendants knew and had access to facts that contradicted their statements, including:

- Gigi's and Gatti's had been struggling financially throughout 2016-2018, resulting in Defendants repapering the loans multiple times, including on June 28, 2018 (¶¶ 71-98);

- Defendants had intentionally misclassified the loans' risk ratings for audit reasons in violation of Equity Bank's internal policies (¶ 101);

- The Sovrano Parties had come to Defendants in December 2018 asking for additional funds because Gigi's and Gatti's were insolvent (¶ 106) and;

- The Sovrano Parties filed for Chapter 11 bankruptcy on January 4, 2019 (¶ 107).

These facts plainly establish that Defendants' statements were reckless at a minimum.  *Lloyd*, 811 F.3d at 1208–09; *Scholastic Corp.*, 252 F.3d at 76–77; *In re Alstom SA*, 406 F. Supp. 2d at 457–58.

### 4.    Additional Factors Strengthen The Inference Of Scienter

First, the Gigi's and Gatti's loans comprised Equity Bank's "largest relationship." Defendants Elliott admitted this during Equity Bank's April 23, 2019 earnings call.  ¶ 133. Further, according to CW1, Defendant Elliott was a highly involved CEO and knew everything about the Gigi's and Gatti's loans.  ¶ 134.  Indeed, given that the Sovrano Parties were Equity Bank's largest borrower, Equity Bank would have had financial controls in place to review the performance of the loans, and given the size of the repapered loans ($29.5 million) the loans

would have required executive approval. Given the importance of the credit relationship to Equity Bank, the inference that Defendants acted with scienter is supported by the "core operations" doctrine. *New Orleans Employees Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (allegations of a company's core operations can provide supplemental support for allegations of scienter); *accord In re Reserve Fund Sec. & Deriv. Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010) (if false statements relate to a core operation, an inference arises "that the defendant knew or should have known the statements were false when made"); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 233 (S.D.N.Y. 2006) (similar).

Second, Defendant Elliot admitted he made the decision to continue lending to the Sovrano Parties despite the companies' insolvency and inability to repay the loans. ¶ 137 ("As CEO of our company, I own this credit decision. Our team extended credit to these borrowers based on a long history of success in their businesses and with us as their bank. Unfortunately, circumstances changed and *we did not discontinue advancing funds early enough*."). Further, on Equity Bank's 2019 second quarter earnings call, Defendants – and more specifically the *executive team* – admitted to irresponsibly extending the Sovrano Parties credit in 2018. ¶ 138 ("Although I've obviously been disappointed by the performance of these credits, *and it is a responsibility myself and our executive team completely own*, I'm happy to see the hard work of our legal and credit teams to get this remaining business out of bankruptcy and returned to normal operation.").[21]

Third, Equity Bank claimed to conduct "early-stage review of loans, regular credit evaluations and management reviews of loans, which supplement the ongoing and proactive

---

[21] Contrary to Defendants' claim that Plaintiffs "do not even attempt to offer any explanation of Mr. Elliott would want Equity Bancshares to continue to extend millions of dollars of loans to Gigi's and Gatti's" (Dfs. Br. at 34) – Plaintiffs do offer a reason – (1) desire not to impair the loans and (2) to avoid a stock drop because prompt disclosure of the truth would cause an immediate drop in the company's stock price, whereas waiting might allow the situation to correct itself. *See infra*, n. 22 (citing *Tellabs III*).

credit monitoring and loan servicing provided by our bankers."  Defendants' review of Equity Bank's loan portfolio on the loan, risk and special assets committees gave Defendants first-hand knowledge of the true quality and value of the Gigi's and Gatti's loans. ¶ 140.  Courts have held that an inference of scienter is strengthened when defendants have represented themselves as closely monitoring the subjects of their false statements. *Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc*., 2012 WL 4049953, at *2-*5 (S.D.N.Y. Sept. 14, 2012) (scienter adequately pled where defendants represented "they closely monitored" the subject of their false statements because they either "failed to perform the monitoring they claimed to have performed or they uncovered [the truth and] knowingly or recklessly misrepresented the circumstances to plaintiffs"); *In re BP p.l.c. Sec. Litig*., 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (defendant's repeated statements "weigh strongly in favor of the inference that" he "paid special attention" to the subject of the fraud "or, at the least, was reckless in not doing so while continuing to publicly tout improvements").

### E.   Allegations Of Motive Are Not Required To Plead Scienter

Defendants argue that the Complaint does not plead any facts showing that Defendants had a motive to commit fraud. Dfs. Br. at 28-29.  Both the Supreme Court and the Second Circuit, however, have made it clear that showing of motive is unnecessary to plead scienter. *See Tellabs*, 551 U.S. at 325; *Ganino*, 228 F.3d at 170 (the Complaint need only plead scienter by alleging either motive and opportunity, *or* conscious or reckless misbehavior).  The Complaint pleads strong circumstantial (and direct) evidence of reckless and/or conscious misbehavior; it is unnecessary to enhance these allegations with evidence of motive.

Defendants' suggestion that because they purchased stock during the Class Period that they are off the hook for misleading investors is ridiculous[22] – it is well established that scienter does not depend on allegations of insider selling, especially where, as here, the Complaint alleges that Defendants knew their statements were false. *See Tellabs*, 551 U.S. at 325 (motive allegations unnecessary); *No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period."); *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *12-*13 (N.D. Ga. Jan. 29, 2009) (scienter pleaded where defendants acquired stock during class period).[23]

**F.    The Complaint Raises A Strong Inference Of Corporate Scienter**

Even if the Court were to conclude that the Complaint failed to allege scienter for any of the Individual Defendants, which in light of the above facts it should not, but Plaintiffs may "raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  In light of the Complaint's allegations regarding the systemic "extend and pretend" scheme perpetrated by Equity Bank (which its officers *admit to*), the Court should find a strong inference of scienter as to Equity Bank irrespective of whether it finds scienter as to any particular Individual Defendant.

---

[22] Defendants attempt to improperly rely on Exhibits M&N, Equity Bank's 2018 and 2019 Schedule 14A, for the truth of the matters contained therein, but the truth of the documents' contents are not properly considered on a motion to dismiss. *Roth*, 489 F.3d at 511.

[23] *See also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Tellabs III*") (explaining that even in the absence of an apparent motive, defendants might still commit securities fraud because prompt disclosure of the truth would cause an immediate drop in the company's stock price, whereas waiting might allow the situation to correct itself or allow other events to overtake the bad news: "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").

## IV.   THE COMPLAINT STATES CONTROL PERSON CLAIMS

In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *In re BioScrip, Inc. Sec. Litig*., 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015).  Here, Plaintiffs have pled a primary violation of Rule 10b–5 and § 10(b) by a controlled person, namely Equity Bank and the Individual Defendants, thus meeting the requirements of the first element of control person liability under § 20(a).

## V.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that Defendants' motion to dismiss be denied in its entirety. Alternatively, if the Court is inclined to grant any part of the motion, Plaintiffs request leave to amend.  Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178 (1962); *see also Luce v. Edelstein*, 802 F.2d 49, 57 (2d Cir. 1986).

Dated: January 21, 2020                     **GLANCY PRONGAY & MURRAY LLP**


By: *s/ Robert V. Prongay*
Lionel Z. Glancy
Robert V. Prongay
Jennifer M. Leinbach
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Lead Plaintiffs Stephen Burr and David Tangeman*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 21, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 21, 2020.

*s/ Robert V. Prongay*
Robert V. Prongay