UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Stephen Burr, *et al.*,

            Plaintiffs,

    –v–

Equity Bancshares, Inc., *et al.*,

            Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/14/2020

19-cv-4346 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

    Between 2015 and 2018, Equity Bancshares, Inc., loaned approximately $29.5 million to two struggling businesses, cupcake franchise Gigi's Cupcakes and pizza and entertainment franchise Mr. Gatti's Pizza. In mid-2018, Equity Bancshares restructured and extended the companies' loans. Gigi's and Gatti's entered Chapter 11 bankruptcy in January 2019, and Equity Bancshares ultimately took a $14.5 million provision for loss against the credit relationship in April of that year. Following the announcement of the loss provision, Equity Bancshares' stock price declined by about 16%.

    Purchasers of Equity Bancshares securities brought this putative class action alleging that the corporation and several of its officers engaged in an "extend-and-pretend" scheme to hide its troubled credit relationship with Gigi's and Gatti's from investors in violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 of its implementing regulations. The defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6). Because the investors have failed to plead a materially false or misleading statement or omission as required to state a claim under § 10(b) and Rule 10b-5, the Court grants the motion to dismiss.

I.      **Background**

The following facts are based on the investors' Amended Class Action Complaint ("FAC"), Dkt. No. 26, taking as true all factual allegations and drawing all reasonable inferences in their favor.

   A.      **Equity Bancshares' Loans**

Between 2015 and 2018, Equity Bancshares loaned a total of about $29.5 million to Gigi's and Gatti's (though Gatti's parent company and Gigi's affiliate Savrano, LLC), with payments of about $6.1 million due in 2018.  FAC ¶¶ 6, 56, 81–83.  Although Savrano had assets valued over $20 million in 2016 and 2017, the company operated at a loss during those years.  FAC Ex. 1; *see* FAC ¶¶ 5, 55–57.  Gigi's was also embroiled in litigation with its franchisees and had been cash-flow negative.  FAC ¶¶ 68–70.  Both companies had struggled to make payments on their loans.  *Id.* ¶¶ 71–78.  Loans to Gatti's were secured by a deed of trust to real property owned by the company in Travis County, Texas.  FAC, Ex. 12.  Equity Bancshares had also loaned about $12 million to Robert Phillips by early 2012, who co-owned and operated Gigi's and Gatti's with Kyle Mann.  FAC ¶ 25, 62, 65.

In 2018, Equity Bancshares' restructured and consolidated its loans to Gigi's and Gatti's.  *See id.* ¶¶ 56, 93–94.  In June, Equity Bancshares made additional term loans to Gigi's for $9.25 million and Gatti's for $20.25 million.  FAC, Ex. 2, Ex. 8.  Phillips and Mann personally guaranteed the full amount of the loan to Gigi's.  FAC, Ex. 4, Ex. 5; *see* FAC ¶ 93.  Philips guaranteed the loan to Gatti's up to $2.025 million, and Mann personally guaranteed the loan to Gatti's up to $8.1 million.  FAC Ex. 9, Ex. 11.  The loan to Gigi's was secured by first security interests in the company's accounts receivable, inventory, furniture, fixtures, equipment, and general intangibles.  FAC Ex. 3.  In October, Equity Bancshares, Gigi's, Gatti's, Mann, and

Phillips executed a cross default/cross collateral agreement.  FAC, Ex. 13.  The agreement provided an additional $1.07 million in working capital for the companies, but also included several mechanisms seemingly designed to increase the likelihood of repayment.  It required Phillips and Mann to provide Equity Bancshares personal financial information.  *Id.*  It also modified the existing loans so that default on any of them would trigger default on all of them, and so that all collateral that securitized one of the loans now served as security for each of them.  *Id.*

Gigi's and Gatti's courted buyers during 2018 and 2019, but several bids fell through, including one bid for Gatti's for $25.5 million.  *See* FAC ¶¶ 109, 113, 154.  Gigi's and Gatti's entered Chapter 11 bankruptcy on January 4, 2019.  Gigi's was ultimately sold for $1.2 million, from which Equity Bancshares was to receive $786,958.  *Id.* ¶ 109.  The Chapter 11 plan for Gatti's and its parent company requires Gatti's to execute a secured promissory note in favor of Equity Bancshares for about $19.5 million, to be guaranteed by Phillips and Mann.  *Id.*  ¶ 110.

Equity Bancshares did not publicly disclose any problems with the loans until a January 24, 2019 earnings call, in which it announced that it had downgraded the loans to "watch" and "substandard."  *Id.* ¶ 157.  On April 22, 2019, the corporation made a provision for loss against the loans of $14.5 million.  *Id.* ¶ 9.  Following the announcement, the corporation's share price declined about 16%.  *Id.* ¶ 10.

The investors characterize the June 2018 loans as part of an "extend-and-pretend" scheme designed to avoid having to make a provision for loss on the existing loans to Gigi's and Gatti's.  *Id.* ¶¶ 88–92.  As a result of that scheme, they allege, Equity Bancshares' reported lower allowances for loan losses than it should have, and so its disclosures to the Securities Exchange Commission and statements to investors were false or misleading.

### B.     Alleged Misrepresentations and Omissions

For ease of analysis, the Court divides the alleged misrepresentations and omissions into three categories: statements related to financial metrics; statements regarding Equity Bancshares' general financial outlook; and the statement during the January 24, 2019 earnings call. With respect to each, the investors allege that the statement was false because Equity Bancshares should have made an allowance for losses on the loans to Gigi's and Gatti's or was rendered misleading by failing to disclose additional details relating to those loans.

#### 1. Statements Related to Financial Metrics

At the core of the investors' claims is their allegation that Equity Bancshares should have made allowances for losses on the loans to Gigi's and Gatti's, and so the income, expenses, and allowance for loan losses reported in its 10-Q, 8-K, and 12b-25 forms were false or misleading. *See id.* ¶¶ 143–144, 148–150, 152–156. In addition to the financial metrics reported in disclosures to the Securities and Exchange Commission, the investors identify a number of statements describing those metrics in earnings calls that the investors allege were false or misleading for the same reason. Those statements are as follows.

- "As we have said on our last call, we believe the current business environment is suitable for reducing nonperforming assets; and as such, Tim Kerr, our special asset manager, has done an excellent job reducing these with his team and on terms within our expectations." *Id.* ¶ 142.
- "Provision for loan losses was $1,170,000 in the quarter, essentially where we planned. Net charge-offs for the quarter were only $352,000, and nothing large was in that number. ALLL as a percentage of total loans was 44 basis points at quarter end and total reserves with purchase accounting discounts was 1.19%." *Id.* ¶ 142 (alteration omitted).
- "[Our] second quarter core earnings, defined as after-tax net income without merger expenses, was another record for our company." *Id.* ¶ 145.
- "Our percentage of nonperforming assets to total assets has improved from 1.52% at 12/31/17 to 1.23% at June 30. Our classified assets have gone from 2.19% to 1.59% during the same time frame, and the percent of regulatory classified assets to capital went from 24.7% in the fourth quarter to 18.3% at June 30. Our net charge-offs are a muted 3

- basis points, and our total reserves for loan losses, including purchase discounts, are 1.11%.  Our ALLL has gone from 40 basis points to 42 basis points even with our acquisitions during the same time frame." *Id.* ¶ 146.
- "Our percentage of nonperforming assets to total assets has improved from 1.52% at 12/31/17 to 1.28% at September 30.  Our ALLL has gone from 40 basis points to 43 basis points, even with our acquisitions during the same time frame.  Our total reserves with purchase accounting discounts stand at 1.12%." *Id.* ¶ 151.

### 2. Statements Regarding Equity Bancshares' General Financial Outlook

The investors also point to statements in earnings calls in which Equity Bancshares made general comments relating to its business practices, current outlook, or anticipated future performance.  Those statements are as follows.

- "[Equity Bancshares] continually monitor[s] our portfolio and markets for macro trends, we continue to see muted credit weakness.  However, and as I have stated before, we are also not loosening our credit criteria." *Id.* ¶ 142.
- "Our credit quality remains strong.  Our net interest margin continues to be solid, and our balance sheet growth continues to be responsible.  This comes as a result of the hard work from the Equity Bank team, both through mergers and through the organic efforts of our outstanding production, operating and support teams day-to-day at our bank." *Id.* ¶ 145.
- "[O]ur portfolio of credit quality has once again improved as we have worked down classified assets, which originated primarily from mergers. . . . Tim Kerr and our special assets teams have done excellent work in staying focused on the quality of our credit and managing special assets." *Id.* ¶ 146.
- Equity Bancshares focuses "on asset quality." *Id.* ¶ 147.
- Equity Bancshares' provision for loan losses "reflect[s] the high credit quality we alluded to earlier." *Id.* ¶ 147.
- Equity Bancshares has "responsible" lending practices. *Id.* ¶ 147.
- "Although we are not tightening credit at this point, we are not loosening either.  We believe this cycle is long in the tooth, and we are still seeing some exuberant behavior from some other lenders in our markets.  And I want our stakeholders to know that is not who we have ever been or who we will become.  I simply expect our lending teams to continue to work hard, be smart, provide excellent service and expertise and grow our portfolio wisely." *Id.* ¶ 147.
- "Our credit quality remains strong, with year-to-date net charge-offs at a very small 3 basis points of loans.  And our balance sheet growth continues to be brisk and responsible. . . . Quality has improved year-to-date as we have worked down nonaccruals." *Id.* ¶151.

### 3. Statement During January 24, 2019 Earnings Call

Finally, the investors take issue with Equity Bancshares' January 24, 2019 earnings call. In that call, Equity Bancshares stated that it had downgraded a credit relationship to "watch" and "substandard" for $19 million and $9 million, respectively. It stated:

> "We do have 1 credit relationship that has been downgraded to watch and substandard for $19 million and $9 million, respectively, at December 31, 2018. These 2 credits are related to the same operator. This relationship is not indicative of a systemic issue in the portfolio, rather one operator who is experiencing difficulty and is working with us to possibly restructure or liquidate his business to resolve his relationship with us. At December 31, 2018, we do not expect a credit impairment based on the collateral and circumstances. Our total reserves to loans are 1.03% at December 31, 2018, of which 45 basis points is traditional ALLL." *Id.* ¶ 157 (alteration omitted).

The investors allege that this statement was false and misleading because it did not disclose that the two loans comprised Equity Bancshares' largest credit relationship and that Gigi's and Gatti's had entered Chapter 11 bankruptcy. *Id.*

## II.     Legal Standard

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Litwin v. Blackstone Grp.*, *L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When determining whether a complaint states a claim, a court ordinary accepts as true all allegations in the complaint and draws all reasonable inferences in favor of the non-moving party. *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337 (2d Cir. 2011). However, the Private Securities Litigation Reform Act "establishes a more stringent rule." *ECA, Local 134*

6

*IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).  "Under the PSLRA, the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(1)).

### III. Discussion

"To maintain a private damages action under § 10(b) and Rule 10b–5, 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  A statement may give rise to liability under §10(b) if it is "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16-cv-3068 (AJN), 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017) (quoting *Litwin*, 634 F.3d at 715–16), *aff'd*, 735 F. App'x 11 (2d Cir. 2018).

#### A. Alleged Misrepresentations and Omissions

The Court analyzes each of the categories of alleged misrepresentations and omissions in turn.  None of them amount to actionable misrepresentations or omissions under § 10(b).

### 1. Statements Related to Financial Metrics

The investors' gripe with Equity Bancshares' statements concerning financial metrics hinges on their allegation that the corporation should have made a provision for loss on the Gigi's and Gatti's loans sooner than it did. Under Second Circuit law, however, a lender's estimation of necessary loan loss reserves is a statement of opinion. Taking the investors' allegations as true and drawing all reasonable inferences in their favor, they have failed to plead that Equity Bancshares' allowances for loan losses were actionable misrepresentations.

The Second Circuit has expressly held that "determining the adequacy of loan loss reserves is not a matter of objective fact. Instead, loan loss reserves reflect management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011). Because this inquiry is "inherently subjective," *id.*, loan loss reserves can amount to misrepresentations under the securities laws only in narrow circumstances: when they are subjectively false or when they omit information that makes the statement misleading to a reasonable investor. *Tongue v. Sanofi*, 816 F.3d 199, 210 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186, 188 (2015)); *see also Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (same standard for materially misleading statements applies to both § 10(b) and § 11). Statements of opinion, like a lender's assessment of the necessary allowance for loan losses, are not misleading merely because the lender fails to disclose "some fact cutting the other way." *Omnicare*, 575 U.S. at 189. Whether a reasonable investor would infer particular facts about a speaker's knowledge or inquiry from a statement of opinion, and thus whether disclosure of contrary facts is required, depends on context. Relevant context includes the "surrounding text, including hedges, disclaimers, and apparently conflicting information" and "the customs and

8

practices of the relevant industry." *Id.* at 189–90.  Under the standard in *Omnicare*, the investors' allegations fall short.

First, the investors fail to plausibly allege subjective falsity.  The investors offer the naked assertion that the June 2018 loans amounted to a repapering of earlier loans as part of an extend-and-pretend scheme.  But the factual allegations in the complaint establish other, at least as likely explanations.  *See Twombly*, 550 U.S. at 566–67 (holding that a plaintiff does not plausibly allege an unlawful motive where the pleaded facts "could equally have been" explained by legitimate business motivations); *see also ECA, Local 134*, 552 F.3d at 198 (under the PSLRA, "the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

Taking as true the investors' factual allegations, as late as the second half of 2018, Gatti's had two bids that might have covered the entire value of Equity Bancshares' loans Gigi's and Gatti's, and both companies were looking for potential buyers.  *See* FAC ¶¶ 109, 113, 122, 154.  The financial statements annexed to the amended complaint also reflect that Gatti's had assets worth around $21.7 million in 2017—assets that were collateralized under the October 2018 cross-default/cross-collateralization agreement.  FAC, Ex. 1, Ex. 13.  The investors' allegations therefore suggest an explanation for the 2018 loans at least as plausible as an extend-and-pretend scheme: that, consistent with the corporation's statements in its January 24, 2019 earnings call, the corporation expected to recoup the value of its loans by the sale or liquidation of Gigi's and Gatti's.  *See* FAC ¶ 157; *see also id.* ¶ 121 ("We were comfortable the new relationship remained adequately secured with personal guarantees, crosscollaterialization with a profitable company and based on the extent of pledged personal assets.").  Moreover, Equity Bancshares extracted

9

meaningful concessions in exchange for the 2018 loans: cross-collateralization and personal guarantees of over $19 million in debt by the borrowers' owners.  *See id.* ¶¶ 64, 93; FAC Ex. 4, 5, 9, 11.

The investors' allegations that Equity Bancshares should have elevated the loans to Gigi's and Gatti's from "6" to "8" in its internal risk assessments also belie the assertion that the corporation knew its loan loss allowances were false.  *See* FAC ¶ 100.  The investors allege that both a "6" and an "8" rating indicated problems with a loan, with internal quarterly write-ups required for a loan rated at "6."  Although the investors allege that an "8" rating meant that the bank "didn't know if the loan would made it or not," they also allege that only a rating of "0" required a write-off.  *Id.*  That is, by the investors' own allegations, no impairment of the Gigi's and Gatti's loans was required through at least September 2018, when their confidential witness left Equity Bancshares.

Second, the Equity Bancshares' loan loss reserves did not imply false facts about its knowledge or inquiry considering the context in which they were offered.  The investors' allegations demonstrate that Equity Bancshares was forthright with investors that its assessment of allowances for loan losses involved a subjective, multi-factor inquiry like that described in *Fait*.  The investors allege that Equity Bancshares' SEC filings describe an open-ended list of factors management considers in assessing the need for a loss accrual.  *Id.* ¶ 37.  Management determines the significance of payment shortfalls "on a case-by case basis" and considers "all of the circumstances surrounding the loan and the borrower."  *Id.*  When it comes to allowances for loan losses, the filings state that management considers its "past loan loss experience, the nature and volume of the portfolio, information about specific borrower situations and estimated

collateral values, economic conditions, and other factors." *Id.* ¶ 38.  Whether any specific loan "should be charged off" is ultimately a matter of "management's judgment."  *Id.*

In context, the "surrounding text, including hedges, disclaimers" and "the customs and practices of the relevant industry" reflect that a reasonable investor would expect that management might determine a loan was not impaired even where a borrower had cash-flow problems if other factors caused management to believe that repayment was likely.  *Omnicare*, 575 U.S. at 189; *see Fait*, 655 F.3d at 113.  Thus, Equity Bancshares' allowances for loan losses did not imply specific facts about Gigi's and Gatti's cash-flow, and disclosure of those facts was not required.  That the allowances for loan losses proved wrong in hindsight does not make them actionable misrepresentations.  *See Omnicare*, 575 U.S. at 188 ("a statement of opinion is not misleading just because external facts show the opinion to be incorrect"); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("We have rejected the legitimacy of 'alleging fraud by hindsight.'"  (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)); *see, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co.*, 655 F. Supp. 2d 262, 268 (S.D.N.Y. 2009).

### 2. Statements Regarding Equity Bancshares' General Financial Outlook

Taking the investor's allegations as true and drawing all reasonable inferences in their favor, the statements regarding Equity Bancshares' general financial outlook are nonactionable puffery.  Statements of puffery or optimism are not actionable under § 10(b) if they are "too general to cause a reasonable investor to rely upon them."  *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)).  "Although there is no definitive test to determine how vague a statement must be to qualify as

puffery, courts have focused on the imprecision of statements and whether such statements relate to future expectations." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018) (collecting cases). Routine statements of a sort that any investment institution would make to tout its business—like that a company would never compromise its "financial integrity," or that it "set the standard for best practices in risk management techniques"—would not reasonably affect investor behavior and so cannot form the basis for a claim under § 10(b). *ECA, Local 134*, 553 F.3d at 206.

Rather than provide specific, falsifiable details about the corporation's financial condition, Equity Bancshares' statements about its general financial outlook largely tout its business philosophy or performance in the most general terms. A statement that a corporation's credit quality is "strong" or that its balance sheet growth is "responsible," FAC ¶ 145, like a statement that a corporation's risk management processes are "highly disciplined," *ECA, Local 134*, 553 F.3d at 205–06, simply does not convey the requisite certainty necessary to give rise to a claim under § 10(b). So too with statements that Equity Bancshares' credit quality had "improved," that its lending teams provided "excellent" service, and that the corporation would grow its portfolio "wisely." FAC ¶¶ 146–47. These platitudes "are 'too general to cause a reasonable investor to rely upon them.'" *Nguyen*, 297 F. Supp. 3d at 489 (quoting *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 77 (S.D.N.Y. 2015)).

To the extent the investors allege that these statements are false or misleading because they imply details about the corporation's allowances for loan losses conveyed in the corporation's financial statements, the Court disagrees because those statements, as discussed in Section III.A.1 above, do not amount to actionable misrepresentations.

### 3. Statement During January 24, 2019 Earnings Call

In its January 24, 2019 earnings call, Equity Bancshares disclosed that it had downgraded a credit relationship to "watch" and "substandard" for $19 million and $9 million, respectively. The investors allege that this statement was false or misleading because it failed to disclose that this credit relationship was the corporation's largest single credit relationship and because it failed to disclose that Gigi's and Gatti's had entered Chapter 11 bankruptcy. FAC ¶ 157.

Failing to disclose that the loans to Gigi's and Gatti's comprised the corporation's largest credit relationship did not render the statement on the January 24 earnings call misleading. Equity Bancshares' disclosed the amount of the loans and that those loans related to a single operator. As the investor's allege, Equity Bancshares included in its 10-K filings the total amount of its classified and unclassified loans. *Id.* ¶ 155. An investor could therefore determine, based on Equity Bancshares' disclosures, how large a share of the corporation's unclassified, classified, or total loans the newly downgraded loans amounted to. The investors do not articulate in their amended complaint or opposition any reason why more information was required. *See ECA, Local 134*, 553 F.3d at 196 (The PSLA requires a plaintiff to plead with particularity "the reason or reasons why the statement is misleading.").

Nor was this statement made false or misleading by the corporation's failure to disclose that Gigi's and Gatti's had entered Chapter 11 bankruptcy. To the contrary, Equity Bancshares expressly stated that the corporation did not anticipate a credit impairment because the borrower was working to restructure or liquidate his business. FAC ¶ 157; *see also id.* ¶¶ 37–38, 155 (not all under-performing loans are impaired, and management may consider the likely proceeds from the sale of collateral). The investors' allegations reflect that the corporation performed an

13

impairment analysis in early 2019 and found no impairment; however, a bidder for Gigi's backed out of the sale. *Id.* ¶ 122.

Although the investors did not make this allegation in their amended complaint, they now contend that the statement in the earnings call was also misleading because it expressed that the corporation did not expect a credit impairment, but the corporation took a $14.5 million loss on the credit relationship just months later. *See id.* ¶ 157; Plf. Opp., Dkt. No. 34, at 27–28. For the reasons discussed in Section III.A.1 above, the statement that management "do[es] not expect a credit impairment based on the collateral and circumstances" is a statement of opinion, and the investors have not plausibly alleged subjective falsity or an obligation to disclose more facts concerning the corporation's knowledge or inquiry. *See Omnicare*, 575 U.S. at 189–90; *see Fait*, 655 F.3d at 113. Like the corporation's earlier estimates of allowances for loan losses, that it proved inaccurate in hindsight does not make it an actionable misrepresentation.

### B. Control Person Liability

The investors also assert a claim for control person liability against the corporate officer defendants under § 20 of the Exchange Act. "In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person." *ECA, Local 134*, 553 F.3d at 207 (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)). Because the investors have not stated a claim for any primary violation, their claim for control person liability fails, too.

### C. Futility of Amendment

The investors have already amended their complaint once, but request permission in their opposition to amend again. Plf. Opp. at 32. They do not suggest what allegations they would add if granted the opportunity to do so. "Leave to amend may properly be denied if the

amendment would be 'futil[e].'" *Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013) (alteration in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The Court finds that further amendment would be futile and so denies leave to amend. The investors' claims cannot succeed because Equity Bancshares' allowances for loan losses were nonactionable statements of opinion. The addition of more allegedly false statements from earnings calls describing those allowances or praising the corporation's performance based on those allowances would not disturb that result. Nor would further allegations related to Gigi's and Gatti's financial troubles call into question the corporation's sincere belief, based on past bids, that it could recoup the value of its loans through the sale of those businesses. To state a § 10(b) claim based on a statement of opinion "is no small task for an investor." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194). The investors cannot surmount that high bar here.

## Conclusion

The investors have failed to plead any material misrepresentations or omissions as required to state a claim under § 10(b) and Rule 10b-5 or to establish control person liability under § 20(a). Because Equity Bancshares' statements during the relevant period were statements of opinion consistent with the belief that the value of its credit relationship with Gigi's and Gatti's could be recouped by sale or liquidation of those businesses, any further amendment to the complaint would be futile. The Court therefore GRANTS the motion to dismiss (Dkt. No. 31) and dismisses all claims with prejudice. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: October 14, 2020
      New York, New York

_____
ALISON J. NATHAN
United States District Judge

16